IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| KELLY RENEE GISSENDANER, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| HOMER BRYSON, Commissioner, ) | |
|     Georgia Department of Corrections; ) | |
| ) | |
| BRUCE CHATMAN, Warden, ) | |
|     Georgia Diagnostic and Classification ) | |
|     Prison; ) | |
| ) | |
| OTHER UNKNOWN EMPLOYEES ) | |
| AND AGENTS, ) | |
| ) | |
|     Georgia Department of Corrections, ) | |
| ) | |
|     Defendants. ) | |
| ) | |
| _____ ) | |

**COMPLAINT AND MEMORANDUM OF LAW**

On Monday, March 2, 2015, Defendants botched the execution of Kelly Renee Gissendaner. All that prevented Ms. Gissendaner's name from becoming synonymous with that of Clayton Lockett – whose torturous death by lethal

injection horrified the nation[1] – is that Defendants, after great indecision, stopped her execution *before* she could be injected with the "cloudy" drugs that Defendants' own pharmacist and doctor had deemed unsafe.  Ms. Gissendaner then endured *thirteen hours* of anxiety and fear as to *when* and *how* Defendants might try to execute her while they fidgeted as to whether they could manage it before her warrant period expired.

Defendants have now postponed Ms. Gissendaner's execution, they say, so that an investigation can take place into what went wrong with their drugs.  But Defendants will not be merely the subject of this investigation; they will also *conduct* it.  And they will hide all critical aspects of their self-assessment from Ms. Gissendaner, the public, and this Court by relying upon Georgia's lethal injection secrecy act.  The act classifies as a "confidential state secret" the identifying information of any "person or entity who participates in or administers the execution of a death sentence . . . . [or] that *manufactures, supplies, compounds, or prescribes the drugs*" used in an execution – or, *i.e.*, the very individuals and entities upon whom any meaningful investigation would center.

A self-investigation with opaque results is unacceptable.  While Defendants' specific failures on March 2 remain murky – and, if Defendants have their way, will remain so – it is clear that their current lethal injection practices are inadequate

---

[1] See discussion *infra* at 20-25.

to prevent violations of Eighth Amendment rights.  Ms. Gissendaner endured hours of unconstitutional torment and uncertainty – to which she had not been sentenced – while Defendants dithered about whether they could execute her.  Defendants have long relied upon a presumption of good faith afforded them by this Court, but they have now proven that this faith is undeserved.  This Court must intervene, lest Defendants be permitted to rubber-stamp their own demonstrably-defective processes and again resume executions behind a veil of secrecy.

Defendants have already violated Ms. Gissendaner's Eighth Amendment rights by subjecting her to prolonged fear and uncertainty as to whether she would be subjected to a torturous death.  She has no remedy for that violation.  Without this Court's intervention, there is a substantial risk Defendants will again violate her rights.  The next time, however, she likely will not survive it.

## JURISDICTION

Jurisdiction of this matter arises under 42 U.S.C. § 1983, 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

## VENUE

Venue is appropriate in the Northern District of Georgia under 28 U.S.C § 1391(b), because at least one of the Defendants resides in this district.

## THE PARTIES

Plaintiff Kelly Renee Gissendaner, a United States citizen and a resident of the State of Georgia, is a death-sentenced prisoner currently being held in the custody of the Georgia Department of Corrections at the Pulaski State Prison in Hawkinsville, Georgia.[2]

Defendant Homer Bryson is the Commissioner of the Georgia Department of Corrections, which is headquartered in Atlanta, Georgia.  As Commissioner, Bryson is responsible for the daily supervision of operations at the Georgia Department of Corrections.  He has a duty to ensure that executions are carried out in compliance with the Eighth and Fourteenth Amendments and departmental procedure.  Defendant Bryson is sued in his official capacity as Commissioner of the Georgia Department of Corrections.

Defendant Bruce Chatman is the warden of the Georgia Diagnostic and Classification Prison in Jackson, Georgia.  As warden, Defendant Chatman is responsible for the day-to-day operations of the prison.  He also has a duty to ensure that executions are carried out in compliance with the Eighth and

---

[2]Ms. Gissendaner had been housed since the spring of 2011 at Lee Arrendale State Prison in Alto, Georgia.  At approximately noon on March 3 – just after Ms. Gissendaner received word that Defendants had postponed her execution – Ms. Gissendaner was moved without notice to her or her counsel to Pulaski.

Fourteenth Amendments and departmental procedure.  Defendant Chatman is sued in his official capacity as warden of the prison. [3]

Other Unknown Employees and Agents of the Georgia Department of Corrections are involved in the development and implementation of the Department's execution procedures, including procedures governing the preparation and administration of drugs designed to execute people.  Ms. Gissendaner does not yet know the identity of those individuals.

All of the Defendants are being sued in their official capacities.  The named Defendants are United States citizens and residents of the State of Georgia.

## PROCEDURAL HISTORY

Ms. Gissendaner was convicted of murder and sentenced to death in the Superior Court of Gwinnett County in 1998.  The Supreme Court of Georgia affirmed Ms. Gissendaner's conviction and sentence, *Gissendaner v. State*, 272 Ga. 704, 532 S.E.2d 677 (Ga. 2000), and the Supreme Court of the United States denied her petition for a writ of certiorari, *Gissendaner v. Georgia*, 531 U.S. 1196

---

[3]Ms. Gissendaner is presently incarcerated at Pulaski, but her execution would take place in the death chamber of the Georgia Diagnostic and Classification Prison, to which she would be transferred in advance of any attempt at her execution. Upon information and belief, the conduct complained of herein centers upon the actions of the Department of Corrections and of those staff members of the Georgia Diagnostic and Classification Prison who will actually attempt to carry out her execution.

(2001). Ms. Gissendaner sought state habeas corpus relief, which was denied. Ms. Gissendaner filed a petition for writ of habeas corpus with this Court, which denied her relief. *Gissendaner v. Seabolt,* No. 1:09-CV-69-TWT, 2012 WL 983930 (N.D. Ga. 2012). The U.S. Court of Appeals for the Eleventh Circuit affirmed the denial of relief on November 19, 2013. *Gissendaner v. Seaboldt*, 735 F.3d 1311 (11th Cir. 2013). The Supreme Court denied Ms. Gissendaner's petition for a writ of certiorari on October 6, 2014. *Gissendaner v. Seaboldt*, 135 S.Ct. 159 (Mem) (U.S. 2014).

Pursuant to an order entered by the Superior Court of Gwinnett County on February 9, 2015, Defendants scheduled Ms. Gissendaner for execution on February 25, 2015. At approximately 6:30 p.m. on February 24, Defendants rescheduled Ms. Gissendaner's execution for March 2. On March 2, Defendants postponed her execution again after determining that their lethal injection drugs were "cloudy" and not appropriate for use.[4] On March 3, Defendants announced

---

[4]Ms. Gissendaner does not believe that exhaustion is necessary under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, because this lawsuit does not challenge prison conditions and because there are no administrative remedies available that could provide redress for the challenged violations of her constitutional rights. Despite the actions of Defendants, Plaintiff has attempted to exhaust any remedies by filing an informal grievance on March 6, 2015, and a supplement to that grievance on March 9 (as Pulaski would not provide her with a form with sufficient space to transcribe the full text of her grievance, or allow her to attach a sheet of paper with the additional text to her form).

that Ms. Gissendaner would not be executed pursuant to the Superior Court's February 9 order.

## FACTUAL ALLEGATIONS

[S]ecrecy [about the time of execution] must be accompanied by an *immense mental anxiety* amounting to *a great increase* of the offender's punishment.

*In re Medley*, 134 U.S. 160, 171, 172 (1890) (emphasis added).[5]

### I.    Ms. Gissendaner's Botched Execution

At approximately 11:30 a.m. on Monday, March 2, 2015, members of Defendants' COBRA Squad[6] removed Plaintiff Kelly Renee Gissendaner from the visitation room of Lee Arrendale Prison in Alto, Georgia.  They searched her, shackled her, and drove her more than a hundred miles to the Georgia Diagnostic and Classification Prison in Jackson, Georgia.  At approximately three in the afternoon, the COBRA squad marched Ms. Gissendaner to the "death cell" of the

---

[5]"[A] man is undone by waiting for capital punishment well before he dies. Two deaths are inflicted upon him, the first being worse than the second." Albert Camus, *Reflections on the Guillotine* (1957).

[6]Created in 2011, the "COBRA squad" is one of two "elite tactical teams" of twelve of the Georgia Department of Corrections' most "highly trained" and "physically fit" staff.  Their duties include "riot and crowd control," hostage rescue, and shakedowns. See Georgia Department of Corrections Fact Sheets: CERT and Tact Units (01/2015), available at:  http://www.dcor.state.ga.us/ Research/Fact_Sheets/Info_Sheets_CERTandTACT.pdf.

prison's execution chamber – leading her directly past the gurney on which she was scheduled to die by lethal injection at seven o'clock that evening.[7]  She would wait there for approximately seven hours in anticipation of the moment that her execution would begin.

At approximately 10:19 p.m., Ms. Gissendaner's lawyers received a telephone call from Sabrina Graham, a Senior Attorney General and counsel for Defendants, who informed them that her execution would not go forward that evening because Defendants' lethal injection drugs were "cloudy."  Declaration of Lindsay N. Bennett (Attached as "Ex. 1") at ¶2.  Defendants' counsel reported that, per Defendants, the drugs had initially appeared "fine," but that when Defendants checked them approximately an hour earlier, they were visibly cloudy.  Defendants said that they would need another day to obtain new drugs and "a day or two" to have them tested.  Defendants, however, did not foreswear proceeding with Ms. Gissendaner's execution sometime within the thirty-six hours remaining in the warrant period.

---

[7]Ms. Gissendaner was first scheduled to make this trip some five days earlier. When the Superior Court of Gwinnett County entered an order on February 9 authorizing her execution, it afforded Defendants a seven-day window in which to carry it out. *See* O.C.G.A. § 17-10-40(b)(execution must take place within seven-day window opening no fewer than ten days and no more than twenty days from entry of execution order).  Defendants had originally scheduled her execution for Wednesday, February 25 – the first day within that window – only to postpone it on February 24, purportedly because of inclement weather.

Ms. Gissendaner's counsel reached her by telephone and told her that she would not be executed that evening because something was wrong with Defendants' lethal injection drugs. Ex. 1 at ¶3. At 10:29 p.m., however, Defendants' counsel called Ms. Gissendaner's counsel for a second time and told them "not to go anywhere," as Defendants had now said that they were no longer certain which drugs they had examined – a "batch" obtained "this week" or one obtained the week before – and were now considering proceeding with Ms. Gissendaner's execution in short order. Ex. 1 at ¶3.

At 10:43 p.m., Defendants' counsel called for the third time to say that Defendants had again decided not to proceed with Ms. Gissendaner's execution that night. Ex. 1 at ¶6. When asked if Defendants were certain, given their previous vacillations, Defendants' counsel repeated that assurance. *Id.* Defendants' counsel then provided further, if somewhat contradictory, details about the night's events, explaining that, per Defendants, the physician attending the execution had seen the drugs at 9:00 p.m. and thought they appeared cloudy. Defendants' counsel understood from Defendants that their doctor had somehow transmitted a picture of the drugs to their pharmacist, who agreed that the drugs were cloudy. Per Defendants, both their doctor and their pharmacist were "concerned" about the cloudiness of the drugs and believed that they were not "appropriate for medical use." *Id.* Defendants' counsel also insisted that

9

Defendants would have no difficulties acquiring new drugs and that there were no problems with their supplier; "this batch [of drugs] just did not come out like it was supposed to."  *Id.* at ¶ 7.

When asked if Defendants planned to proceed with Ms. Gissendaner's execution before her warrant window closed at noon on Wednesday, Defendants' counsel again stated that they might, and that they would meet the following morning to discuss both "what went wrong down there" and how they would proceed.  *Id.* at ¶ 8.  Accordingly, in the early morning hours of March 3, the COBRA squad shackled Ms. Gissendaner and marched her out of her cell for transport back to Arrendale.  She was again led past the gurney on which she had been scheduled to die – with even Defendants evidently unsure whether she would be placed upon it later that day or what they would inject into her body if she were.

Ms. Gissendaner remained in this "immense mental anxiety" for a total of thirteen hours.  At 11:00 a.m. on March 3, Defendants' counsel telephoned Ms. Gissendaner's counsel and informed them that Defendants had decided that her execution would not proceed before her warrant window closed.  *Id.* at ¶ 9. Defendants' counsel also said that Defendants would be conducting an investigation into what had gone wrong with their lethal injection drugs, but provided no details as to its steps, saying only that they might send the cloudy

drugs to be analyzed by *the same pharmacist who had provided them*, or perhaps to "an independent lab."  *Id.*

Ms. Gissendaner learned that her execution would not go forward shortly before noon on Tuesday, March 3.  Defendants subsequently announced that Ms. Gissendaner's execution would be postponed only "while an analysis is conducted of the drugs planned for use in last night's scheduled execution . . . ."[8]  Defendants noted, however, that "[t]he sentencing courts will issue new execution orders when [*Defendants* are] prepared to proceed."  *Id.*

The status quo is: While Defendants' current lethal injection protocol indicates that they use "Pentobarbital" – a drug no longer available from FDA-approved manufacturers for use in executions – they in fact use a substance that *purports* to be Pentobarbital, but that has been mixed from unknown ingredients and in unknown circumstances by an unknown compounding pharmacy – a process which introduces a range of serious risks that Ms. Gissendaner has detailed in her previous action before this Court.[9]  As detailed *infra*, Defendants rely upon

---

[8]http://www.dcor.state.ga.us/NewsRoom/PressReleases/PR_150303.html The press release was issued shortly before 2:00 p.m.  Defendants also announced that they had postponed the execution of Brian Keith Terrell, whose execution was scheduled for 7:00 p.m. on March 10, 2015.

[9]On February 19, 2015, Ms. Gissendaner filed *Gisssendaner v. Bryson, et al.*, 2015-CV-00523, an action pursuant to 42 U.S.C. § 1983 in this Court which, *inter alia*, challenged Defendants' representations as to the safety and efficacy of their lethal injection drugs and the adequacy of the training and qualifications of

Georgia's lethal injection secrecy act to hide every scintilla of information about the origins and true nature of their lethal injection drugs from Ms. Gissendaner, the public, and the courts. They similarly conceal the qualifications and training of their personnel who handle, store, and administer those drugs. The only information Defendants now provide as to how they carry out lethal injections is their elliptical protocol, which predates their professed adoption of compounded drugs and provides no additional safeguards for their use. When challenged as to the safety and efficacy of their drugs and the competence of their personnel, however, Defendants have deprecated those risks and have asked this Court to rely upon their assurances that they will not violate a prisoner's Eighth Amendment rights. *See* discussion *infra* at 33-36. On March 2, by Defendants' own admissions, those assurances were revealed as hollow.

While the events of that night raise many questions, Defendants have decided that they *and they alone* will determine which questions are asked – an approach which guarantees that the most urgent questions will go unanswered. Defendants have stated that they will inquire into the mistakes that brought them so close to injecting Ms. Gissendaner with unsafe drugs. But Defendants have not disclosed – or, apparently, decided – what steps they will take to uncover how this

---

their personnel. Within this complaint, Ms. Gissendaner makes reference to both pleadings submitted during that action and several exhibits admitted during the motions hearing. Those documents are attached as exhibits and denoted as "*Gissendaner I*" when cited.

error occurred.  Pursuant to Georgia's lethal injection secrecy act, moreover, the most critical aspects of this inquiry – namely, the qualifications and training of the people who compounded the drugs and the people who stored and handled them – will be conducted in secret and will not be disclosed to the public, the courts, and, of course, the party most aggrieved:  Ms. Gissendaner.  There is a name for such a proceeding:  a star chamber.

Ms. Gissendaner respectfully submits that Defendants' aborted attempts to carry out her execution, combined with the hours of mortal fear to which they subjected her while wringing their hands as to whether they would proceed with her execution, constituted a "great increase" of her punishment in violation of her Eighth Amendment rights.  *In re Medley*, 134 U.S. at 171.  She has no remedy for that violation.[10]  As it is clear that Defendants' protocol does not operate to prevent another violation of her rights, this Court must afford her the discovery and relief necessary to ensure that the events of March 2 are never repeated.   Ms. Gissendaner accordingly seeks declaratory and injunctive relief.

---

[10]As Ms. Gissendaner has argued in *Gissendaner I*, Defendants' use of their secrecy act in combination with the current and stringent standard for a prisoner to demonstrate that a method of execution violates her Eighth Amendment rights – as promulgated in the plurality decision of the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008) – deprived her of any remedy for a violation.  See *Gissendaner I* Complaint (Attached as "Ex. 2").  This argument has proven prophetic.  See *infra* at 43, n. 50.

**II.    The Cloudiness of Defendants' Drugs Establishes Substantial Risks of Constitutional Dimension**

All that is known about the drugs that Defendants intended to use to execute Ms. Gissendaner on Monday night is that they were "cloudy," and that Defendants' own doctor and pharmacist deemed them "inappropriate" for medical use.  It is unclear why the drugs were cloudy.  Every potential explanation, however, implicates Ms. Gissendaner's Eighth Amendment rights.

Per their prior representations to this Court, Defendants attempted to execute Ms. Gissendaner on March 2 with a one-drug lethal injection protocol that features "Pentobarbital."  *See* Letter from Vallee to Munro of 02/13/2015 (attached as "Ex. 3") at 0014.  As Defendants have not had any FDA-approved Pentobarbital in their possession since March of 2013, they evidently used a substance that purports to be Pentobarbital, but that had been mixed from unknown ingredients and in unknown circumstances by a compounding pharmacy whose identity they conceal from the public and the courts.  *See* Section III, *infra*, at 25-28.

In *Gissendaner I*, Ms. Gissendaner presented the declaration of Dr. Larry Sasich, a pharmacist and consultant specializing in drug safety and efficacy, who attested to the "foreseeable risks that the compounded drugs used in lethal injections in Georgia would be sub-standard in a manner that would cause severe pain upon or shortly after injection."   Declaration of Dr. Larry Sasich of 03/05/2015 ("Sasich Decl.") (attached as "Ex. 4") at 1 (attaching and discussing

14

declaration tendered for *Gissendaner I* as "Ex. 4A").[11]  Those risks include "that the compounded drug will be sub-potent, expired, contaminated, contain unintended additives, or will contain a substantial level of particulates."  Ex. 4 at 1. Dr. Sasich also detailed the deficiencies of Defendants' protocol in assuring that their drugs are stored and handled in keeping with professional standards, which risked the drugs expiring before they were used. *See* discussion *infra* at 18-20.

One or more of these predictions evidently came to pass on March 2.  As Dr. Sasich details, "[w]henever a solution that is supposed to be clear turns cloudy, it indicates one of a number of serious problems that make the drug *unusable and*

---

[11]As noted in *Gissendaner I*, the simple truth about any drug is that unless you know how it was made – where, and from what, and by whom – you cannot know what it is. While a drug approved by the Food and Drug Administration provides those assurances, the same cannot be said for Defendants' lethal injection drugs, as the compounding pharmacy industry operates in a "grey market" that is not subject to the FDA's drug-approval process or manufacturing standards.  Ex. 4A at 4.  To receive FDA approval, injectable drugs must be sterile and meet other stringent requirements for quality, purity, and stability.  *Id.* at 5. Because compounding pharmacies are not subject to FDA's drug approval process, rigorous checks, and regulatory procedures, even a compounding pharmacy operating in good faith can make critical mistakes that it lacks the capacity to detect until the damage has been done.   For example, compounding pharmacies generally are unable to test chemicals to confirm their identity, potency, and purity, and to detect contamination.  *Id.* at 4-5.  Accordingly, while a pharmacist might accurately measure or weigh individual ingredients, he or she would have no way of discovering in a pharmacy setting if the ingredients themselves were adulterated or counterfeit.  *Id.* at 5.  A pharmacist unable to confirm the identity of a chemical would miss contaminants – a risk present at any stage of the chemical's manufacture – that would cause pain immediately upon intravenous administration. *Id.*

*dangerous. Those include all of the risks that I detailed in my previous declaration.*" Ex. 4 at 2.  (emphasis added).  Further, "[t]he fact that Georgia's lethal injection drugs were cloudy indicates that serious mistakes occurred somewhere along the line in how the drugs were made, stored, and/or handled. Those mistakes were either in the material obtained, training, or personnel, *or all three.*" *Id.* at 4 (emphasis added).

### A.        Explanation #1: Defendants' Compounder Lacks the Material or Expertise to Properly Manufacture Their Drugs.

As Dr. Sasich noted in his first declaration for Ms. Gissendaner, "[t]he acidity/alkalinity (pH) of any injectable drug must be carefully adjusted to ensure that the recipient of the drug does not suffer *an immediate painful sensation* at the time of injection of the drug." Ex. 4 at 2 (emphasis added) (quoting earlier declaration).  "Both *a compromised API* and *improper compounding procedures* can cause the pH of an injectable drug to be off-balance." *Id.* (emphasis added). This provides one explanation for "[t]he cloudiness of Georgia's compounded drugs," which "could indicate an out-of-balance pH that caused the API of the drug to precipitate, or fall out of solution in the form of particles." *Id.*  A drug so compromised would pose "a number of substantial risks," including that "particulate matter contaminating sterile injectable drugs can become lodged in small blood vessels . . . [or] in a prisoner's lungs," which "would be extremely painful." *Id.* (internal quotations omitted).  An out-of-balance pH "could also

reduce the potency of the drugs so that they would not kill the prisoner, or would kill them much more slowly" than intended.  *Id.*

Another potential cause of the cloudiness is that Defendants' lethal injection drugs were compounded from a non-sterile API, or by a facility or individual that lacked the expertise to maintain the "steril[ity] . . . quality, purity, and stability" of the drug.  Such inadequate materials or training could result in a drug "contaminated with fungi, bacteria, and other contaminates"; if so, the drug could have turned cloudy because "a plume of bacteria was growing in the syringe." *Id.* Such contaminates could include "[e]ndotoxins . . . [which] would elicit an inflammatory reaction and can result in shock."  *Id.*  Other potential contaminates include "cross-contaminates," in which the compounders lack the expertise or equipment necessary to properly segregate the air supply of the room in which the drug is being mixed, which leads to it being "contaminated with a different drug to which the prisoner might be highly allergic . . . . In the event of a severe allergic reaction, the throat can swell making breathing extremely difficult or impossible." *Id.*

Had Ms. Gissendaner been injected with a compounded drug that was clouded with "particulate matter (from precipitated API or contaminates), she would have suffered terrible pain."  *Id.*  Further, "[i]f the pH of the drug was off-balance in a way that made it even more caustic than it is when properly

17

manufactured, the liquid part of the drug would have caused [Ms. Gissendaner] *intense, burning pain* upon injection." *Ibid* (emphasis added).

**B.      Explanation #2: Defendants' Lack the Equipment or Training to Properly Store and Handle the Drug**

Further, as Dr. Sasich noted, "[t]he cloudiness of Georgia's lethal injection drugs could [also] be due to expiration or contamination from . . . [their] improper storage and handling" by Defendants. *Id.* at 4.  As Dr. Sasich noted in his original declaration, "it does not appear that Georgia is properly storing its compounded drugs, which would cause them to expire prior to their use." *Id.* at 3.  The standards promulgated by Chapter <797> of the United States Pharmacopoeia ("USP") state that sterile products manufactured from non-sterile ingredients – such as pharmacy-compounded pentobarbital – are "high-risk" and must be stored and transported within specific temperature requirements[12] -- which, if not adhered to, "increases the risk of microbial growth, chemical degradation, contamination from physical damage to packaging, and permeability of plastic packaging." *Id.* at 3-4.  These requirements must be observed by the personnel charged with producing the drug and its "storage during transport . . . and storage at the facility at which the pentobarbital sodium will be administered." *Id.* at 4.

_____

[12]These requirements allow for storage for not more than twenty-four hours at "controlled room temperature" (defined as 68º F to 77º F); for not more than three days at a "cold temperature" (defined as a temperature "not exceeding 46º F"); and for not more than forty-five days in "a solid frozen state at temperatures between . . . 13º F and 14º F." *Id.*, citing USP <797>.

There is nothing in Defendants' lethal injection procedures to indicate that they are storing these compounded chemicals properly. Further, as Dr. Sasich notes, the procedures also direct members of the execution team "to do things that make no sense," such as drawing the compounded drugs into syringes once they have been brought into the execution chamber, even though the drugs *are already in syringes*. *Id.* As Dr. Sasich notes, "draw[ing] sterile products from one syringe to another . . . . increases the risk of contamination" and, accordingly, an unconstitutional execution. *Id.*

As Ms. Gissendaner has previously noted, other states using compounded drugs have seen botched executions that illustrate what might have occurred had Ms. Gissendaner's execution proceeded. When Oklahoma executed Michael Lee Wilson with compounded pentobarbital in January 2014, he cried out, "I feel my whole body burning!" Charlotte Alter, *Oklahoma Convict Who Felt "Body Burning" Executed With Controversial Drug*, TIME MAGAZINE (January 10, 2014).[13] Mr. Wilson's reaction is consistent with exposure to contaminants introduced by the unsafe compounding of Pentobarbital. Ex. 4 at 3 ("the injection used in Mr. Wilson's execution likely contained cross-contaminates that he was allergic to, bacteria and endotoxins . . . . [and] could have had an altered pH due to

---

[13]Available at: http://nation.time.com/2014/01/10/oklahoma-convict-who-felt-body-burning-executed-with-controversial-drug/ (last visited March 8, 2015).

contaminates or inadequate procedures used in the preparation of the drug.") Similarly, Jose Luis Villegas complained of a burning sensation when Texas executed him with compounded pentobarbital in April of 2014.[14] Further, when Eric Robert was executed with compounded pentobarbital in South Dakota in October 2013, he gasped and snorted heavily, turned a blue-purplish hue, and took more than twenty minutes to die.[15] These events were "consistent with the administration of a compounded drug that was contaminated or sub-potent." *Id.* at 3.

### C. Defendants Also Conceal the Qualifications of Their Personnel, Which Presents an Additional, Substantial Risk of Harm

On April 29, 2014, the State of Oklahoma attempted to execute Clayton Lockett by lethal injection. Instead, his execution was halted when he "began to writhe and gasp after he had already been declared unconscious and called out 'oh,

---

[14]Vivian Kuo and Ralph Ellis, *U.S. Supreme Court grants stay of 'excruciating execution*, CNN (May 21, 2014)(discussing Villegas execution), available at http://www.cnn.com/2014/05/20/justice/missouri-videotaped-execution-russell-bucklew-duplicate-2/index.html (last visited March 8, 2015).

[15]Jill Johnson, *Witnesses Describe Events Inside Chamber*, KBLT NEWS, available at: http://www.kdlt.com/index.php?option=com_content&task=view&id=21169&Itemid=72 (Last visited Oct. 15, 2014)*; see also* Steve Young, *Execution: South Dakota Delivers Eric Robert His Death Wish*, ARGUSLEADER.COM (Oct. 16, 2012), available at: http://www.argusleader.com/article/20121016/NEWS/310160016/Execution-South-Dakota-delivers-Eric-Robert-his-death-wish (last visited March 8, 2015).

man,' according to witnesses."  Erik Eckholm, *One Execution Botched, Oklahoma Delays the Next*, N.Y. TIMES (April 30, 2014)[16]; *see also* Ziva Branstetter, *Eyewitness account: A minute-by-minute look at what happened during Clayton Lockett's execution*, TULSA WORLD, May 1, 2014.[17]  Mr. Lockett convulsed in agony for thirty minutes before dying of a heart attack in the execution chamber. *Id.*

It is beyond dispute that Mr. Lockett's execution violated his Eighth Amendment rights.  Erik Eckholm & Motoko Rich, *Oklahoma Faces Sharp Scrutiny Over Botched Execution*, N.Y. TIMES, (April 30, 2014).[18]  Oklahoma has subsequently disclosed that it took fifty-one minutes to obtain intravenous access, with the execution team ultimately inserting a line into his groin – "a more difficult procedure because the intended vein is not visible."  *Id.*   The paramedic and

---

[16]Available at: http://www.nytimes.com/2014/04/30/us/oklahoma-executions.html (last visited March 8, 2015); *see also* Erik Eckholm and John Schwartz, *Timeline Describes Frantic Scene at Oklahoma Execution*, N.Y. TIMES (May 1, 2014), (last visited March 8, 2015).

[17]Available at: http://www.tulsaworld.com/news/state/eyewitness-account-a-minute-by-minute-look-at-what-happened/article_f7764efc-d036-11e3-af7e-0017a43b2370.html (last visited March 8, 2015).

[18]Available at: http://www.nytimes.com/2014/05/01/us/oklahoma-faces-sharp-scrutiny-over-botched-execution.html?hp. The White House joined those condemning the execution, stating that the Lockett execution fell short of the country's standard that "even when the death penalty is justified, it must be carried out humanely," and pledged to examine executions by lethal injections.

physician charged with obtaining intravenous access punctured multiple parts of Mr. Lockett's body at least twelve times, before essentially jury-rigging a solution by inserting a too-short catheter in Mr. Lockett's right femoral vein and attempting to secure it with tape. Carol Cole-Frowe, *Doctors Say Flaws Led to Suffering in Oklahoma Execution*, N.Y. TIMES, Dec. 17, 2014.[19] *See also* Cary Aspinwall and Ziva Branstetter, *Secrets still shroud Clayton Lockett's execution, Failed IV line was started by a medical professional whose credentials are a secret under state law*, TULSA WORLD (May 12, 2014).[20] As an anesthesiologist testified during a hearing on Mr. Lockett's execution, he was most likely "conscious, in intense pain, and feeling the equivalent of liquid fire from the inappropriate use of drugs used to kill him . . . ." *Id.*

Oklahoma's botched execution of Mr. Lockett should serve as a sobering reminder of what Defendants risk by delegating their constitutional responsibilities to individuals or entities that, as established by the events of March 2, lack the equipment, training, or expertise – or all of the above – to safely carry out an execution. Ms. Gissendaner's experience demonstrates clear shortfalls in either the

---

[19] Available at http://www.nytimes.com/2014/12/18/us/doctors-say-flaws-led-to-suffering-in-oklahoma-execution.html?_r=0 (last visited March 8, 2015).

[20] Available at: http://m.tulsaworld.com/news/state/secrets-still-shroud-clayton-lockett-s-execution/article_5513ea6b-1f24-519e-9340-66c42b109502.html?mode=jqm) (last visited March 8, 2015).

manufacturing or storage and handling of Defendants' lethal injection drugs -- or, again, in all of the above.  But these are not the only aspects of Defendants' lethal injection procedures that pose a risk of significant harm to Ms. Gissendaner, or that Defendants shield from scrutiny. Defendants also refuse to disclose the qualifications and training of the personnel who will prepare Ms. Gissendaner for her execution. As detailed in *Gissendaner I*, if a member of Defendants' execution team were to inadvertently inject pentobarbital "directly into [Ms. Gissendaner's] tissue (through, for example, improper placement of the intravenous line) that tissue will be seriously and irretrievably damaged." Declaration of Dr. Joel Zivot (attached as "Ex. 5") at ¶ 17.[21]  This is due to the fact that Pentobarbital -- when manufactured in accordance with FDA regulations[22] -- has a pH of 9.5, is extremely caustic, and "will burn when injected." Ex. 5 at ¶¶ 15, 17.[23]  Further,

---

[21]In *Gissendaner I*, Ms. Gissendaner tendered the declaration of Dr. Joel Zivot, a board-certified anesthesiologist, professor at the Emory University School of Medicine, the Medical Director of the Cardiothoracic Intensive Care Unit at Emory University Hospital, and the fellowship director for training in Critical Care Medicine." Ex. 5 at ¶1; see also Ex. 5A (Dr. Zivot's *curriculum vitae*).

[22]Given that one explanation for the cloudiness of Defendants' drugs is an out-of-balance pH, it is horrifying to imagine what could have happened on March 2 if Defendants' personnel has improperly injected their improperly manufactured or handled drugs – which would have amplified the "tissue destruction . . . and intense pain" of Ms. Gissendaner.

[23]Florida's botched execution of Angel Diaz in 2006 further illustrates these consequences. In Mr. Diaz's case, the misplaced line allowed the caustic lethal injection drugs to leak into the soft tissue of his arms. The drugs accordingly failed

particular expertise would be required to manage intravenous access in the context of an execution, as "[m]any people with expertise in a health-care setting would lack the expertise necessary to overcome the challenges posed by the setting and circumstances of lethal injection." Ex. 5 at ¶ 6. [24] Defendants should no longer be

---

to render him unconscious while causing chemical burns so severe that a great deal of the skin on his arms sloughed away, mutilating him. Mr. Diaz likely suffocated to death before the execution drugs could end his life. Ben Crair, *Photos from a Botched Lethal Injection*, THE NEW REPUBLIC (May 29, 2014). Available at: http://www.newrepublic.com/article/117898/lethal-injection-photos-angel-diazs-botched-execution-florida (last visited March 8, 2015). Ms. Gissendaner cautions the Court that the photos of the damage done to Mr. Diaz by the improperly-injected drugs are quite graphic.

[24]Some of those challenges include finding a vein in a prisoner who has already been restrained, which would affect the "viability of the vein selected." *Id.*at ¶ 7. Not only are "repeated attempts [at intravenous access] . . . increasingly unlikely to succeed," but "[t]he placing of intravenous catheters is painful, and that pain only increases with multiple, prolonged attempts." *Id.* at ¶ 8. Dr. Zivot also noted that the standard of care for placing a central line "requires the use of ultrasound to locate a central vein" -- a skill that "[m]any physicians lack," that Defendants' protocol does not ensure, and that Defendants, citing their secrecy act, will not reveal. *Id.* at ¶ 9. Dr. Zivot also noted that Ms. Gissendaner's gender and health present particular concerns for intravenous access, as the "venous systems [of women] tend to be smaller than those of men," while her obesity makes "[i]ntravenous access . . . very difficult to obtain" and places her at risk for obstructive sleep apnea, which, in Ohio's botched execution of Dennis McGuire, contributed to his choking and gasping during his prolonged and painful execution. *Id.* at ¶¶ 11, 12.

permitted to conceal this aspect of how they propose to put Ms. Gissendaner to death.[25]

## III. Defendants' Cloudy Drugs Are the Culmination of Their History of Ineptitude and Indifference in Administering Lethal Injections

While the events of March 2 alone demonstrate that Defendants are not safeguarding Ms. Gissendaner's Eighth Amendment rights, they are hardly Defendants' first transgression in their administration of executions.   Defendants have previously run afoul of the Drug Enforcement Administration by illegally importing sodium thiopental.[26] Unfortunately, this thiopental of questionable

---

[25]Another case that illustrates the consequences of unqualified execution team personnel is that of Romell Broom, whom Ohio attempted to execute in 2009. After Mr. Broom was brought to the execution chamber, the personnel on Ohio's execution team – none of whom were qualified to insert an intravenous line – stabbed him with needles for an hour in an attempt to find a vein. The team ultimately brought in a prison doctor to assist, but after another ninety minutes of futile attempts and a total of eighteen needle sticks – which left Mr. Broom in agony – the governor halted his execution. In the six years since, Ohio has been unable to schedule Mr. Broom's execution because of litigation over whether a state can try again to execute a prisoner who survives the first attempt, and whether the initial, failed attempt constitutes cruel and unusual punishment. Stephanie Mencimer, *Is it legal to try executing someone twice?*, MOTHER JONES (June 6, 2014), Available at: http://www.motherjones.com/politics/2014/06/romell-broom-ohio-execution (last visited March 8, 2015).

[26]When the FDA placed an administrative hold upon a shipment of imported sodium thiopental that Georgia and several other states had ordered through a U.S. pharmacy, Defendants opted to circumvent federal law governing the importation of controlled substances by directly purchasing a supply of mislabeled sodium thiopental for use in lethal injections from Dream Pharma, Inc., a fly-by-night pharmaceutical wholesaler/distributor which operated out of a storefront driving school in London, England.  Defendants chose this course despite the fact that they

provenance had already been used in the executions of Brandon Rhode and Emanuel Hammond, both of whom appeared to remain conscious throughout their executions.[27]  Defendants changed their protocol to feature Pentobarbital despite the fact that its sole FDA-approved manufacturer warned them that the drug was not safe for use in judicial lethal injections – and an execution spectacle followed.[28]  Defendants once changed their protocol on the very eve of an

---

were not registered with the Drug Enforcement Agency (DEA) as an importer of non-narcotic controlled substances and did not provide a declaration of importation to the DEA.  On March 16, 2011, after the Attorney General of the United States was notified of Georgia's illegal importation, the DEA seized Georgia's entire supply of thiopental.  Bill Rankin et al., *DEA seizes Georgia's supply of lethal injection drug*, ATLANTA JOURNAL-CONSTITUTION (March 16, 2011)(available at: http://www.ajc.com/news/news/local/dea-seizes-georgias-supply-of-lethal-injection-dru/nQrdf/ (last visited March 8, 2015).

[27]On September 27, 2010, Georgia used its illegally-imported thiopental in its execution of Brandon Rhode.  Mr. Rhode's eyes remained open throughout his execution, which strongly suggested that he was conscious after the administration of thiopental.  On January 25, 2011, Georgia executed Emanuel Hammond with the same batch of thiopental; Mr. Hammond opened his eyes and grimaced after the injection of the thiopental, suggesting that he was inadequately sedated. Liliana Segura, *the Executioner's Dilemma*, THE NATION (May 12, 2011), available at: http://www.thenation. com/article/160648/executioners-dilemma# (last visited March 8, 2015).

[28]Sten Stovall, *Lundbeck "Horrified" at Drug Execution Use*, WALL STREET JOURNAL (June 8, 2011), Available at:  http://online.wsj.com/article/ SB10001424052702304259304576373020954841208.html (last visited March 8, 2015).   Defendants ignored the drug manufacturer's caution and, on June 23, 2011, executed Roy Blankenship pursuant to their new protocol. An AP reporter who witnessed the execution offered the following account of Mr. Blankenship's reaction:

execution because their drugs had expired some two weeks earlier.[29] Defendants also scheduled two executions within a single week because of their mistaken belief that their drugs were about to expire.[30]  Further, as detailed in *Gissendaner I*,

------

> As the injection began, [Blankenship] jerked his head toward his left arm and made a startled face while blinking rapidly.  He soon lurched to his right arm, lunging with his mouth agape twice.  He then held his head up, and his chin smacked as he mouthed words that were inaudible to observers . . . . His eyes never closed.

Greg Bluestein, *Ga. Executes inmate convicted of Savannah slaying*, THE ATLANTA JOURNAL-CONSTITUTION (June 23, 2011); *see also* Eddie Ledbetter, *Making a date with death*, STATESBORO HERALD (June 25, 2011)("Blankenship was apparently much more aware of his surroundings at a time when he shouldn't have been").

[29]Defendants hastily adopted a new, one-drug lethal injection protocol at approximately noon on July 17, 2012 – the day before the scheduled execution of Warren Hill.  Rhonda Cook and Bill Rankin, *State changes lethal injection protocol, reschedules execution*, ATLANTA JOURNAL-CONSTITUTION (July 17, 2012), Available at: http://www.ajc.com/news/news/local/state-changes-lethal-injection-protocol-reschedule/nQXJc/ (last visited March 8, 2015).    While Defendants offered no explanation for this eleventh-hour change, later reports revealed that Georgia's supply of pancuronium bromide – the second drug administered pursuant to its now-abandoned three-drug protocol – had expired on July 1, 2012, some two weeks before Mr. Hill's scheduled execution.  Rhonda Cook, *Expired drugs led to cancellation of execution by lethal injection*, ATLANTA JOURNAL-CONSTITUTION (Aug. 2, 2012), available at:  http://www.ajc.com/news /news/local/expired-drugs-led-to-cancellation-of-execution-by-/nQXhn/ (last visited March 8, 2015).

[30]**Error! Main Document Only.**Following litigation over whether state law prohibited Georgia from changing its protocol without complying with the notice-and-comment procedures of its Administrative Procedures Act, Defendants promptly scheduled two executions: Warren Hill for February 19, 2013, and Andrew Cook on February 21, 2013.  Defendants' decision to schedule Mr. Hill and Mr. Cook's executions within days of each other was based upon their mistaken belief that their supply of pentobarbital expired on March 1, 2013; it

it appears that Defendants have illegally obtained the "Pentobarbital" that they have used or intended to use in the seven executions they have scheduled since July of 2013 by paying an unidentified doctor $5,000 to write a fraudulent prescription "for" the condemned prisoner authorizing the compounding of the drugs for their execution. Ex. 1 at 42-60.[31]

---

actually expired on March 31.  Ed Pilkington, *Georgia rushes through executions before lethal injection drugs expire*, THE GUARDIAN (February 21, 2013)("Georgia confirmed to the Guardian that its entire supply of pentobarbital expires on 1 March")(available at:     http://www.guardian.co.uk/world/2013/feb/21/georgia-executions-lethal-injection-
drug-pentobarbital (Last visited March 7, 2015). While Mr. Hill's execution was stayed, Mr. Cook was executed pursuant to the novel protocol.

[31]Ms. Gissendaner bases this conclusion upon Defendants' ORA responses in July 10, 2013, which reveal the agreements Defendants entered into with an unknown compounding pharmacy and doctor in order to procure Pentobarbital for the execution of Mr. Hill, which was then scheduled for July 15, 2013.  See Letter from Wilson to Painter of 07/10/2013 (attached as "Ex. 6") at 000005-000039. The federal Controlled Substances Act ("CSA") permits the compounding of "Schedule II" controlled substances such as pentobarbital within a narrow set of exceptions only if "the drug product is compounded for an *identified individual patient* based on the . . . receipt of a *valid prescription order* or a notation, approved by the prescribing practitioner, on the prescription order that a compounded product is *necessary* for the identified patient . . . .").  21 U.S.C. § § 353a(a) (emphases added), 812(b)(2). The CSA further defines a "valid prescription" as one "issued for a *legitimate medical purpose*."  21 U. S. C. §830(b)(3)(A)(ii)(emphasis added); *see also* 21 U. S. C. §829(c); 21 CFR §1306.04(a) (2005) ("[a] prescription for a controlled substance to be effective must be *issued for a legitimate medical purpose* by an individual practitioner *acting in the usual course of his professional practice*" (emphases added)); O.C.G.A. § 16-13-41(f) "[n]o person shall prescribe or order the dispensing of a controlled substance, except a registered practitioner who is . . . [a]cting *in the usual course of his professional practice*; *and* . . .[p]rescribing or ordering such controlled substances *for a legitimate medical purpose*." (emphases added). In

Defendants have been held responsible for none of these transgressions. Their most critical tool in escaping accountability has been Georgia's lethal injection secrecy act.  In July of 2013, O.C.G.A. § 42-5-36 – a provision that previously governed "[c]onfidential information *supplied by inmates*" – was amended to classify all "identifying information" about a "person or entity who participates in or administers the execution of a death sentence . . . [or] that *manufactures, supplies, compounds, or prescribes the drugs*, medical supplies, or medical equipment" used in an execution as a "confidential state secret" not subject to disclosure through Georgia's Open Records Act or "*judicial process*." O.C.G.A. § 42-5-36 (d)(emphases added).  "Identifying information" also includes "professional qualifications."  *Id.*  As contemporaneous accounts noted, the legislation had two purposes:

> The legislation should make it easier for Georgia to obtain lethal-injection drugs as companies worldwide, in the face of strong criticism from opponents of capital punishment, have either stopped making lethal injection drugs or forbidden such drugs from being used for executions . . . . [and] *is also expected to make it more difficult for lawyers representing death-row inmates to challenge the state's lethal-injection process.*

---

their correspondence with their hired doctor and pharmacist, moreover, Defendants repeatedly assured them that the lethal injection secrecy act would ensure that their identifying information would remain "a confidential state secret."  Ex. 6 at 000022, 000015-18.

Rhonda Cook and Bill Rankin, *Lethal injection secrecy bill wins approval*, ATLANTA JOURNAL-CONSTITUTION (March 26, 2013) (emphasis added).[32]

These reports suggest that Georgia first erected its lethal-injection-secrecy legislation in order to shield Defendants and the compounding pharmacies with whom they might work from the "*legal* and public relations problems with a local pharmacist making up a batch of lethal injection drug on a case-by-case basis." Rhonda Cook, *Compounding pharmacies may be source of lethal injection drugs*, ATLANTA JOURNAL-CONSTITUTION (April 27, 2013) (emphasis added).[33]  Further, Defendants' expanding interpretation of the scope of the secrecy act confirms that their primary motivation is to avoid scrutiny of their practices by the courts.

As noted *supra* at 27-28, Defendants initially responded to requests made pursuant to Georgia's Open Records Act ("ORA") with redacted documents concerning the sources and means of acquisition of their lethal injection drugs. Those redactions concealed the names of Defendants' doctor and pharmacist – purportedly Defendants' only concern.  When Defendants realized that those documents could establish that they had obtained their drugs illegally, however,

---

[32]Available at:  http://www.ajc.com/news/news/state-regional-govt-politics/lethal-injection-secrecy-bill-wins-approval/nW4tK/ (last visited March 8, 2015).

[33]Available at: http://www.myajc.com/news/news/state-regional/compounding-pharmacies-may-be-source-of-lethal-inj/nXXxT/ (last visited March 8, 2015).

they began to respond to such requests by asserting that the secrecy act obliges

them to withhold the *entirety* of any document or record that contains identifying

information classified by that statute.[34]   Accordingly, since that single crack in

their wall of silence, Defendants have scheduled seven executions[35] and carried out

four:  Marcus Wellons on June 17, 2014[36]; Robert Wayne Holsey, on December 8,

---

[34]See Letter from Wilson to Munro of 06/06/2014 (attached as "Ex. 7")
Defendants' increasingly secretive approach to these documents is contrary to both
the spirit and letter of Georgia law.  The Georgia Code states that the exception of
certain records from the Open Records Act "shall be interpreted narrowly so as to
exclude from disclosure only *that portion of a public record to which an exclusion
is directly applicable*."  §O.C.G.A 50-18-72(b)(emphasis added).  It further states
that "[i]t shall be the duty of the agency having custody of a record to provide all
other portions of a record for public inspection or copying."  *Ibid* (emphasis
added).  In interpreting this provision, the Supreme Court of Georgia has
accordingly held "that any purported statutory exemption from disclosure under
the Open Records Act must be *narrowly construed*."  *Hardaway v. Rives*, 262 Ga.
631, 422 S.E.2d 854 (Ga. 1992)(internal quotations omitted)(emphasis added).

[35]Defendants scheduled Tommy Waldrip's execution by lethal injection for
7:00 p.m. on Tuesday, July 10, 2014, but he received clemency prior to his
execution.  Rhonda Cook, *Waldrip's death sentence commuted to life without
parole*, ATLANTA JOURNAL-CONSTITUTION (July 9, 2014), available at:
http://www.myajc.com/news/news/breaking-waldrips-death-sentence-commuted-
to-life-/ngcRm/ (last visited March 8, 2015).  Ms. Gissendaner and Mr. Terrell's
executions were postponed because of Defendants' cloudy drugs.

[36]Rhonda Cook and Bill Rankin, *Marcus Wellons executed*, ATLANTA
JOURNAL-CONSTITUTION (June 18, 2014), available at: http://www.ajc.com/news/
news/breaking-news/wellons-files-federal-appeal-to-delay-execution-fo/ngMpK/
(last visited March 8, 2015).

2014[37]; Andrew Howard Brannan, on January 13, 2015[38]; and Warren Hill, on

January 27, 2015.[39] They refuse, however, to disclose *any* documents – even

redacted ones – concerning the origins or nature of their lethal injection drugs and

the mechanisms by which they obtain them, and the qualifications of their

personnel.  *See, e.g.,* Letter from Wright to Munro of 01/21/2015 (attached as "Ex.

8") at 1-3.[40]

---

[37]Erik Eckholm, *After Delay, Inmate Is Executed in Georgia*, N.Y. TIMES
(Dec. 9, 2014), available at: http://www.nytimes.com/2014/12/10/us/georgia-
supreme-court-refuses-to-delay-execution.html (last visited March 8, 2015).

[38]Amanda Sakuma, *Vietnam vet with PTSD Andrew Brannan first man
executed in 2015*, MSNBC.COM (Jan. 13, 2015), available at:
http://www.msnbc.com/msnbc/vietnam-vet-ptsd-set-be-first-man-executed-2015
(last visited March 8, 2015).

[39]Alan Blinder, *Georgia Executes Warren Lee Hill for Murder*, N.Y. TIMES
(Jan. 27, 2015), available at: http://www.nytimes.com/2015/01/28/us/georgia-
executes-warren-lee-hill-for-murder.html (last visited March 8, 2015).

[40]Indeed, Defendants recently moved yet another category of document into
the classified column, asserting that the secrecy act forbids the disclosure of their
inventory logs for their lethal injection drugs -- no doubt because those logs
contain information critical to any protocol challenge, including the drugs'
concentration and expiration date.  Ex. 8 at 1-2.   Defendants take this position
despite having disclosed copies of these logs without objection as recently as
*December 12, 2014.*  See Letter from Wright to Munro of 12/12/2014 (attached as
"Ex. 9").  Given the fact that the drugs Defendants originally obtained for Ms.
Gissendaner's execution had to be replaced after a five-day postponement, it would
certainly be interesting to see this information as to those drugs and their
replacements.

**IV.    Defendants' Unsubstantiated and Inaccurate Representations to this Court**

When challenged as to the constitutionality of their lethal injection procedures, Defendants have relied upon – indeed, have *exploited* – the good faith of this Court so that they can continue executions without meaningful scrutiny.  In *Gissendaner I*, for example, Defendants attempted to assuage any concerns that this Court might have about the safety and efficacy of their secret drugs by insisting that the FDA-approved pentobarbital that they formerly used and the compounded "pentobarbital" they now obtain "are the *exact* same . . . ."  Transcript of *Gissendaner I* Motions Hearing of 02/24/2015 (attached as "Ex. 10") at 17.  Indeed, in another action before this Court that challenged Defendants' use of compounded pentobarbital, Defendants mocked the notion that compounding drugs posed any risks:

> So you are saying that they can't take pentobarbital, which is described as a pretty easy process, you take a liquid and you take a dry powder and you put them together. I mean, *this isn't difficult, it isn't something difficult to compound* . . . .

Transcript of Motions Hearing in *Wellons v. Owens*, No. 1:14-CV-1827-WBH of 06/16/2014 (attached as "Ex. 11") at 30 (emphasis added).  All evidence to the contrary.

33

In *Gissendaner I*, moreover, Defendants offered an assessment of the consequences that would befall them if their representations to this Court proved inaccurate – consequences that their current behavior suggests they intend to avoid:

> The only thing that is being kept from the Plaintiff is the source of the drug, and there has been no proof other than speculation that we would ever use a drug that would cause excruciating pain . . . [I]f we do not obtain pentobarbital that's properly compounded . . . . the minute that we do run afoul and we do something like that then we *will no longer be able to carry out any of our lawful death sentences*.

Ex. 10 at 25 (emphasis added).

Defendants took a similar tack to reassure this Court that their execution team members could carry out Ms. Gissendaner's lethal injection in keeping with the Eighth Amendment by proffering unsubstantiated assertions about the team's qualifications and identities – the very information that Defendants have insisted the lethal injection secrecy act shields.  In their motion to dismiss in *Gissendaner I*, Defendants referred this Court to a portion of its 2007 opinion in *Alderman v. Donald*, 1:07-cv-01474-BBM, which assessed the constitutionality of Georgia's now-abandoned three-drug protocol – which has not been used in more than four years.  Defendants' Motion to Dismiss in *Gissendaner I* (attached as "Ex. 12") at 27-29.[41]  Defendants informed the district court that the quoted passage referred to "the execution team medical personnel *who are still employed in that capacity by*

---

[41]The last Georgia prisoner executed with this protocol was Emmanuel Hammond on January 25, 2011.

34

*the prison*," Ex. 12 at 27 (emphasis added), and could therefore be relied upon by the district court as evidence of the current team's qualifications. Defendants continued these "disclosures" during argument, reiterating that as "we said in our pleading, our executions, the nurses and the doctors, they are very qualified. They have done this for many years. They know exactly what they are doing." Ex. 10 at 20.

This brazen gambit merits some discussion. The portion of *Alderman* upon which Defendants rely was premised upon a "Statement of Material Facts" as to the qualifications and experience of Defendants' execution team, which Defendants were required to tender because it was not contained in the rather bare-bones text of the lethal injection protocol. Nowadays, of course, Georgia's secrecy act would prevent Defendants from offering additional information to fill in these blanks. In sum, Defendants asked this Court to affirm their current protocol based upon a fact-finding procedure that should now be prohibited, and which was premised in large part upon a statement of material facts that it is now against the law for Defendants to give.

Defendants' goal in offering these assurances, of course, was to reveal as little as possible about how they conduct lethal injections while asking this Court to paper over the gaps in their disclosures with a presumption that they operate in good faith. In Ms. Gissendaner's earlier proceeding, Defendants cited authority for

"a presumption of legitimacy accorded to the Government's official conduct," while ignoring the adjoining sentences qualifying that presumption as "perhaps . . . less a rule of evidence than a general working principle" that can be displaced with "applicable, clear evidence."   Ex. 12 at 34, quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004).   Surely such evidence is now before the Court.

Defendants similarly insist that "[e]ven if Plaintiff were supplied with the names and the information that she requests, she would be unable to demonstrate an Eighth Amendment violation."   Ex. 12 at 36.   That assertion now appears demonstrably inaccurate.   Indeed, it has never been clearer that the "baseline assurances" Defendants have proffered to this Court are "*little more than hollow invocations of "trust us."*   Owens v. Hill,* 758 S.E.2d 794, 807, (Ga. 2014)(Benham, J., dissenting)(emphasis added).   They should never carry the day again.

## CAUSE OF ACTION

**Georgia's Combination of Secrecy, Ineptitude, and Illegality in Its Administration of Executions by Lethal Injection *Has Violated* – and Threatens to *Again Violate* – Ms. Gissendaner's Rights Pursuant to the Eighth and Fourteenth Amendments**

The Eighth Amendment prohibits "cruel and unusual punishments . . . ." and "the imposition of inherently barbaric punishments under all circumstances." *Graham v. Florida*, 560 U.S. 48, 58-59 (2010). The Amendment forbids punishments that are 'totally without penological justification.'" *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Gregg,* 428 U.S. at 183; citing *Gamble*, 429 U.S. at 103). Accordingly, "punishments of torture . . . and all others in the same line of *unnecessary cruelty* . . . are forbidden." *Wilkerson v. State of Utah*, 99 U.S. 130, 136 (1878)(emphasis added); *see also Graham*, 560 U.S. at 58 ("[p]unishments of torture, for example, are forbidden."). But the Eighth Amendment "proscribes more than *physically* barbarous punishments." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). It also outlaws punishments that "involve the unnecessary and wanton infliction of *pain*," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)(emphasis added), which include "exercises of cruelty by laws other than those which inflict[] *bodily* pain or mutilation." *Weems v. United States*, 217 U.S. 349, 373 (1910)(emphasis added).

37

The Eighth Amendment therefore forbids both laws subjecting a person to "circumstance[s] of degradation," *ibid*. at 366, and "circumstances of terror, pain, or disgrace" "*superadded*" to a sentence of death, *ibid* at 370 (emphasis supplied).

> As the Court makes clear, the Eighth Amendment prohibits the unnecessary and wanton infliction of "*pain*," rather than "*injury*." … "Pain" in its ordinary meaning surely includes *a notion of psychological harm*. … I have no doubt that to read a "physical pain" or "physical injury" requirement into the Eighth Amendment would be . . . pernicious and without foundation  . . . .

*Hudson v. McMillian*, 503 U.S. 1, 16-17 (1992) (Blackmun, J., concurring). Accordingly, "[t]here may be involved no physical mistreatment, no primitive torture," but a "fate of ever-increasing fear and distress" offends the Amendment. *Trop v. Dulles*, 356 U.S. 86, 101-102 (1958) (condemning punitive denationalization); *see also Hudson v. McMillian*, 503 U.S. 1, 26 (1992) ("That is not to say that the injury [violating the Eighth Amendment] must be, or always will be, physical.") (Thomas, J., dissenting); *Weems*, 217 U.S. at 372 ("it must have come to [framers of Eighth Amendment] that there could be exercises of cruelty by laws other than those which inflicted bodily pain or mutilation").

Psychological science confirms the common-sense understandings that underlie those conclusions: that the anticipation of pain can exacerbate its

intensity[42]; and that "dread increases exponentially as pain is approached in time."[43]   An understanding of the psychological mechanisms that people use to cope with the anticipation of their death from illness[44] teaches us that condemned inmates like Ms. Gissendaner will attempt to make sense of their impending deaths; will spend time contemplating what is about to happen to them, and will harness whatever psychological and emotional resources they can muster to endure the fate that they believe awaits them.   As with others facing imminent death,[45]   a

---

[42]A. Ploughaus, I. Tracey, S. Clare, et al., *Dissociating Pain from its Anticipation in the Human Brain*, 284 SCIENCE (No. 5422) 1979 (1999).  As one researcher has noted, "[e]ven the suffering associated with losses from past events [emphasizes its anticipatory nature] … because the suffering person is forced to anticipate the effects of the losses on his or her present and future." W. Fordyce, *Pain and Suffering: A Reappraisal*, 43 AMER. PSYCHOLOGIST 276, 278 (1988).

[43]G. Story, I. Vlaev, B. Seymour, J. Winston, A. Darzi, et al., *Dread and the Disvalue of Future Pain*, PLOS COMPUTATIONAL BIOLOGY 10(1) (2014). Regarding this research, George Loewenstein, professor of economics and psychology at Carnegie-Mellon University, concluded:  "This study demonstrates that the fear of anticipation is so strong it can reverse the usual pattern of time discounting . . . . It's probably not an exaggeration to say that as much, or more, of the pains of life come from anticipation and memory than from actual experience." S. Makin, *Waiting for pain can cause more dread than pain itself*, NEW SCIENTIST (2013), available at: http://www.newscientist.com/article/dn24642-waiting-for-pain-can-cause-more-dread-than-pain-itself.html#.VPuymnzF-So.

[44]*See, e.g.*, E. Kubler-Ross, On Death and Dying (Macmillan 1969); E. Kubler-Ross, *The Languages of Dying Patients*, 10 HUMANITAS 5 (1974).

[45]*See, e.g.*, J. Arndt, J. Greenberg, S. Solomon, T. Pyszczynski & L. Simon, Suppression, *Accessibility of Death-Related Thoughts, and Cultural Worldview Defense: Exploring the Psychodynamics of Terror Management*, 73 JOURNAL OF PERSONALITY AND SOCIAL PSYCHOLOGY 5 (1997); T. Pyszczynski, J. Greenberg &

condemned prisoner experiences an anticipatory fear of dying and struggles to overcome and manage that powerful emotion.[46]

But the experience of Ms. Gissendaner and her fellow condemned Georgia prisoners differs from the terminally ill in that they face a death that will be deliberately brought about through human activity that is cloaked in secrecy, fraught with error, potentially painful, and that threatens to render their last moments a degrading and public spectacle. The "superadd[ition]" of these "circumstances of terror, pain, or disgrace" can only exacerbate the terror inherent to the contemplation of death. *Weems*, 217 U.S. at 366, 370.[47] Defendants have already once obtained drugs to inject into Ms. Gissendaner's body that they have now conceded were unsafe, but continue to conceal the origins of those drugs and the qualifications of the people whom they have charged with ending her life. Accordingly, the death that she must contemplate lacks any of the predictability

---

S. Solomon, *A Dual Process Model of Defense Against Conscious and Unconscious Death-Related Thoughts: An Extension of Terror Management Theory*, 106 PSYCHOLOGICAL REVIEW 835 (1999).

[46]*See* C. Haney, *Psychological Secrecy and the Death Penalty: Observations on "The Mere Extinguishment of Life,"* 16 STUDIES IN LAW, POLITICS AND SOCIETY 3 (1996).

[47]As Ernest Becker observed in his classic work: "We admire the courage to face death; we give such valor our highest and most constant adoration; it moves us deeply in our hearts because we have doubts about how brave we ourselves would be." E. Becker, The Denial of Death 11-12 (Free Press paperback ed. 1997).

that is a condition of humane treatment and that, when absent, exacerbates the

profound fear that people associate with their impending demise – what mental

health professionals have described as "death anxiety"[48] – and denatures their

ability to manage that terror.[49]

The Supreme Court has condemned subjecting a prisoner to such

uncertainty, holding that maintaining "secrecy" about the time that an execution

will be carried out violates the Eighth Amendment, as it "must be accompanied by

an *immense mental anxiety* amounting to *a great increase* of the offender's

---

[48]R.A. Neimeyer & D. Van Brunt, "Death Anxiety," in H. Wass, R. Neimeyer et al., eds., Dying: Facing the Facts 49-88 (3d ed., Taylor and Francis 1995); R. Neimeyer, ed., Death Anxiety Handbook: Research, Instrumentation, and Application (Taylor and Francis 1994); *see also* C. Abengozar, B. Bueno & J. Vega, *Intervention on Attitudes toward Death along the Life Span*, 25 EDUCATIONAL GERONTOLOGY 435 (1999).

[49]Indeed, introducing unpredictability is a favored practice of torturers, who can thus intensify the fear their actions generate and, accordingly, the suffering they inflict. *See, e.g.*, M. Basoglu & S. Mineka, *"The Role of Uncontrollable and Unpredictable Stress in Post-traumatic Stress Responses in Torture Survivors,"* Torture and its Consequences: Current Treatment Approaches 182-225 (Cambridge University Press 1992); *see also* A. Koestler, Darkness at Noon (Macmillan 1941); T. Pyszczynski, J. Greenberg, & S. Solomon, "A Terror Management Perspective on the Psychology of Control: Controlling the Uncontrollable," in M. Kofta, G. Weary, et al., eds., Personal Control in Action: Cognitive and Motivational Mechanisms 85-108 (Plenum Press 1998); V. Florian & M. Mikulincer, *Fear of Death and the Judgment of Social Transgressions: A Multidimensional Test of Terror Management Theory*, 73 JOURNAL OF PERSONALITY AND SOCIAL PSYCHOLOGY 369 (1997). Terror management is facilitated by the belief that future death-related events will be orderly and predictable. J. Lieberman, *Terror Management, Illusory Correlation, and Perceptions of Minority Groups*, 21 BASIC AND APPLIED SOCIAL PSYCHOLOGY 13 (1999).

punishment." *In re Medley*, 134 U.S. at 172 (emphasis added).  It is accordingly incontrovertible that the events of March 2 *and* March 3 subjected Ms. Gissendaner to cruel and unusual punishment. After being paraded in chains past the gurney on which she was scheduled to die and waiting more than three hours past the time that her execution was scheduled to commence, Ms. Gissendaner learned that Defendants had decided to delay her execution because the drugs they had planned to inject into her veins were unsafe – a fact that, by their own account, they noticed only two hours *after* her execution was to begin.  Defendants then subjected her to another thirteen hours of "immense fear," *ibid*, stemming from her knowledge that they were unwilling to abandon their pursuit of her execution sometime before Wednesday at noon – despite the fact that what had caused their drugs to "turn out" wrong could not be meaningfully addressed within that time.

"A penalty . . . must accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.'" *Gregg v. Georgia*, 428 U.S. 153, 173 (1976), quoting *Trop v. Dulles*, 356 U.S. at 100 (plurality opinion).  These cases underscore the essential principle that, under the Eighth Amendment, the State must respect the human attributes even of those who have committed serious crimes." *Graham v. Florida*, 560 U.S. 48, 58-59 (2010).  Indeed, by protecting such persons, "the Eighth Amendment reaffirms the duty of the government to *respect the dignity of all persons.*" *Hall v. Florida*, 134 S.Ct. 1986, 1992 (2014).

Ms. Gissendaner respectfully submits that there was nothing dignified – or, indeed, constitutional – about what she endured on March 2 and 3.

The Eighth Amendment's prohibition against cruel and unusual punishment can only be enforced *prospectively*, as there can be no remedy for a prisoner who has already suffered such a punishment.[50] This Court can do nothing to remedy what Defendants have already done to Ms. Gissendaner; it can and should ensure that Defendants can never do it again. Ms. Gissendaner accordingly proposes that this Court allow her to overcome the state-law evidentiary privilege of the lethal injection secrecy act and conduct discovery into the origins of Defendants' lethal injection drugs – including the nature of the materials used and the qualifications and training of those who produce them – and the qualifications and training of

---

[50]Indeed, in *Gissendaner I*, Ms. Gissendaner asserted that allowing her execution to proceed under these circumstances would violate her constitutional rights by depriving her of "any meaningful remedy" for their violation. See Ex. 2 at 61-65, citing *Marbury v. Madison*, 5 U.S. 137, 163 (1803)(bedrock principle of rule of law is "where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded"); *see also General Oil Co. v. Crain*, 209 U.S. 211, 221-30 (1908) (holding that a state court must provide a remedy for a constitutional violation); *Morgan v. Illinois*, 504 U.S. 719, 728-29 (1992)(because "the Sixth and Fourteenth Amendments . . . ensure the impartiality of any jury that will undertake capital sentencing," defendant is entitled to prospective remedy of *voir dire* and challenges for cause to discover and remove potential jurors who would automatically vote for a death sentence in every capital case); *Brady v. Maryland*, 373 U.S. 83, 86 (1963)(due process requires the government to disclose evidence which "would tend to exculpate [the defendant] or reduce the penalty"; defendant entitled to prospective remedy to prevent violation).

their personnel who store, handle, and administer their lethal injection drugs.  *See, e.g.*, *McGoy v. Ray*, 164 Fed.Appx. 876, 878 (11th Cir. 2006) (laying out balancing test for determining whether a request for discovery of confidential state secrets will be granted; district court should balance need for discovery against burden such discovery would place upon state agency); *Robertson v. Bryant,* 2006 WL 2982828, *1-2 (N.D.Ga. 2006)(applying balancing test in determining whether to grant discovery of confidential state secrets; "if there is material in those reports which support a plaintiff's version of an incident, a defendant should not be able *to hide behind the wall of privilege to keep that relevant and material information from a plaintiff*  . . . ." (emphasis added)).  Nothing less than a meaningful and thorough examination of Defendants' lethal injection procedures can provide the prospective remedy necessary to ensure that Ms. Gissendaner's rights will be protected before Defendants can violate them again.

## CONCLUSION

In *Gissendaner I*, Ms. Gissendaner described "the Catch-22" in which Defendants' have placed her and other death-sentenced prisoners through their aggressive use of both the secrecy act and the *Baze* plurality's stay standard to foreclose scrutiny of their lethal injection procedures:

> [I]t is impossible to imagine any circumstances in which a prisoner could even *approach* the threshold of the [*Baze* plurality's] standard

except in *the immediate aftermath of a botched execution.* And even then, of course, the secrecy act would impede any meaningful investigation into what went wrong.

Ex. 2 at 64 (emphasis in original).  The former of these statements has come to pass.  Ms. Gissendaner has evidence that Defendants' lethal injection procedures violate her constitutional rights; intolerably, Defendants had to botch her execution for her to obtain it.

This Court must insure that the latter of these statements does not prove as prophetic as the first.   Ms. Gissendaner spent thirteen hours with the knowledge that Defendants might yet decide to proceed with her execution despite their own manifest uncertainty about whether they should.  Even now she waits, knowing that Defendants will reset her execution as soon as they choose, with no assurances – beyond Defendants' demonstrably empty promises – that the next batch of drugs will be any more humane than their last.  Again, the Constitution cannot tolerate this.  Neither should this Court.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff Kelly Renee Gissendaner respectfully requests that this Court:

1.     Enter a declaratory judgment that Defendants, by maintaining for thirteen hours that they might yet proceed with Ms. Gissendaner's execution prior

45

to a meaningful assessment of what went wrong with their lethal injection drugs, violated Ms. Gissendaner's rights pursuant to the Eighth and Fourteenth Amendments;

2.      Afford Ms. Gissendaner discovery and order Defendants to disclose the information necessary for she and this Court to conduct a meaningful investigation into the events of March 2 and 3, 2015, and for this Court to assess whether their protocols and procedures are sufficient to protect her from similar and additional violations of her rights pursuant to the Eighth and Fourteenth Amendments;

3.      Grant injunctive relief preventing Defendants from proceeding with the execution of Ms. Gissendaner until and unless this Court concludes that their protocols and procedures are sufficient to protect her from similar and additional violations of her rights pursuant to the Eighth and Fourteenth Amendments.

This, the 9th day of March, 2015.

Respectfully submitted,

*/s/ Gerald King*
Gerald W. King, Jr. (Ga. Bar No. 140981)
FEDERAL DEFENDER PROGRAM, INC.
101 Marietta Street, Suite 1500
Atlanta, Georgia 30303
404-688-7530
(fax) 404-688-0768
Gerald_King@fd.org

Susan C. Casey (Ga. Bar. No. 115665)
965 Virginia Avenue, NE
Atlanta, Georgia  30306
404-242-5195
(fax) 404-879-0005
susancasey@outlook.com

Lindsay N. Bennett (Ga. Bar. No. 141641)
FEDERAL PUBLIC DEFENDER
801 I Street, 3rd Floor
Sacramento, CA 95814
916-498-6666
(fax) 916-498-6656
Lindsay_Bennett@fd.org

COUNSEL FOR MS. GISSENDANER