Ex. 01

## DECLARATION OF LINDSAY NICOLE BENNETT

My name is Lindsay Bennett and I am over the age of eighteen. The information contained in this declaration is based on my personal knowledge.

1.  I am an attorney currently employed as an assistant federal defender with the Office of the Federal Public Defender for the Eastern District of California. From 2008 to 2014, I was employed as a staff attorney at the Federal Defender Program for the Northern District of Georgia. I was assigned to work on Ms. Gissendaner's case in 2008 and have continued to do so since that time.

2.  At 10:19 PM on March 2, 2015, I received the first of three phone calls from counsel for Defendants, Senior Assistant Attorney General Sabrina Graham (hereinafter "Counsel"), who said the execution of Ms. Gissendaner was "off" that night because there was a problem with the drugs. Counsel said that when the execution drugs had been checked initially they "were fine," but that when they were checked approximately an hour prior to the phone call I received, the drugs "appeared cloudy." Counsel stated that the Department of Corrections would need to obtain new drugs. She said it would likely take 1-2 days to obtain new drugs and another 2-3 days to have the new drugs tested.

3.  After this phone call, I called the Georgia Diagnostic and Classification Prison and spoke with Ms. Gissendaner. I told her the execution was off for that evening because something was wrong with the lethal injection drugs.

4.  Immediately after I got off the phone with Ms. Gissendaner, I contacted another member of the legal team to convey the news that the execution was "off." That team member was with Ms. Gissendaner's children and communicated the same to them.

5.  At 10:29 PM on March 2, 2015, I received the second of three phone calls from Counsel. Counsel told me "not to go anywhere" because there was confusion about which drugs had been the subject of examination and whether there was another "batch" that might be available to use. Counsel said that there was a batch from the prior week and a batch from "this week" and she was now unsure whether DOC would be trying to proceed with the execution that night. She said she would get back to me within a few minutes with something definitive.

6.  At 10:43 PM on March 2, 2015, I received the third of three calls from Counsel.  Counsel stated that Ms. Gissendaner would definitely not be executed that night.  I asked if they were absolutely sure, given the ambiguity expressed during her second phone call.  Counsel said she was positive the execution would not take place that night.  She said the physician overseeing the execution observed the drugs approximately an hour prior to Counsel's initial call to me and the drugs appeared cloudy.  She said a pharmacist was consulted and that the pharmacist agreed about the cloudy appearance.  She said she thought that the physician sent a picture of the cloudy drugs to the pharmacist.  She said the cloudy appearance caused the physician and the pharmacist to be "concerned" and that they reported to DOC that they did not think the drugs would be "appropriate for medical purposes."  She said that based on the advice of the physician and the pharmacist with whom the DOC was consulting, the DOC decided not to proceed with the execution as planned.

7.  During this call, I asked whether DOC anticipated that they would have any problems acquiring the execution drugs needed to carry out Ms. Gissendaner's execution. Counsel said it was not a problem with the supplier, but that "apparently this batch just did not come out the way it was supposed to."  She said DOC would be sending out the cloudy drugs for testing and that DOC would investigate "what went wrong."  She said she was "not completely sure" but that the cloudy drugs might be sent to the pharmacist who had provided them and that they might also be sent to "an independent lab."

8.  During this third phone call on March 2, 2015, Counsel said they were still trying to figure out what happened and what would happen in the days ahead. I asked whether the State still planned to execute Ms. Gissendaner prior to the expiration of the warrant and Counsel said that she could not say.  She said it would likely take "a few days" to obtain and test a new batch of drugs, but that there would be meeting the morning of March 3, 2015, to discuss "what went wrong down there" and how they would proceed.

9.  At approximately 11:00 AM on March 3, 2015, I received another phone call from Counsel, who said that DOC would be conducting an investigation into the execution drugs and attempting to determine why there were problems with the drugs, and that Ms. Gissendaner's warrant would expire.  I asked about her

previous reference to two "batches" of drugs.  She said there had been a batch last week (i.e., the week of February 23-27, 2015) and that they got a replacement batch this week (March 2-6, 2015).  She said the replacement batch was the batch they were intending to use to execute Ms. Gissendaner on March 2, 2015, and, accordingly, the replacement batch was the batch that was "cloudy."  It was not made clear whether the first batch was disposed of.

10. A member of our legal team reached Ms. Gissendaner by telephone shortly before noon on March 3 and informed her that her warrant would expire.

I swear under pain and penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated this, the 9th day of March 2015.

_/s/Lindsay Nicole Bennett_
Lindsay N. Bennett
Assistant Federal Public Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
916-498-6666
(fax) 916-498-6656
Lindsay_Bennett@fd.org

Ex. 02

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KELLY RENEE GISSENDANER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| HOMER BRYSON, Commissioner, | ) | |
| Georgia Department of Corrections; | ) | **EXECUTION SCHEDULED** |
| | ) | **FEBRUARY 25, 2015,** |
| | ) | **7:00 P.M.** |
| BRUCE CHATMAN, Warden, | ) | |
| Georgia Diagnostic and Classification | ) | |
| Prison; | ) | |
| | ) | |
| OTHER UNKNOWN EMPLOYEES | ) | |
| AND AGENTS, | ) | |
| | ) | |
| Georgia Department of Corrections, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## COMPLAINT AND MEMORANDUM OF LAW

On January 23, 2015, the Supreme Court of the United States granted certiorari in the matter of *Glossip v. Gross*, an action brought under 42 U.S.C. § 1983 by twenty-one (21) death-sentenced prisoners in Oklahoma challenging the constitutionality of Oklahoma's lethal injection protocol. — S.Ct. —, Nos. 14-

7955, 14-A761 (Jan. 23, 2015). The questions the Court accepted for review signal its intent to reconsider the burdens that its plurality decision in *Baze v. Rees*[1] has imposed upon petitioners challenging methods of execution, including whether "the *Baze*-plurality stay standard appl[ies] when states are not using a protocol substantially similar to the one that this Court considered in *Baze*," and and even the pleading requirements for such a challenge. Appellant's Cert. Pet., *Glossip v. Gross*, 2015 WL 309509 at *i.[2] In the wake of this grant, executions have been stayed across the country[3], the Attorney General of the United States has called for

---

[1] 553 U.S. 35, 50-52 (2008) (plurality opinion)

[2] Another of the questions presented to the Court asks whether a petitioner must "establish the availability of an alternative drug formula even if the state's lethal-injection protocol, as properly administered, will violate the Eighth Amendment?"

[3] Following its grant of certiorari in *Glossip*, *supra*, the Supreme Court granted the State of Oklahoma's applications for stays of three pending executions. *Glossip v. Gross*, No. 14-7955 (14A796), --- S.Ct. ----, 2015 WL 341655 (Mem)(Jan. 28, 2015). On February 17, 2015, the Supreme Court of Florida stayed the execution of Jerry William Correll until *Glossip* is decided. *Correll v. Florida*, Case No. SC15-147 (Fla. Feb. 17, 2015). On that same day, the Middle District of Alabama stayed the execution of Tommy Arthur, also until *Glossip* is decided. Mike Cason, *Alabama death row inmate wins stay of execution*, Montgomery Advertiser (Feb. 17, 2015), available at: http://www.montgomeryadvertiser.com/story/southunionstreet/2015/02/17/alabama-death-row-inmate-wins-stay-of-execution/23550169/ (last visited Feb. 19, 2015). Also, the governor of Pennsylvania declared a moratorium on the death penalty on February 13, 2015. Associated Press, *Pennsylvania: Governor Halts Executions*, N. Y. Times (Feb. 13, 2015) available at: http://www.nytimes.com/2015/02/14/us/pennsylvania-governor-halts-executions.html (last visited Feb. 19, 2015).

a nationwide moratorium pending the Court's decision[4], and numerous states seem

prepared to abandon lethal injection altogether.[5]

The Supreme Court's grant of certiorari review is an acknowledgment of the

wholesale changes in executions by lethal injection since the Court approved of

Kentucky's protocol in *Baze*. When it handed down that decision in 2008, the

Court could survey the country and find nearly every death-penalty jurisdiction

using a combination of the same three drugs that were widely available from FDA-

approved manufacturers and that -- as even the petitioners in *Baze* conceded –

would, if properly administered, bring about a painless death. The Court was also

able to scrutinize the training and qualifications of the personnel entrusted to carry

---

[4]"Attorney General Eric Holder called [on February 17, 2015] for a national moratorium on the death penalty until the Supreme Court weighs in on . . . . an appeal the from death row inmates in Oklahoma who are challenging the state's procedures for lethal injections. 'I think a moratorium until the Supreme Court makes that decision would be appropriate,' Holder said." Lydia Wheeler, *Holder calls for halt to U.S. executions*, THE HILL (Feb. 17, 2015), available at: http://thehill.com/regulation/administration/232979-holder-calls-for-halt-to-us-executions (last visited Feb. 19, 2015).

[5]Committees for the Oklahoma House of Representatives and Senate OK have unanimously approved bills that would authorize the use of nitrogen gas for executions. The Associated Press, *Oklahoma Debates Use of Nitrogen Gas for Executions*, N.Y. TIMES (Feb. 10, 2015), available at: http://www.nytimes.com/2015/02/10/us/oklahoma-debates-use-of-nitrogen-gas-for-executions.html?gwh=1F6323BC8E1C21A59BDE1B4667AC8986&gwt=pay&assetType=nyt_nowmoving to lethal gas. Meanwhile, Tennessee's proposed return to the electric chair is the subject of a legal challenge before its Supreme Court. The Associated Press, *TN Supreme Court to hear challenge of electric chair law*, Chattanooga Times Free Press (Feb. 19, 2015)(last visited Feb. 19, 2015).

out executions and conclude in earnest that the death-penalty states were its partners in protecting a condemned prisoner's constitutional rights, altering their methods of execution and protocols only to better ensure the most humane death that science could provide.

Today, what is remarkable about the lethal-injection landscape is not only how much it has changed, but how much of it is concealed from view – in Georgia, above all. The near-universal protocol approved in *Baze* has been replaced by experimental combinations of untested and often illegally-acquired drugs, while the states – with Georgia at their vanguard – hide behind secrecy statutes that forbid the disclosure of the very information that the Court reviewed in *Baze* and, accordingly, the same information necessary to meet its plurality stay standard. States, including Georgia, evince indifference and disregard for prisoners' Eighth Amendment rights -- resulting, predictably, in Eighth Amendment violations in the form of horrifically botched executions.

Indeed, as is detailed *infra*, no state is more emblematic of these efforts to subvert *Baze* and exploit its plurality stay standard than Georgia, which has repeatedly acquired lethal injection drugs of questionable provenance in violation of state and federal laws while relying upon its lethal injection secrecy act to prevent prisoners, the public, and the courts from examining the very aspects of their lethal injection procedures reviewed by *Baze*. When previously challenged as

4

to their lethal injection practices, Defendants have benefitted in this Court from the same presumption of good faith upon which the *Baze* plurality premised its stay standard. Troublingly, Defendants seem determined not to live up to that presumption, but, rather, to stretch it to the breaking point – as exemplified by their ever-broader assertions as to the scope of Georgia's secrecy act, discussed *infra*, which appear directed at placing the entirety of their "machinery of death" beyond the scrutiny of this Court.

Consequently, while Kelly Renee Gissendaner knows that Georgia intends to execute her by lethal injection next Wednesday, she knows nothing of the safety and efficacy of the drugs it will use to end her life, or whether the people it has charged with injecting them into her body are qualified to do so – a matter of particular importance here, as her gender and health raise particular challenges for the personnel who will place the catheters into her veins. As these are the very categories of information with which the *Baze* court concerned itself – but which its current stay standard demands that *Ms. Gissendaner* present to the court, despite the fact that Georgia has literally *outlawed* her from obtaining them – she respectfully requests that this Court stay her execution pending the resolution of *Glossip*, which could well-result in a standard better-tailored to Georgia's regime of secrecy. Ms. Gissendaner also submits that Defendants' ever-increasing secretiveness demonstrates their deliberate indifference and, indeed, reckless

disregard for her constitutional rights. Accordingly, as Defendants' conduct cannot be sanctioned by the Eighth and Fourteenth Amendments to the Constitution, Ms. Gissendaner seeks declaratory and injunctive relief.[6]

## JURISDICTION

Jurisdiction of this matter arises under 42 U.S.C. § 1983, 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

## VENUE

Venue is appropriate in the Northern District of Georgia under 28 U.S.C § 1391(b), because at least one of the Defendants resides in this district.

## THE PARTIES

Plaintiff Kelly Renee Gissendaner, a United States citizen and a resident of the State of Georgia, is a death-sentenced prisoner currently being held in the custody of the Defendants at the Arrendale State Prison in Alto, Georgia. She is

---

[6] This Complaint challenges neither the conviction underlying Ms. Gissendaner's sentence of death nor that sentence itself. Nor does it allege that lethal injection as a form of execution is *per se* unconstitutional. But Defendants' deliberate efforts to subvert *Baze*'s stay standard to disclose these critical aspects of their lethal injection procedures deprives her and this Court of the information necessary to determine whether those procedures present a "substantial risk of significant harm" in violation of his Eighth Amendment rights – a risk underscored by Oklahoma's secretive and botched execution of Clayton Lockett.

scheduled to be executed at the Georgia Diagnostic and Classification Prison in Jackson, Georgia, on Wednesday, February 25, 2015, at 7:00 p.m. EDT.

Defendant Homer Bryson is the Commissioner of the Georgia Department of Corrections, which is headquartered in Atlanta, Georgia. As Commissioner, Owens is responsible for the daily supervision of operations at the Georgia Department of Corrections. He has a duty to ensure that executions are carried out in compliance with the Eighth and Fourteenth Amendments and departmental procedure. Defendant Bryson is sued in his official capacity as Commissioner of the Georgia Department of Corrections.

Defendant Bruce Chatman is the warden of the Georgia Diagnostic and Classification Prison in Jackson, Georgia. As warden, Defendant Chatman is responsible for the day-to-day operations of the prison. He also has a duty to ensure that executions are carried out in compliance with the Eighth and Fourteenth Amendments and departmental procedure. Defendant Chatman is sued in his official capacity as warden of the prison. [7]

---

[7] Ms. Gissendaner is presently incarcerated at Lee Arrendale State Prison in Alto, Georgia, but will be executed in the death chamber of the Georgia Diagnostic and Classification Prison, to which she will be transferred sometime in advance of her execution. Upon information and belief, the conduct complained of herein centers upon the actions of the Department of Corrections and of those staff members of the Georgia Diagnostic and Classification Prison who will actually carry out her execution.

Other Unknown Employees and Agents of the Georgia Department of Corrections are involved in the development and implementation of the Department's execution procedures, including procedures governing the preparation and administration of drugs designed to execute people. Ms. Gissendaner does not yet know the identity of those individuals.

All of the Defendants are being sued in their official capacities. The named Defendants are United States citizens and residents of the State of Georgia.

## PROCEDURAL HISTORY

Ms. Gissendaner was convicted of murder and sentenced to death in the Superior Court of Gwinnett County in 1998. The Supreme Court of Georgia affirmed Ms. Gissendaner's conviction and sentence, *Gissendaner v. State*, 272 Ga. 704, 532 S.E.2d 677 (Ga. 2000), and the Supreme Court of the United States denied her petition for a writ of certiorari, *Gissendaner v. Georgia*, 531 U.S. 1196 (2001). Ms. Gissendaner sought state habeas corpus relief, which was denied. Ms. Gissendaner filed a petition for writ of habeas corpus with this Court, which denied her relief. *Gissendaner v. Seabolt,* No. 1:09-CV-69-TWT, 2012 WL 983930 (N.D. Ga. 2012). The U.S. Court of Appeals for the Eleventh Circuit affirmed the denial of relief on November 19, 2013. *Gissendaner v. Seaboldt*, 735 F.3d 1311 (11th Cir. 2013). The Supreme Court denied Ms. Gissendaner's petition for a writ of

certiorari on October 6, 2014.  *Gissendaner v. Seaboldt*, 135 S.Ct. 159 (Mem) (U.S. 2014).  Pursuant to an order entered by the Superior Court of Gwinnett County on February 9, 2015, Defendant GDC has scheduled Ms. Gissendaner for execution on Wednesday, February 25, 2015.[8]

## FACTUAL ALLEGATIONS

I.        Overview

When the Supreme Court handed down its decision in *Baze* on April 16, 2008, the most salient quality about the death penalty in America was the uniformity with which it was carried out.  The federal government and thirty-six (36) states – including Georgia -- imposed the death penalty, and each used lethal injection as its method of execution.  *Baze*, 553 U. S. at 41.  "This broad consensus," the Court noted, went "not just to the method of execution, but also to the specific three-drug combination" used in *Baze*, as at least thirty-one (31) of those jurisdictions – again, including Georgia – "use[d] a series of sodium

---

[8] Ms. Gissendaner does not believe that exhaustion is necessary under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, because this lawsuit does not challenge prison conditions and because there are no administrative remedies available that could provide redress for the challenged violations of her constitutional rights.  Moreover, as explained below, Defendants refuse to disclose the identity of the supplier of the lethal injection drugs in question or the qualifications of the personnel who will carry out the execution.  Because of the actions of Defendants, Ms. Gissendaner has been denied the information necessary to enable her to pursue any administrative remedies.  Despite the actions of Defendants, Plaintiff has attempted to exhaust any remedies by filing an informal grievance on February 18, 2015, and an appeal of its denial on February 19.

thiopental, pancuronium bromide, and potassium chloride, in varying amounts." *Baze*, 553 U.S. at 53; *see also ibid* at 44 (thirty states and federal government "use[d] the same combination of three drugs in their lethal injection protocols"). Even more significantly, all of the parties to *Baze* agreed that this three-drug protocol, "if applied as intended, will result in a humane death." *Id.* at 41.

The *Baze* plurality was also able to satisfy itself that the protocol would indeed be "applied as intended," as Kentucky provided information demonstrating that the personnel charged with establishing intravenous access had adequate training and qualifications "to ensure that an adequate dose of sodium thiopental is delivered to the condemned prisoner" – taking particular note of the requirement that they "have at least one year of professional experience as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman" and "participate in at least 10 practice sessions per year." *Id.* at 55.

Finally, the *Baze* plurality could review the history of executions in America and plausibly conclude that the death penalty jurisdictions would change their protocols only to *reduce* the risk of an unconstitutional execution, noting that each of the thirty-seven (37) "has altered its method of execution over time to *more humane* means of carrying out the sentence," with that "progress" having culminated in lethal injection. *Baze*, 553 U.S. at 40-41; *see also ibid* at 41-42

(tracking transition from hanging to electrocution to lethal injection as progressively "less painful and more humane" methods).

In sum, then, in assessing the *Baze* protocol, the plurality found "a method of execution believed to be the most humane available, one [Kentucky] shares with 35 other States . . . . that, if administered as intended . . . will result in a painless death." *Id.* at 62. Having satisfied itself that both the nature of the drugs themselves and the qualifications of the personnel were sufficient, the plurality crafted a daunting standard that requires a death-sentenced prisoner to show "a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment," in order for the reviewing court to grant a stay. *Baze*, 553 U.S. at 50, quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846, and n. 9 (1994). The reason why the plurality crafted such an onerous standard is evident in its response to Justice Stevens's concern in dissent that its standard "leaves the disposition of other cases uncertain," which countered that "the standard we set forth here resolves more challenges than [Justice Stevens] acknowledges," as "[a] State with a lethal injection protocol *substantially similar to the protocol we uphold today* would not create a risk that meets this standard." *Baze*, 553 U.S. at 61 (emphasis added). As virtually every jurisdiction's protocol met that criterion – and with no foreseeable prospect of a state deviating from that

broad consensus save to adopt a more humane method -- the plurality clearly wished to foreclose repetitive, state-by-state challenges to essentially identical protocols.

Just eight years after *Baze*, however, there is nothing uniform about lethal injections. As discussed *infra*, two of the three drugs approved by the *Baze* plurality – thiopental and pancuronium bromide – have become generally unavailable for use in executions, which has led the death penalty jurisdictions to experiment with a hodgepodge of untested drug combinations.[9] More critically, many death-penalty states have revealed themselves as motivated more by expedience than by any commitment to ensuring the most humane methods of execution.[10]

---

[9] Over just the last two years, at least twelve states have changed their execution protocols – some more than once. *See, e.g., Alabama Changes Execution Drug Combination*, THE ASSOCIATED PRESS (Sept. 12, 2014) available at: http://wiat.com/2014/09/12/alabama-changes-execution-drug-combination/ (last visited Feb. 19, 2015); *Kentucky Dropping 2-drug executions*, THE ASSOCIATED PRESS, November 14, 2014 at http:// www.wlwt.com/news/kentucky-drops-2drug-executions-reworking-method/29716428 ((last visited Feb. 19, 2015); Lucas L. Johnson II, *Tennessee Revises Protocol for Executions*, The Associated Press, Sept. 30, 2013 at http://www.memphisdailynews.com/ news/2013/sep/30/tennessee-revises-protocol-for-executions/ (last visited Feb. 19, 2015). Upon information and belief, Arizona, Arkansas, Florida, Louisiana, Missouri, Montana, North Carolina, Ohio, and Oklahoma have also changed their protocols during this period.

[10] Indeed, as noted in note 5, *supra*, some states are poised to resume some of the methods previously discarded as "less humane," including the electric chair and lethal gas.

Nowhere has this proven more true than in Georgia. Indeed, the history of lethal injection in Georgia after *Baze* is a litany of embarrassing and illegal missteps by the Defendants as they attempted to obtain drugs for use in lethal injections in spite of widespread shortages. In their seemingly-desperate quest to continue executions unabated, Defendants have run afoul of the Drug Enforcement Administration by illegally importing sodium thiopental. They have also repeatedly and abruptly altered their lethal injection procedures in spite of a series of botched executions, once changing their protocol on the very eve of an execution.

Rather than be chastened by these experiences, however, Defendants have evidently decided that the best way to avoid challenges to their method of execution is to simply prohibit prisoners and the Courts from obtaining the information necessary to meet the *Baze* plurality stay standard. Indeed, Defendants' most critical tool in subverting *Baze* has been Georgia's lethal injection secrecy act, which, in July of 2013, amended O.C.G.A. § 42-5-36 – a provision that previously governed "[c]onfidential information *supplied by inmates*" -- to classify all "identifying information" about a "person or entity who participates in or administers the execution of a death sentence . . . [or] that *manufactures, supplies, compounds, or prescribes the drugs*, medical supplies, or medical equipment" used in an execution as a "confidential state secret" not

13

subject to disclosure through Georgia's Open Records Act or "*judicial process*." O.C.G.A. § 42-5-36 (d)(emphases added).  "Identifying information" also includes "professional qualifications."   Accordingly, Defendants have asserted that this statute excuses them from disclosing any information concerning the safety and efficacy of their lethal injection drugs or, for that matter, the qualifications of those personnel whom they designate to administer the execution.  That, of course, is the precise information that the *Baze* plurality reviewed, and the precise information that its stay standard obliges Ms. Gissendaner to provide.

Ms. Gissendaner's predicament is clear.  The only information Defendants have divulged concerning the substances that they intend to use in her execution is a copy of the lethal injection procedures that they first adopted on July 17, 2012. See Letter from Vallee to Munro of 02/13/2015 (attached as "Ex. 1") at 0008-0020. These procedures outline a one-drug lethal injection protocol featuring "Pentobarbital."  *Id.*  As Defendants have not had any FDA-approved Pentobarbital in their possession since March of 2013, Ms. Gissendaner suspects that Defendants will use a substance that purports to be pentobarbital, but that has been mixed from unknown ingredients and in unknown circumstances by a compounding pharmacy.

The considerable risks presented by compounded pentobarbital are discussed *infra* at 26-34.[11]

Further, Georgia cites its secrecy act to refuse to disclose the qualifications of the personnel whom Defendants have charged with administering the lethal injection drugs. See Ex. 1 at 0002. This is not an abstract concern. As is discussed *infra* at 34-41, the consequences of error in the placement of the intravenous lines during an execution include suffering that cannot be sanctioned by the Eighth Amendment, as illustrated by Florida's botched execution of Angel Diaz and Oklahoma's botched execution of Clayton Lockett.

## II.    After *Baze*: Georgia's "Progress" Away From Humane Executions

As noted *supra*, Defendants' checkered history with lethal injection demonstrates that their primary goal is to carry out executions as rapidly as possible, with little regard for the safety and efficacy of their lethal injection drugs or, indeed, the laws that regulate their use. As the following narrative

---

[11]Ms. Gissendaner cannot be certain that even these risks encompass all that could go wrong with her execution, however, as Georgia's lethal injection statute does not limit the drugs that the Defendants can use when carrying out executions beyond requiring that they use "a substance or substances sufficient to cause death . . . ." O.C.G.A. § 17-10-38(a), and the Supreme Court of Georgia has empowered Defendants to change their protocol at will and at any time with no supervision from any other entity or meaningful notice to the prisoner or the public. *Hill v. Owens*, 292 Ga. 380 (2013). Accordingly, if Defendants opt to change their protocol at the last minute – as they attempted to do on the eve of a scheduled execution in July of 2012 –  even the little information that Ms. Gissendaner has could become obsolete before next Wednesday.

demonstrates, Defendants' pattern of "deliberate indifference" to a substantial risk of serious harm is of constitutional dimension and cannot stand. *Farmer*, 511 U.S. at 828

### A.    Georgia Illegally Imports Drugs

Beginning in 2010, Georgia was faced with an acute nationwide shortage of sodium thiopental, the first of the three drugs that it administered to prisoners during lethal injections under its then-protocol. *See, e.g.,* Carol Williams, *Maker of Anesthetic Used in Executions is Discontinuing Drug*, Los Angeles Times, January 22, 2011.[12]  When the FDA placed an administrative hold upon a shipment of imported sodium thiopental that Georgia and several other states had ordered through a U.S. pharmacy, Georgia opted to circumvent federal law governing the importation of controlled substances by directly purchasing a supply of mislabeled sodium thiopental for use in lethal injections from Dream Pharma, Inc., a fly-by-night pharmaceutical wholesaler/distributor which operated out of a storefront driving school in London, England.  Georgia chose this course despite the fact that they were not registered with the Drug Enforcement Agency (DEA) as an importer of non-narcotic controlled substances and did not provide a declaration of

---

[12] Available at: http://articles.latimes.com/2011/jan/22/local/la-me-execution-drug-20110122 (last visited Feb. 19, 2015).

importation to the DEA.[13]   On March 16, 2011, after the Attorney General was

notified of Georgia's illegal importation, the DEA seized Georgia's entire supply

of thiopental.  Bill Rankin et al., *DEA seizes Georgia's supply of lethal injection

drug*, ATLANTA JOURNAL-CONSTITUTION (March 16, 2011).[14]  Unfortunately, this

thiopental of questionable provenance had already been used in the executions of

Brandon Rhode and Emanuel Hammond, both of whom appeared to remain

conscious throughout their executions.[15]

### B.        Georgia Changes Its Protocol

Following the seizure, Georgia altered its three-drug lethal injection protocol

to replace thiopental with pentobarbital, a barbiturate and controlled substance.

Georgia made this substitution despite the fact that the sole manufacturer of FDA-

approved pentobarbital, Lundbeck Inc., warned them that the drug was not safe for

---

[13] Nor did Georgia possess a DEA license to possess, dispense, or distribute a Schedule III non-narcotic controlled substance such as thiopental.

[14] Available at: http://www.ajc.com/news/news/local/dea-seizes-georgias-supply-of-lethal-injection-dru/nQrdf/ (last visited Feb. 19, 2015).

[15] On September 27, 2010, Georgia used its illegally-imported thiopental in its execution of Brandon Rhode.  Mr. Rhode's eyes remained open throughout his execution, which strongly suggested that he was conscious after the administration of thiopental.  On January 25, 2011, Georgia executed Emanuel Hammond with the same batch of thiopental; Mr. Hammond opened his eyes and grimaced after the injection of the thiopental, suggesting that he was inadequately sedated. Liliana Segura, *the Executioner's Dilemma*, the Nation (May 12, 2011), available at: http://www.thenation.com/article/160648/executioners-dilemma# (last visited Feb. 19, 2015).

use in judicial lethal injections, as it had not been tested for the induction of anesthetic comas in humans. Sten Stovall, *Lundbeck "Horrified" at Drug Execution Use*, WALL STREET JOURNAL (June 8, 2011).[16] Georgia ignored this caution and, on June 23, 2011, executed Roy Blankenship pursuant to their new protocol. An AP reporter who witnessed the execution offered the following account of Mr. Blankenship's reaction:

> As the injection began, [Blankenship] jerked his head toward his left arm and made a startled face while blinking rapidly. He soon lurched to his right arm, lunging with his mouth agape twice. He then held his head up, and his chin smacked as he mouthed words that were inaudible to observers . . . . His eyes never closed.

Greg Bluestein, *Ga. Executes inmate convicted of Savannah slaying*, THE ATLANTA JOURNAL-CONSTITUTION (June 23, 2011). As another eyewitness said of the execution, "Blankenship was apparently much more aware of his surroundings at a time when he shouldn't have been." Eddie Ledbetter, *Making a date with death*, STATESBORO HERALD (June 25, 2011).

Lundbeck announced on July 1, 2011, that it was establishing a new distribution system to "deny orders from prisons located in states currently active in carrying out death sentences" and prohibiting the redistribution of pentobarbital without its authorization. Jeanne Whalen and Nathan Koppel, *Lundbeck Seeks to*

---

[16] Available at: http://online.wsj.com/article/ SB10001424052702304259304576373020954841208.html (last visited Feb. 19, 2015).

*Curb Use of Drug in Executions*, WALL STREET JOURNAL (July 1, 2011).[17] Undaunted, Georgia used the same protocol in short order to carry out the executions of Andrew DeYoung on July 21, 2011, and Troy Davis on September 21, 2011.

**C.      Georgia Changes Its Protocol – Again – On the Eve of an Execution**

Georgia next hastily adopted a new, one-drug lethal injection protocol at approximately noon on July 17, 2012 – the day before the scheduled execution of Warren Hill.    Rhonda Cook and Bill Rankin, *State changes lethal injection protocol, reschedules execution*, ATLANTA JOURNAL-CONSTITUTION (July 17, 2012).[18]  While Georgia offered no explanation for this eleventh-hour change, later reports revealed that Georgia's supply of pancuronium bromide – the second drug administered pursuant to its now-abandoned three-drug protocol – had expired on July 1, 2012, some two weeks before Mr. Hill's scheduled execution.   Rhonda Cook, *Expired drugs led to cancellation of execution by lethal injection*, ATLANTA JOURNAL-CONSTITUTION (Aug. 2, 2012).[19]

---

[17] Available at:  http://online.wsj.com/article/ SB10001424052702304584004576419092675627536.html (last visited Feb. 19, 2015).

[18] Available at: http://www.ajc.com/news/news/local/state-changes-lethal-injection-protocol-reschedule/nQXJc/ (last visited Feb. 19, 2015).  Mr. Hill's execution was ultimately stayed by the Supreme Court of Georgia.  The last-minute protocol adopted for his execution is Georgia's current protocol.

[19] Available at:  http://www.ajc.com/news/news/local/expired-drugs-led-to-

Following litigation over whether state law prohibited Georgia from changing its protocol without complying with the notice-and-comment procedures of its Administrative Procedures Act, Georgia promptly scheduled two executions: Warren Hill for February 19, 2013, and Andrew Cook on February 21, 2013. It is worth noting that Georgia's decision to schedule Mr. Hill and Mr. Cook's executions within days of each other appears to have been based upon its mistaken belief that its supply of pentobarbital expired on March 1, 2013; it actually expired on March 31. Ed Pilkington, *Georgia rushes through executions before lethal injection drugs expire*, THE GUARDIAN (February 21, 2013)("Georgia confirmed to the Guardian that its entire supply of pentobarbital expires on 1 March").[20] While Mr. Hill's execution was stayed, Mr. Cook was executed pursuant to the novel protocol.

### D. Georgia Embraces Secrecy

Shortly after Mr. Cook was executed, the Georgia Legislature adopted the lethal injection secrecy act. O.C.G.A. § 42-5-36 (d); *see also* Rhonda Cook and Bill Rankin, *Lethal injection secrecy bill wins approval*, ATLANTA JOURNAL-

---

cancellation-of-execution-by-/nQXhh/ (last visited Feb. 19, 2015).

[20] Available at: http://www.guardian.co.uk/world/2013/feb/21/georgia-executions-lethal-injection-drug-pentobarbital (last visited Feb. 19, 2015).

CONSTITUTION (March 26, 2013).[21] O.C.G.A. § 42-5-36. As contemporaneous media accounts noted, the legislation had two purposes:

> The legislation should make it easier for Georgia to obtain lethal-injection drugs as companies worldwide, in the face of strong criticism from opponents of capital punishment, have either stopped making lethal injection drugs or forbidden such drugs from being used for executions . . . . [and] *is also expected to make it more difficult for lawyers representing death-row inmates to challenge the state's lethal-injection process.*

*Ibid* (emphasis added). Indeed, these same reports suggest that Georgia first erected its lethal-injection-secrecy legislation in order to shield itself and the compounding pharmacies with which it might work from the "*legal* and public relations problems with a local pharmacist making up a batch of lethal injection drug on a case-by-case basis." Rhonda Cook, *Compounding pharmacies may be source of lethal injection drugs*, ATLANTA JOURNAL-CONSTITUTION (April 27, 2013)(emphasis added).[22] Interviews with the legislation's sponsor confirmed this motivation:

> The state would be pressed [to obtain drugs] if . . . executions [were] scheduled in the near future. That's why it's important for the state to shield the identities of doctors, pharmacists or drug providers that could be involved with procuring lethal injection drugs, said State Rep. Kevin Tanner, R-Dawsonville. He sponsored the legislation to

---

[21] Available at: http://www.ajc.com/news/news/state-regional-govt-politics/lethal-injection-secrecy-bill-wins-approval/nW4tK/ (last visited Feb. 19, 2015).

[22] Available at: http://www.myajc.com/news/news/state-regional/compounding-pharmacies-may-be-source-of-lethal-inj/nXXxT/ (last visited Feb. 19, 2015).

keep those identities secret, *expecting the state will have to turn to a pharmacist*.

*Id.*[23] Indeed, in a March 22 email, GDC attorney Robert Jones noted that "[i]f we cannot protect the identities of these individuals, we may not be able to obtain drugs to carry out executions." *Ibid* (emphasis added).

The act took effect on July 1, 2013. Two days later, on July 3, the Superior Court of Lee County, Georgia, issued an execution warrant for Mr. Hill, and Georgia set his execution for July 15. Rhonda Cook, *Execution date set for Warren Hill*, ATLANTA JOURNAL-CONSTITUTION (July 3, 2013).[24] On July 10, Defendants responded to a request made on Mr. Hill's behalf pursuant to Georgia's Open Records Act ("ORA"), disclosing redacted documents concerning their acquisition of and supply of lethal injection drugs. See Letter from Wilson to Painter of 07/10/2013 (attached as "Ex. 2"); Relying upon O.C.G.A. § 42-5-36, Defendant GDC redacted the names of the manufacturer, individuals or entities in the chain of supply, prescriber, compounding pharmacy, and pharmacist through

---

[23] Ironically, Rep. Tanner has subsequently sponsored a bill to repeal many of the statutory provisions that classify certain activities of the Board of Pardons and Paroles as state secrets, on the ground that "[t]here has to be a degree of transparency *in any government function*." Alan Judd, Criticized for secrecy, parole board to give crime victims a say, ATLANTA JOURNAL-CONSTITUTION (Dec. 2, 2014)(emphasis added), available at: http://www.myajc.com/news/news/crime-law/criticized-for-secrecy-parole-board-to-give-crime-/njKRY/#2d481da7.3937392.735649

[24] Available at http://www.ajc.com/news/news/state-regional/execution-date-set-for-warren-hill/nYc4m/ (last visited Feb. 19, 2015).

whom they obtained the drugs. *Id.* at 000001-000005. As discussed *infra* at 41-59, however, Defendants' one-time disclosure was sufficient to demonstrate that they obtained lethal injection drugs by inducing their hired doctor and pharmacy to act in violation of state and federal laws governing controlled substances.[25]

Mr. Hill subsequently filed a declaratory judgment action in the Superior Court of Fulton County that, pursuant to O.C.G.A. § 9-4-1 *et seq.*, challenged the Constitutionality of O.C.G.A. § 42-5-36(d). The Superior Court granted Mr. Hill's concurrently-filed request for an injunction to maintain the status quo until such time as the court could rule upon the merits of his Complaint for declaratory judgment, which the Supreme Court of Georgia overturned on interlocutory review on May 19, 2014. *Owens v. Hill*, 758 S.E.2d 794, 807, (Ga. 2014). Just nine days later, Georgia sought an execution warrant for Marcus Wellons; Mr. Wellons was

---

[25] Under the terms of Defendants' proposed Professional Services Agreement with this prescriber – which, if signed, would have been effective through June 30, 2014 – Defendants agreed to pay him or her a sum of $5,000 per annum in exchange for writing the prescriptions they require to obtain their lethal injection drugs. Ex. 2 at 000025-000026. They also offered to provide the prescriber with a litigation reserve fund of $50,000 and add the prescriber to the Georgia Department of Administrative Services' General Liability Policy, insuring him or her for "acts of medical negligence and omissions" in the amount of $1,000,000 per person and $3,000,000 per occurrence. *Id.*

ultimately executed on June 17, 2014.  Rhonda Cook and Bill Rankin, *Marcus Wellons executed*, ATLANTA JOURNAL-CONSTITUTION (June 18, 2014).[26]

### E.      Georgia Expands its Secrecy Act

In the seven months since Georgia resumed lethal injections, it has scheduled four executions[27] and carried out three: Robert Wayne Holsey, on December 8, 2015[28]; Andrew Howard Brannan, on January 13, 2015[29]; and Warren Hill, on January 27, 2015.[30]  Parties acting on behalf of death-sentenced prisoners have made numerous ORA requests to obtain information about how Defendants have acquired their lethal injection drugs for those executions and the

_____

[26] Available at: http://www.ajc.com/news/news/breaking-news/wellons-files-federal-appeal-to-delay-execution-fo/ngMpK/ (last visited Feb. 19, 2015).

[27] Georgia scheduled Tommy Waldrip's execution by lethal injection for 7:00 p.m. on Tuesday, July 10, 2014, but he received clemency prior to his execution. Rhonda Cook, *Waldrip's death sentence commuted to life without parole*, ATLANTA JOURNAL-CONSTITUTION (July 9, 2014), available at: http://www.myajc.com/news/news/breaking-waldrips-death-sentence-commuted-to-life-/ngcRm/ (last visited Feb. 19, 2015).

[28] Erik Eckholm, *After Delay, Inmate Is Executed in Georgia*, N.Y. TIMES (Dec. 9, 2014), available at: http://www.nytimes.com/2014/12/10/us/georgia-supreme-court-refuses-to-delay-execution.html (last visited Feb. 19, 2015).

[29] Amanda Sakuma, *Vietnam vet with PTSD Andrew Brannan first man executed in 2015*, MSNBC.COM (Jan. 13, 2015), available at: http://www.msnbc.com/msnbc/vietnam-vet-ptsd-set-be-first-man-executed-2015 (last visited Feb. 19, 2015).

[30] Alan Blinder, *Georgia Executes Warren Lee Hill for Murder*, N.Y. TIMES (Jan. 27, 2015), available at: http://www.nytimes.com/2015/01/28/us/georgia-executes-warren-lee-hill-for-murder.html (last visited Feb. 19, 2015).

qualifications of their execution personnel. No doubt mindful of the illegal

conduct revealed in the redacted documents that they disclosed to Mr. Hill in July

of 2013, however, Defendants have responded to those requests by asserting that

the secrecy act obliges them to withhold the *entirety* of any document or record

that contains identifying information classified by that statute.[31] Accordingly,

Defendants now refuse to disclose *any* documents – even redacted ones –

concerning the origins or nature of its lethal injection drugs and the mechanisms by

which it obtains them, or the qualifications of its personnel. *See, e.g.,* Letter from

Wright to Munro of 01/21/2015 (attached as "Ex. 3") at 1-3.

More disturbingly, Defendants are engaged in a game of keep-away with

prisoners and the Courts, continually broadening their interpretation of the scope of

their secrecy act to conceal more and more documents. Indeed, Defendants have

just moved yet another category of document into the classified column, asserting

that the secrecy act forbids the disclosure of their inventory logs for their lethal

---

[31] Defendants' increasingly secretive approach to these documents is contrary to both the spirit and letter of Georgia law. The Georgia Code states that the exception of certain records from the Open Records Act "shall be interpreted narrowly so as to exclude from disclosure only *that portion of a public record to which an exclusion is directly applicable*." §O.C.G.A 50-18-72(b)(emphases added). It further states that "[i]t shall be the duty of the agency having custody of a record to provide all other portions of a record for public inspection or copying." Ibid (emphasis added). In interpreting this provision, the Supreme Court of Georgia has accordingly held "that any purported statutory exemption from disclosure under the Open Records Act must be *narrowly construed*." *Hardaway v. Rives*, 262 Ga. 631, 422 S.E.2d 854 (Ga. 1992)(internal quotations omitted)(emphasis added).

injection drugs -- no doubt because those logs contain information critical to any protocol challenge, including the drugs' concentration and expiration date. Ex. 3 at 1-2. Defendants take this position despite the fact that they disclosed copies of these logs without objection as recently as *December 12, 2014*. See Letter from Wright to Munro of 12/12/2014 (attached as "Ex. 4").

The opportunism that motivates Defendants desire to stretch the protection of their secrecy act is plain. It is unclear, however, if they realize that their current position is tantamount to accusing themselves of breaking the law on the occasion of July 10, 2013, and for each of their subsequent disclosures of the controlled substance inventory log.

## III. Georgia's Current Protocol of Compounded Pentobarbital Presents a Risk of Harm

The most recent information that Defendants have divulged concerning the substance that they intend to use in Mr. Gissendaner's execution is a copy of the lethal injection procedures that they adopted on July 17, 2012. *See* Ex. 1 at 0008-0020. These procedures outline a one-drug lethal injection protocol featuring "Pentobarbital." *Id.* at 0014. As Defendants have not had any FDA-approved Pentobarbital in their possession since March of 2013[32], Ms. Gissendaner

---

[32] Discussed *infra* at 17-20. It should be noted at the outset that the safety and efficacy of even FDA-approved Pentobarbital for judicial executions is far from settled. As noted *supra*, the sole manufacturer of FDA-approved pentobarbital disputes its safety for use in executions, and -- as the Middle District

anticipates that Defendants will use a substance that purports to be Pentobarbital, but that has been mixed from unknown ingredients and in unknown circumstances by a compounding pharmacy.

The simple truth about any drug is that unless you know how it was made – where, and from what, and by whom – you cannot know what it is. A drug approved by the Food and Drug Administration provides those assurances. The same cannot be said for Georgia's lethal injection drugs, which are compounded from unknown ingredients in a concealed location. Accordingly, Georgia's decision to use such drugs both presents a substantial risk of significant harm to Ms. Gissendaner and demonstrates its continuing deliberate indifference to the Eighth Amendment's prohibition against cruel and unusual punishment.

A.      **Drug Compounding Remains Unregulated and Risky**

The compounding pharmacy industry operates in a "grey market" that is not subject to the FDA's drug-approval process or manufacturing standards.

---

of Alabama has observed -- "unlike sodium thiopental, which was the first drug in the three-drug execution protocol approved of by the Supreme Court in *Baze* . . . there is little scientific evidence on the effects of pentobarbital when injected into healthy and conscious humans  . . . . Judicial executions are the only known context in which pentobarbital is administered in this fashion." *Arthur v. Thomas*, 974 F. Supp. 2d 1340, 1349 (M.D. Ala. 2013)(denying defendant's motion for summary judgment as to, *inter alia*, the safety of pentobarbital in executions by lethal injection).

Declaration of Dr. Larry Sasich ("Sasich Decl.")(attached as "Ex. 5") at 4.[33] To receive FDA approval, injectable drugs must be sterile and meet other stringent requirements for quality, purity, and stability. Sasich Decl. at 5. These requirements are not luxuries. They exist because "[c]ountless members of the public have suffered and experienced pain before science-based federal regulations were implemented to protect the public from what had become the obvious hazards of injectable drugs contaminated with fungi, bacteria, and other contaminates." *Id.* at 6.

Indeed, pharmacists began compounding drugs not because they considered FDA-approval unimportant, but because the needs of some patients could not be met by FDA-approved products due to medical reasons. *Id.* at 2 ("For example, a two-year-old transplant patient may require a medication that is only available in an FDA-approved tablet form. In such a case, tablets may be reformulated into an oral liquid for administration.") This practice knowingly compromised federal standards, but only because it was necessary in order to meet critical medical needs. *Id.* Drug compounding has now grown, however, into an industry that manufactures what purport to be copies of FDA-approved products, but that are produced through manufacturing processes that are not federally regulated. *Id.* Because compounding pharmacies are not subject to FDA's drug approval process,

---

[33] Ms. Gissendaner has attached the Declaration of Dr. Larry Sasich, a pharmacist and consultant specializing in drug safety and efficacy.

rigorous checks, and regulatory procedures, even a compounding pharmacy operating in good faith can make critical mistakes that it lacks the capacity to detect until the damage has been done. *Id.*

For example, compounding pharmacies generally are unable to test chemicals to confirm their identity, potency, and purity, and to detect contamination. *Id.* at 4-5. Accordingly, while a pharmacist might accurately measure or weigh individual ingredients, he or she would have no way of discovering in a pharmacy setting if the ingredients themselves were adulterated or counterfeit. *Id.* At 5. A pharmacist unable to confirm the identity of a chemical would miss contaminants – a risk present at any stage of the chemical's manufacture – that would cause pain immediately upon intravenous administration. *Id.*

This is not an abstract problem. Compounding pharmacies frequently purchase bulk Active Pharmaceutical Ingredients (or "API's") and have become an entry point for counterfeit product whose manufacturer, impurity profile, age, storage history, manufacturing environment, and synthesis cannot be determined. *Id.* at 4. Many API's come from plants in India or China that are not registered with the FDA and that in some instances manufacture pesticides on the same equipment as they make API's. *Id.* A product made from such an ingredient will

always be lacking, regardless of the pharmacist's skill, and the pharmacist would be unable to detect its dangers.

Other, subtler risks that would not evade FDA inspection can plague even well-meaning compounding pharmacies. Cross-contamination can occur when the air supply for the room in which one drug is being compounded is not scrupulously segregated from the air supply in the room in which another, allergy-causing agent is being produced. *Id.* at 6. The consequence of cross-contamination can be immediate anaphylaxis. *Id.* Similarly, the acidity (or "pH") of any injectable drug "must be carefully adjusted to ensure that the recipient of the drug does not suffer an immediate painful sensation at the time of injection. Both a compromised API and improper compounding procedures can cause the pH of an injectable drug to be unacceptable." *Id.* Contamination with endotoxins can elicit an inflammatory reaction that causes shock. *Id.* Particulate matter contaminating sterile injectable drugs can become lodged in small blood vessels to agonizing effect. *Id.* Accordingly, "there are parameters beyond [a compounding pharmacy's] professional control that build risk and uncertainty into all compounded products." *Id.* at 5. This, above all else, is why use of FDA-approved drugs is necessary, and why Defendants' decision to employ these compounded drugs behind a veil of secrecy should not be tolerated.

## B.     State Board of Pharmacy Inspections Are Not Equivalent to FDA Approval

While some compounding pharmacies are subject to inspection by state pharmacy boards, the level of scrutiny applied is insufficient to address the concerns detailed above. An illustration of this can be found in an FDA Warning Letter issued to Grandpa's Compounding Pharmacy, Inc., in Placerville, California, on May 2, 2014, following a four-day inspection in October of 2013. *Id.* at 7-8 and App. B. The FDA found serious deficiencies in the pharmacy's production of sterile drug products, including: that the "cleanroom" where these products were being manipulated had air supply ductwork that was held together with duct tape and contained an in-wall air conditioner that could introduce outside air with unacceptable microbial and particulate levels; that operators were manipulating these "sterile" drugs with their wrists and forearms exposed; and that the pharmacy used tap water to clean the containers and closures intended for injectable drug products. *Id.* These deficiencies risk the contamination of compounded sterile products and could pose a substantial risk of immediate harm and pain when injected. *Id.*

In sum, "[t]he true contents of pharmacy-compounded pentobarbital injection, or any pharmacy-compounded drug, prepared from . . . . non-sterile API

are unknown." Ex. 5 at 10.[34] This reality creates an impermissible risk of Ms. Gissendaner's unconstitutional execution.

### C. Compounded Pentobarbital Has Led to Botched Executions

In light of these dangers, it is unsurprising that states using compounded drugs in executions have seen botched executions. When Oklahoma executed Michael Lee Wilson with compounded pentobarbital in January 2014, he cried out, "I feel my whole body burning!" Charlotte Alter, *Oklahoma Convict Who Felt "Body Burning" Executed With Controversial Drug*, TIME MAGAZINE (January 10, 2014).[35] Mr. Wilson's reaction is consistent with exposure to contaminants introduced by the unsafe compounding of Pentobarbital. Sasich Decl. at 6-7 ("the injection used in Mr. Wilson's execution likely contained cross-contaminates that he was allergic to, bacteria and endotoxins . . . . [and] could have had an altered pH due to contaminates or inadequate procedures used in the preparation of the drug.") Similarly, Jose Luis Villegas complained of a burning sensation when Texas executed him with compounded pentobarbital in April of 2014.[36] Further, when Eric Robert was executed with compounded pentobarbital in South Dakota in

---

[34] Ms. Gissendaner has attached the Declaration of Dr. Larry Sasich, a pharmacist and consultant specializing in drug safety and efficacy.

[35] Available at: http://nation.time.com/2014/01/10/oklahoma-convict-who-felt-body-burning-executed-with-controversial-drug/ (last visited Feb. 19, 2015).

[36] Vivian Kuo and Ralph Ellis, *U.S. Supreme Court grants stay of 'excruciating execution*, CNN (May 21, 2014)(discussing Villegas execution), available at http://www.cnn.com/2014/05/20/justice/missouri-videotaped-execution-russell-bucklew-duplicate-2/index.html (last visited Feb. 19, 2015).

October 2013, he gasped and snorted heavily, turned a blue-purplish hue, and took more than twenty minutes to die.[37]  These events were "consistent with the administration of a compounded drug that was contaminated or sub-potent." Sasich Decl. at 7.

It is important to note that the risks detailed above are only those generally raised by the use of drugs compounded in a pharmacy without FDA approval and regulation.  Given the lack of scrutiny of compounding pharmacies in general, the specific pharmacy used by Georgia could present different and even graver risks. Georgia's refusal to disclose information about their pharmacy, however, will ensure that those risks do not come to light -- yet another manifestation of its deliberate indifference to Ms. Gissendaner's constitutional rights.

### D.      Georgia's Has Likely Used Expired Pentobarbital

Dr. Sasich further notes that a review of Georgia's current lethal injection procedures indicate that Defendants are not storing their compounded drugs in keeping with  professional standards, which would cause those drugs to expire before they were used.  The standards promulgated by Chapter <797> of the

---

[37] Jill Johnson, *Witnesses Describe Events Inside Chamber*, KBLT NEWS, available at:  http://www.kdlt.com/index.php?option=com_content&task= view&id=21169&Itemid=72 (Last visited Oct. 15, 2014)*; see also* Steve Young, *Execution: South Dakota Delivers Eric Robert His Death Wish*, ARGUSLEADER.COM     (Oct.     16,     2012),     available     at: http://www.argusleader.com/article/20121016/NEWS/ 310160016/Execution-South-Dakota-delivers-Eric-Robert-his-death-wish (last visited Feb. 19, 2015).

United States Pharmacopoeia ("USP") define sterile products that have been manufactured from non-sterile ingredients – such as pharmacy-compounded pentobarbital sodium produced from an API – as "high-risk."  Ex. 5 at 9.  These high-risk compounds must be stored and transported within specific temperature requirements which, if not adhered to, "increases the risk of microbial growth, chemical degradation, contamination from physical damage to packaging, and permeability of plastic packaging."  *Id.* at 10.  These requirements apply "to the facility in which the pentobarbital sodium was produced; storage during transport; and storage at the facility at which the pentobarbital sodium will be administered." *Id.*  They allow for storage for not more than twenty-four hours at "controlled room temperature" (defined as 68º F to 77º F); for not more than three days at a "cold temperature" (defined as a temperature "not exceeding 46º F"); and for not more than forty-five days in "a solid frozen state at temperatures between . . . 13º F and 14º F."  *Id.*, citing USP <797>.

There is literally nothing in Georgia's lethal injection procedures to indicate that they are storing these compounded chemicals properly.  Further, as Dr. Sasich notes, the procedures also direct members of the execution team "to do things that make no sense," such as drawing the compounded drugs into syringes once they have been brought into the execution chamber, even though the drugs *are already in syringes*.  *Id.*  As Dr. Sasich notes, "draw[ing] sterile products from one syringe

34

to another . . . . increases the risk of contamination" and, accordingly, an unconstitutional execution. *Id.*

## IV.    Unqualified Personnel Present a Risk of Harm

### A.        The Botched Execution of Clayton Lockett

On April 29, 2014, the State of Oklahoma attempted to execute Clayton Lockett by lethal injection.  Instead, his execution was halted when he "began to writhe and gasp after he had already been declared unconscious and called out 'oh, man,' according to witnesses."  Erik Eckholm, *One Execution Botched, Oklahoma Delays the Next*, N.Y. TIMES (April 30, 2014).[38] One media witness offered a minute-by-minute account of Mr. Lockett's agony.

> **6:33 p.m.** The doctor checks Lockett a second time after a full minute without movement. "Mr. Lockett is unconscious," [Warden] Trammell states. It seems like it took longer than expected for this to occur . . . .

> **6:36 p.m.** Lockett kicks his right leg and his head rolls to the side. He mumbles something we can't understand.

> **6:37 p.m.** The inmate's body starts writhing and bucking and it looks like he's trying to get up. Both arms are strapped down and several straps secure his body to the gurney. He utters another unintelligible statement . . . .

---

[38] Available at: http://www.nytimes.com/2014/04/30/us/oklahoma-executions.html (last visited Feb. 19, 2015); *see also* Erik Eckholm and John Schwartz, *Timeline Describes Frantic Scene at Oklahoma Execution*, N.Y. TIMES (May 1, 2014), (last visited Feb. 19, 2015).

**6:38 p.m.** Lockett is grimacing, grunting and lifting his head and shoulders entirely up from the gurney. He begins rolling his head from side to side. He again mumbles something we can't understand, except for the word "man." He lifts his head and shoulders off the gurney several times, as if he's trying to sit up. He appears to be in pain.

**6:39 p.m.** The physician walks around to Lockett's right arm, lifts up the sheet and says something to Trammell. "We're going to lower the blinds temporarily," she says. The blinds are lowered and we can't see what is happening.

Ziva Branstetter, *Eyewitness account: A minute-by-minute look at what happened during Clayton Lockett's execution*, TULSA WORLD, May 1, 2014.[39]  Mr. Lockett continued to writhe in agony for thirty minutes. *Id.*  The Oklahoma Department of Corrections later announced that Mr. Lockett had died in the execution chamber of a heart attack at 7:06 p.m. *Id.*

It is beyond dispute that Mr. Lockett's execution violated his Eighth Amendment rights.  Erik Eckholm & Motoko Rich, *Oklahoma Faces Sharp Scrutiny Over Botched Execution*, N.Y. TIMES, (April 30, 2014)("As [Mr. Lockett] began to buck and moan in apparent agony, corrections officials pulled the blinds on witnesses.")[40] A report by the Oklahoma Office of Public Safety has conceded

---

[39] Available at: http://www.tulsaworld.com/news/state/eyewitness-account-a-minute-by-minute-look-at-what-happened/article_f7764efc-d036-11e3-af7e-0017a43b2370.html (last visited Feb. 19, 2015).

[40] Available at: http://www.nytimes.com/2014/05/01/us/oklahoma-faces-sharp-scrutiny-over-botched-execution.html?hp. The White House joined those condemning the execution, stating that the Lockett execution fell short of the

at least that the intravenous line placed into his groin failed. Erik Eckholm, *IV Misplaced in Oklahoma Execution, Report Says*, N.Y. TIMES, Sep. 4, 2014.[41] Oklahoma has also disclosed that it took fifty-one minutes to insert an intravenous line, with the execution team ultimately inserting it through his groin – "a more difficult procedure because the intended vein is not visible." *Id.* Indeed, the paramedic and physician charged with obtaining intravenous access punctured multiple parts of Mr. Lockett's body at least twelve times, before essentially jury-rigging a solution by inserting a too-short catheter in Mr. Lockett's right femoral vein and attempting to secure it with tape. Carol Cole-Frowe, *Doctors Say Flaws Led to Suffering in Oklahoma Execution*, N.Y. TIMES, Dec. 17, 2014[42], *see also* Cary Aspinwall and Ziva Branstetter, *Secrets still shroud Clayton Lockett's execution, Failed IV line was started by a medical professional whose credentials are a secret under state law*, TULSA WORLD (May 12, 2014).[43] The consequences of these errors were grotesque. As an anesthesiologist testified during a hearing on

---

country's standard that "even when the death penalty is justified, it must be carried out humanely," and pledged to examine executions by lethal injections.

[41] Available at: http://www.nytimes.com/2014/09/05/us/oklahoma-report-on-clayton-lockett-execution.html?_r=0 (last visited Feb. 19, 2015).

[42] Available at http://www.nytimes.com/2014/12/18/us/doctors-say-flaws-led-to-suffering-in-oklahoma-execution.html?_r=0 (last visited Feb. 19, 2015).

[43] Available at: http://m.tulsaworld.com/news/state/secrets-still-shroud-clayton-lockett-s-execution/article_5513ea6b-1f24-519e-9340-66c42b109502.html?mode=jqm) (last visited Feb. 19, 2015).

the events surrounding Mr. Lockett's execution, he was most likely "conscious, in intense pain, and feeling the equivalent of liquid fire from the inappropriate use of drugs used to kill him . . . ." *Id.*

Oklahoma's botched execution of Mr. Lockett highlights the risks of Georgia's refusal to disclose the qualifications of the personnel who will prepare Mr. Gissendaner for her execution. Pentobarbital is a barbiturate which, when manufactured in accordance with FDA regulations, has a pH of 9.5, is extremely caustic and "will burn when injected." Declaration of Dr. Joel Zivot ("Zivot Decl.")(attached as "Ex. 6") at ¶¶ 15, 17.[44] Accordingly, "[i]f an execution-team member were to inadvertently inject pentobarbital directly into the tissue (through, for example, improper placement of the intravenous line) that tissue will be seriously and irretrievably damaged. This tissue destruction would result in intense pain for Ms. Gissendaner." Zivot Decl. at ¶ 17.

Intravenous access is obtained by using a needle to introduce a catheter into either a peripheral vein, typically in the arm or hand, or a central vein, typically in the neck, chest or groin. Particular expertise would be required to manage intravenous access in the context of an execution, as "[m]any people with expertise

---

[44]Ms. Gissendaner has attached the declaration of Dr. Joel Zivot, a board-certified anesthesiologist, professor at the Emory University School of Medicine, the Medical Director of the Cardiothoracic Intensive Care Unit at Emory University Hospital, and the fellowship director for training in Critical Care Medicine." Zivot Decl at ¶1.

in a health-care setting would lack the expertise necessary to overcome the challenges posed by the setting and circumstances of lethal injection." Zivot Decl at ¶ 6. For example, the placement of a peripheral line "requires the application of a tourniquet to the arm followed by the search for a vein." *Id.* at ¶ 7. In the context of lethal injection in Georgia, however, "[i]ntravenous access takes place in the execution chamber when the inmate is already restrained." *Id.* This poses a number of challenges, as "[i]n a situation when an inmate is nervous or participating involuntarily, intravenous access is even more difficult." *Id.* "The person choosing the vein would also have to account for the effect of the restraints on the viability of the vein selected." *Id.* Nor would the personnel have infinite attempts without consequence, as "repeated attempts are actually increasingly unlikely to succeed." *Id.* at ¶ 8. Further, "[t]he placing of intravenous catheters is painful, and that pain only increases with multiple, prolonged attempts." *Id.*

In the event that the execution team resorted to attempting a central line, "[t]he standard of care for that procedure requires the use of ultrasound to locate a central vein" – for which this protocol does not provide. *Id.* at ¶ 9. "Many physicians lack the necessary skill to use ultrasound and to place central venous access," and this protocol does not ensure – and Defendants, citing their secrecy act, will not reveal – whether "the physicians on hand possess the necessary skills . . . ." *Id.* The execution team did not use "ultrasound to guide catheter placement"

in the execution of Mr. Lockett, and that failure, "confirmed by post-mortem examination, resulted in what is widely acknowledged as an excruciatingly painful death." *Id.* at ¶ 10.

Florida's botched execution of Angel Diaz in 2006 further illustrates the gruesome consequences of the improper placement of an intravenous line by inexperienced or unqualified personnel. In Mr. Diaz's case, the misplaced line allowed the caustic lethal injection drugs to leak into the soft tissue of his arms. The drugs accordingly failed to render him unconscious while causing chemical burns so severe that a great deal of the skin on his arms sloughed away, mutilating him. Mr. Diaz likely suffocated to death before the execution drugs could end his life. Ben Crair, *Photos from a Botched Lethal Injection*, THE NEW REPUBLIC (May 29, 2014).[45]

Another consequence of unqualified execution team personnel is illustrated by the case of Romell Broom, whom Ohio attempted to execute in 2009. After Mr. Broom was brought to the execution chamber, the personnel on Ohio's execution team – none of whom were qualified to insert an intravenous line – stabbed him with needles for an hour in an attempt to find a vein. The team ultimately brought

---

[45] Available at: http://www.newrepublic.com/article/117898/lethal-injection-photos-angel-diazs-botched-execution-florida (last visited Feb. 19, 2015). Ms. Gissendaner cautions the Court that the photos of the damage done to Mr. Diaz by the improperly-injected drugs are quite graphic.

in a prison doctor to assist, but after another ninety minutes of futile attempts and a total of eighteen needle sticks – which left Mr. Broom in agony – the governor halted his execution. In the six years since, Ohio has been unable to schedule Mr. Broom's execution because of litigation over whether a state can try again to execute a prisoner who survives the first attempt, and whether the initial, failed attempt constitutes cruel and unusual punishment. Stephanie Mencimer, *Is it legal to try executing someone twice?*, MOTHER JONES (June 6, 2014).[46]

### B. Intravenous Access for Ms. Gissendaner Will Require Expertise

The need for qualified personnel is of increased importance in this case, as Ms. Gissendaner's gender and health present particular concerns for anyone attempting to obtain intravenous access. "Female gender . . . is a risk factor for difficult intravenous access, as their venous systems tend to be smaller than those of men." Zivot Decl. at ¶ 11. Further, Ms. Gissendaner is obese, which makes "[i]ntravenous access . . . very difficult to obtain . . . ." *Id.* Her obesity also places her at risk for obstructive sleep apnea, which, in Ohio's botched execution of Dennis McGuire, contributed to his choking and gasping during his prolonged and painful execution. *Id.* at 12.[47]

---

[46] Available at: http://www.motherjones.com/politics/2014/06/romell-broom-ohio-execution (last visited Feb. 19, 2015).

[47] If this Court were to grant a stay, Ms. Gissendaner would seek an access order to allow Dr. Zivot to examine her and administer the STOP-Bang questionnaire, which predicts sleep apnea.

41

Any one of these factors should compel Defendants to provide, at the very least, the qualifications of those members of the execution team responsible for inserting the catheters into Ms. Gissendaner's body. Their refusal to do so cannot be reconciled with the Constitution.

## V. Defendants Have Illegally Obtained Their Lethal Injection Drugs

### A. Pentobarbital Can Only Be Compounded Pursuant to a Valid Prescription

Pentobarbital is a "controlled substance" under state and federal law. The federal Controlled Substances Act ("CSA") and its implementing regulations categorize controlled substances[48] in one of five "schedules" based upon whether those substances have an accepted medical use in the United States, their relative potential for abuse, and the likelihood that they will cause dependence when abused. 21 U.S.C. § 801 *et. seq.*[49] Pentobarbital, which is a powerful barbiturate,

---

[48] Controlled substances are drugs and other substances that have a potential for abuse and psychological and physical dependence; these include opioids, stimulants, depressants, hallucinogens, anabolic steroids, and drugs that are immediate precursors of these classes of substances.

[49] When enacting the CSA in 1970, Congress recognized that while "[m]any of the drugs included with [the CSA] have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people . . . [t]he illegal . . . distribution, and possession and improper use of controlled substances have a substantial and detrimental impact on the health and general welfare of the American people." 21 U.S.C. § 801. In order to prevent the diversion of these substances for illicit purposes, Congress established a "closed system of drug distribution," which is codified in the CSA and other statutory

42

has been categorized as a "Schedule II" controlled substance.  While the controlled substances listed in Schedule II have accepted medical uses in treatments within the United States, they also have both a high potential for abuse and the greatest potential for physical and psychological dependence of all FDA-approved controlled substances.  21 U.S.C. § 812(b)(2).  Consequently, the manufacture, distribution, and dispensation of Schedule II controlled substances is – and, indeed, must be – subject to the most-restrictive controls applied to any FDA-approved controlled substance.

Accordingly, the CSA allows for the compounding of Schedule II substances only within a narrow set of exceptions.   The relevant exception in this circumstance is if "the drug product is compounded for an *identified individual patient* based on the . . . receipt of a *valid prescription order* or a notation, approved by the prescribing practitioner, on the prescription order that a compounded product is *necessary* for the identified patient . . . .").  21 U.S.C. § 353a(a)(emphases added).[50]

---

provisions. Georgia law provides a parallel closed system.  Georgia Controlled Substances Act, O.C.G.A. § 16-13-1 et seq.

[50] Further, pursuant to Georgia law, a "[p]harmacist may not compound Schedule II, III, IV or V controlled substances, as defined in Article 2 of Chapter 13 of Title 16 *without a patient specific prescription drug order*." 480-11-.02(2)(h) (emphasis added).

Federal law states that a prescription for a controlled substance may be issued only by an individual practitioner who is "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession and . . . [is] either registered or exempted from registration" with the Drug Enforcement Administration ("DEA"). 21 C.F.R. §1306.03.[51] To issue lawful prescriptions of Schedule II drugs, physicians must "obtain from the Attorney General a registration issued in accordance with the rules and regulations promulgated by him." 21 U. S. C. §822(a)(2).[52]

The CSA further requires a "medical purpose" for dispensing any controlled substance. 21 U. S. C. §829(c). Indeed, it defines a "valid prescription" as one "issued for a *legitimate medical purpose*." 21 U. S. C. §830(b)(3)(A)(ii)(emphasis added). Accordingly, Section 1306.04(a) of Title 21 of the Code of Federal

---

[51] In keeping with the strict regulation of Schedule II controlled substances, prescriptions for them are required to contain patient-specific information including: the patient's name and address; the drug's name, strength, dosage form, quantity prescribed, and directions for use; and the name, address, and DEA number of the issuing practitioner. 21 CFR 1306.05(a). Further, all prescriptions for controlled substances must be dated as of, and signed on, the day when issued. 21 U.S.C. 829. Georgia law contains similar requirements, as detailed in O.C.G.A. § 16-13-41(b).

[52] The Attorney General may deny, suspend, or revoke this registration if the physician's registration would be "inconsistent with the public interest." 21 U. S. C. §§824(a)(4), 822(a)(2). When deciding whether a practitioner's registration is in the public interest, the Attorney General "shall" consider, *inter alia*, his or her "[c]ompliance with applicable State, Federal, or local laws relating to controlled substances." 21 U.S.C. §823(f).

Regulations states that "[a] prescription for a controlled substance to be effective must be *issued for a legitimate medical purpose* by an individual practitioner *acting in the usual course of his professional practice*."   21 CFR §1306.04(a) (2005)(emphases added).[53]

## B.    Doctors Are Allowed to Prescribe for Medical Purposes Only

As the Supreme Court has held, "[i]mplicit in the registration of a physician is the understanding that he is authorized only to act '*as a physician.*'"   *U. S. v. Moore*, 423 U.S. 122, 141 (1975)(emphasis added). Accordingly, the CSA has the "intent to limit a registered physician's dispensing authority *to the course of his 'professional practice.*'"   *Moore*, 423 U.S. at 140 (emphasis added).[54]

---

[53] The Georgia Code echoes that requirement as well:
No person shall prescribe or order the dispensing of a controlled substance, except a registered practitioner who is:

(1)    Licensed or otherwise authorized by this state to prescribe controlled substances;

(2)    Acting *in the usual course of his professional practice*; *and*

(3)    Prescribing or ordering such controlled substances *for a legitimate medical purpose*.

O.C.G.A. § 16-13-41(f)(emphases added).

[54] "Dispense" is defined in 21 U.S.C. § 802(10) to mean "to deliver a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance . . . ."

45

> In the case of a physician, [the CSA] contemplates that he is authorized by the State to practice medicine and to dispense drugs in connection with his professional practice. The federal registration, which follows automatically, extends no further. It authorizes transactions within "the legitimate distribution chain" and *makes all others illegal . . . .*

*Moore,* 423 U.S. at 140-141 (1975)(emphasis added).

In *U.S. v. Collier*, the Fifth Circuit explained the restrictions imposed by "in the course of [his or her] professional practice" as follows:

> Manifestly the language 'in the course of professional practice' is intended to limit the immunity of a licensed practitioner. A licensed practitioner is not immune from the [prohibitions of the Controlled Substance Act] solely due to his status….but rather, because he is expected to *prescribe* or dispense drugs *within the bounds of his professional practice of medicine*. A physician is restricted to dispensing or prescribing drugs in the *bona fide treatment of a patient's disease*[.]

478 F.2d 268, 271 (5th Cir. 1973)(emphases added).[55]

## C. A Pharmacy Cannot Compound or Dispense an Invalid Prescription

The CFR further notes that while "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner . . . *a corresponding responsibility rests with the pharmacist who fills the prescription*." 21 CFR § 1306.04 (emphasis added). Accordingly, "[a]n order

---

[55] Fifth Circuit decisions from prior to 1981 are considered binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

purporting to be a prescription issued not in the usual course of professional treatment . . . *is not a prescription within the meaning and intent* of section 309 of the [Controlled Substances] Act . . . ." *Ibid* (emphasis added).[56] Further, "*the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.*" *Ibid* (emphasis added). Dispensing controlled substances without a valid prescription is a federal crime. See, e.g., 21 U. S. C. §841(a)(1) (2000 ed., Supp. II); *United States v. Moore*, 423 U. S. 122 (1975).[57]

---

[56] These prohibitions are also found in Georgia Law and the rules of the Georgia Pharmacy Board. *See* 480-22-.02(1) " The responsibility for the proper prescribing of controlled substances is upon the prescribing practitioner, but the pharmacist is responsible for the proper filling of the prescription drug order. Any person knowingly filling a purported prescription drug order, as well as the person issuing it, shall be subject to disciplinary action); 480-5-.03(c) ("Error or Uncertain Prescriptions")(" No pharmacist or pharmacy intern/extern shall *compound or dispense* any prescription, which, in his/her professional opinion, contains any error omission, irregularity or ambiguity . . . .  No pharmacist or intern/extern shall dispense any medication by virtue of a prescription if said pharmacist or intern *has any doubt existing in his mind that such prescription is not legitimate*"); 480-5-.03(o)("Valid Prescription Drug Orders")("Prescription drugs shall be dispensed only pursuant to a valid prescription drug order. A pharmacist shall not dispense a prescription which the pharmacist *knows or should know is not a valid prescription*. A pharmacist shall have the same corresponding liability for prescriptions as an issuing practitioner as set forth in 21 C.F.R. as such regulation exists on January 1, 2013").

[57] The CSA further states that "[n]o controlled substance that is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act may be delivered, distributed, or dispensed *by means of the Internet* without a valid

47

**D.      Georgia Obtained Their Lethal Injection Drugs Through a Fraudulent Prescription**

Upon information and belief, Georgia has obtained the "Pentobarbital" that it has used or intended to use in the six executions it has scheduled since the enactment of its lethal injection secrecy act by hiring an unidentified doctor to write a "patient specific drug order" authorizing the compounding of that drug – a prescription that was invalid, as it was written for no legitimate medical purpose. Further, Mr. Gissendaner believes that Defendants intend to obtain the drugs for her execution through the same illegal means.

As noted *supra*, Ms. Gissendaner bases this allegation upon redacted documents disclosed by Defendants on July 10, 2013, in response to an Open Records Act request made on behalf of Warren Hill, a death-row prisoner in Georgia.  Ex. 2.  These documents reveal that beginning on July 2, 2013 – the day after the lethal injection secrecy act took effect – Defendants quickly entered into agreements with an unknown compounding pharmacy and an unknown doctor in

---

prescription."  21 U.S.C.A. § 829 (emphasis added).  The CSA defines a "valid prescription" for this subsection as "a prescription that is issued for a legitimate medical purpose in the usual course of professional practice by . . . a practitioner who has conducted *at least 1 in-person medical evaluation of the patient*; or . . . a covering practitioner."  *Id.*  The CSA defines "in-person medical evaluation" as "a medical evaluation that is conducted *with the patient in the physical presence of the practitioner*, without regard to whether portions of the evaluation are conducted by other health professionals."  *Id.*

order to procure Pentobarbital for the execution of Mr. Hill, which was then scheduled for July 15, 2013.  Ex. 2 at 000005-000039.

It is clear from this correspondence that in order to procure the services of both the doctor and the pharmacy, Defendants were obliged to go to great lengths to reassure them that their involvement in procuring controlled substances would incur no consequences and, indeed, would never be discovered.  Under the terms of Defendants' proposed Professional Services Agreement with this anonymous doctor – which was effective through June 30, 2014 – Defendants agreed to pay him or her a sum of $5,000 *per annum* in exchange for writing the prescriptions they required to obtain their lethal injection drugs.  Ex. 2 at 000025-000026. As further inducement, Defendants also offered to provide the doctor with a litigation reserve fund of $50,000 and add him or her to the Georgia Department of Administrative Services' General Liability Policy, insuring him or her for "acts of medical negligence and omissions" in the amount of $1,000,000 per person and $3,000,000 per occurrence.  *Id.*

In the same email to which they attached this agreement, Defendants repeatedly assured their doctor that he or she would face no legal or licensure consequences for writing these prescriptions.  Defendants begin by quoting Section 17-10-38 of the Georgia Code, which reads:

> Notwithstanding any other provision of law, prescription, preparation, compounding, dispensing, or administration of a lethal injection

49

authorized by a sentence of death by a court of competent jurisdiction *shall not constitute the practice of medicine* or any other profession relating to health care which is subject by law to regulation, licensure, or certification.

O.C.G.A. § 17-10-38(c)(emphasis added); *see* Ex. 2 at 000022-000032.[58]

Defendants buttressed these assurances by citing O.C.G.A. 17-10-42.1, which "[a]dditionally . . . provides that any participation by a medical professional in this process cannot serve as a basis for challenge or suspension of any medical professional's license." Ex. 2 at 000022. Saving the best for last, Defendants closed with the secrecy statute, informing the doctor that "O.C.G.A. 42-5-36 was amended this year to provide that the identifying information about any person or entity assisting in this process is a confidential state secret." *Id.*[59] Defendants provided the same statutes to their compounding pharmacy, which entered into a "confidentiality and nondisclosure agreement with Defendants the following day. Ex. 2 at 000015-18.

With all parties assured that they were operating with impunity and anonymity, Defendants set about brokering the compounding of their lethal injection drugs. Indeed, the parties' subsequent correspondence demonstrates that

---

[58] Defendants also refer to Section 17-10-42.1, which states that "[p]articipation in any execution of any convicted person carried out under this article shall not be the subject of any licensure challenge, suspension, or revocation for any physician or medical professional licensed in the State of Georgia." O.C.G.A. § 16-13-41.

[59] Defendants also attached copies of these statutory provisions to their email.

Defendants served as a go-between for the doctor and the pharmacy, relaying the information that the compounding pharmacy required to compound the drugs to the doctor and – most critically – providing the doctor with all of the information about Mr. Hill that he or she needed to fill out a prescription for a Schedule II controlled substance.

On July 8, Defendants sent the following urgent message to their doctor:

> I apologize for emailing you again so soon. I spoke with the compounding pharmacist earlier today and I wanted to relay some instructions he gave regarding the prescription. Along with the patient name, he also needs their birthday and social security number. *I will be happy to forward this information along to you when you are preparing to write the prescription.* I just wanted to give you a heads up.

Ex. 2 at 000036 (emphasis added).

On July 9, the pharmacist evidently followed up on his telephone conversation with Defendants by emailing them a list of the "information . . . that is required to be on the rx."  Ex. 2 at 000020.

> Today's date
> *Inmate Name, DOB and Address*
> *lnmate SSN*
> Drug Name: PENTOBARBITAL SODIUM 50MG/ML INJ SOL
> QTY: 6 X 50ML SYRINGES (2.5GM EA)
> *SIG: ADMINISTER AS ORDERED PER DEATH WARRANT*
> Dr's Printed Name and signature
> Dr's DEA#

Ex. 2 at 000020 (emphases added).

51

Defendants promptly filled in Mr. Hill's biographical information and forwarded it to their doctor.

> *Below I have provided how the prescription should be written.* Additionally, I have attached the court order. Please let me know if you need any clarification or additional information.

> July 9, 2013
> Name: Warren Lee Hill, Jr.
> DOB: [redacted by Ms. Gissendaner]
> SSN: [redacted by Ms. Gissendaner]
> Address: 2978 Hwy 36 W, Jackson, GA 30233
> Drug Name: PENTOBARBITAL SODIUM 50MGIML INJ SOL
> QTY: 6X 50ML SYRINGES (2.5GM EA)
> SIG: ADMINISTER AS ORDERED PER EXECUTION ORDER
> Dr's Printed Name and signature
> Dr's DEA#

Ex. 2 at 000037 (emphasis added).

### E.    Defendants' Doctor, Compounding Pharmacy, and Prison Pharmacy are Violating State and Federal Law.

Every stage of Defendants' scheme to obtain compounded Pentobarbital violates Federal and State law – beginning, of course, with the invalid prescription they paid their doctor to write.

In the first place, there is simply no argument that this prescription was written for a "legitimate medical purpose." Ironically, the very statute upon which Defendants relied to assure their doctor that he or she will face no repercussions for prescribing drugs for use in lethal injections places that activity outside of Georgia's definition of "the practice of medicine." O.C.G.A. § 17-10-38(c).

Further, judicial lethal injections could not be sensibly construed as "the practice of medicine" under any rubric.   The Georgia Code defines "the practice of medicine" as follows:

> [H]old[ing] oneself out to the public as being engaged in the diagnosis or treatment of disease, defects, or injuries of human beings; or the suggestion, recommendation, or prescribing of any form of treatment for the intended palliation, relief, or cure of any physical, mental, or functional ailment or defect of any person with the intention of receiving therefor, either directly or indirectly, any fee, gift, or compensation whatsoever; or the maintenance of an office for the reception, examination, and treatment of persons suffering from disease, defect, or injury of body or mind . . . .

O.C.G.A. § 43-34-21.   The American Medical Association has issued an opinion stating that "[a] physician, *as a member of a profession dedicated to preserving life when there is hope of doing so*, should not be a participant in a legally authorized execution . . . ."   American Medical Association Code of Medical Ethics, Opinion 2.06 (emphasis added).[60]  "In the case where the method of execution is lethal injection, the following actions by the physician would . . . constitute physician participation in execution: . . . *prescribing*, preparing, administering, or supervising injection drugs . . . ."  *Ibid* (emphasis added).  The Medical Association of Georgia ("the MAG")  has adopted the AMA's ethical rules.  See Chapter I, Sections 1(f)

---

[60] Available at: http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion206.page?utm_content=buffer4cdd5&utm_medium=social&utm_source=twitter.com&utm_campaign=buffer (last visited Feb. 19, 2015).

and 2(a), Constitution and Bylaws of the Medical Association of Georgia.[61] The MAG has also adopted its own policy stating that "[t]he participation of physicians in the implementation of the death penalty, particularly by the method of lethal injection, should not be required by the State of Georgia, inasmuch as a physician's primary responsibility *is to sustain and prolong life.*" See Policy 140.984 ("Capital Punishment(Death Penalty)"), MAG Policy Compendium at 23(emphasis added).[62] As this prescription is not written in the practice of medicine, it cannot be written for a legitimate medical purpose, and within the course of the doctor's usual practice. Accordingly, the doctor's prescription is not permitted under state and federal law.

Nor is the prescription written within a physician-patient relationship. The physician-patient relationship "is a consensual one wherein the patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient." *Clanton v. Von Haam,* 177 Ga.App. 694, 696 (Ga.App.,1986), citing *Buttersworth v. Swint*, 53 Ga.App. 602, 603-604(2) (1936). As is clear from the correspondence between Defendants and their doctor, discussed *supra* at 15-20, he

---

[61] Available at page three of:
http://www.mag.org/sites/default/files/downloads/mag-candb-2013.pdf (last visited Feb. 19, 2015).

[62] Available at:
http://www.mag.org/sites/default/files/downloads/mag-policies-032114.pdf (last visited Feb. 19, 2015).

or she had no such relationship with Warren Hill when he or she wrote the prescription necessary for Defendants to obtain their lethal injection drugs. Upon information and belief, Defendants' doctor had no more of a relationship with Mr. Waldrip, Mr. Holsey, Mr. Brannan, and Mr. Hill (again) when he or she wrote a prescription "for" them to be executed, and will have no more of one with Ms. Gissendaner when writing one for her.

The next illegal action is taken by Defendants' compounding pharmacy, which, as is illustrated by their correspondence with Defendants, is compounding a controlled substance pursuant to a prescription that it knows is invalid. The CSA also imposes several requirements upon the person or entity compounding the drugs. It is impossible to determine whether the compounder used by Defendants meets these criteria, of course, because its identity is a confidential state secret.[63]

Finally, Defendants' pharmacy at the Georgia Diagnostic and Classification Prison ("GDCP") – which orders, stores, and dispenses the controlled substances

---

[63] It is unclear, for example, whether the compounding pharmacy's transfer of the lethal injection drug comports with federal law. The transfer of a compounded controlled substance to anyone other than the ultimate user as defined by the CSA constitutes the distribution of a controlled substance, and the compounding of drugs for distribution is manufacturing. The CSA defines an "ultimate user" as "a person who has lawfully obtained, and who possesses, a controlled substance *for his own use or for the use of a member of his household or for an animal owned by him or by a member of his household.*" 21 U.S.C. § 802(27)(emphasis added). The lethal injection secrecy act prevents Ms. Gissendaner or this court from determining whether the compounder here is licensed as a manufacturer.

that the GDC uses to carry out executions – is dispensing a controlled substance

that it knows, by virtue of its participation in the above-detailed correspondence,

was obtained through an invalid prescription.[64]

Indeed, the degree to which Defendants' conduct flouts the intent of the

CSA cannot be overstated. Doctors are authorized to prescribe and order the

compounding of a controlled substance in the expectation that they will do so for

the sole purpose of providing medical care that is *necessary* to meet the specific

needs that they have identified for their patient. 21 U.S.C. § 353a(a). By contrast,

Defendants' doctor could not know less about these condemned prisoners. Indeed,

none of the information required for a prescription to compound a Schedule II

controlled substance comes from the doctor. Mr. Hill's information – which is

intended to be obtained within the physician-patient relationship, and is normally

provided as part of consent for treatment – was provided by Defendants. The

---

[64] Upon information and belief, the GDCP's pharmacy is licensed by the State of Georgia as a "prison pharmacy" and a "researcher pharmacy," and is registered with the DEA as a hospital/clinic, which is a category of institutional practitioner. A prescription or order is also required for the dispensation of Schedule II substances if the practitioner is an "institutional practitioner," which the C.F.R. defines as "a hospital or other person (other than an individual) licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which it practices, to dispense a controlled substance in the course of professional practice . . . ." 21 C.F.R. § 1300.01. The C.F.R. states that "[a]n institutional practitioner may administer or dispense directly (but not prescribe) a controlled substance listed in Schedule II *only* pursuant to a written prescription signed by the prescribing individual practitioner or to an order for medication made by an individual practitioner that is dispensed for immediate administration to the ultimate user." 21 C.F.R. § 1306.11(c)(emphasis added).

directions for the drug's administration come from the compounding pharmacy, and merely parrot the execution order. Defendants' doctor, who is allowed to order controlled substances in the practice of medicine, is merely performing data entry in the prescription pad that he or she has sold to Defendants for $5,000. It is well-compensated data entry, to be sure, but it is not the practice of medicine. While the statutes upon which Defendants relied were intended to insulate medical practitioners from licensure challenges based upon their participation in executions by lethal injections – they cannot also be used to excuse Defendants, or their doctor, or their pharmacy – from the state and federal regulatory schemes that govern the dispensation of controlled substances.

Further, even if Defendants could argue that their statutes insulating doctors and pharmacists from licensure challenges excused them from abiding by *state laws* governing controlled substances, the Supremacy Clause of the United States Constitution would preempt any state law that attempted to authorize violations of federal law. U.S. Const. art. VI, cl. 2 (federal law "shall be the supreme law of the land . . . anything in the constitution or laws of any state to the contrary notwithstanding"); *Arizona v. United States*, 132 S.Ct. 2492, 2500 (2012)("[u]nder this principle, Congress has the power to preempt state law"); *Gonzales v. Raich*, 545 U.S. 1 (2005); *Mich. Canners & Freezers Ass'n v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 478 (1984)(state law's authorization of conduct forbidden by

federal act "stands as an obstacle to the accomplishment and execution of the full purposed and objectives of Congress"). Accordingly, this state law provision, even if it were applicable in some way to the GCSA, could not empower Defendants, their doctor, or their compounding pharmacy to disregard the CSA with impunity.

## F.    Georgia Deliberately Uses Its Secrecy Act to Conceal Illegal Activity

Georgia's method of obtaining these drugs would be troubling enough were it the product of an error or oversight. On the contrary, as discussed *supra*, however, the lethal injection secrecy act upon which Georgia now rely to conceal these transactions was evidently adopted precisely so that Georgia could obtain its lethal-injection drug of choice with no possibility of legal ramifications for it or its accessories.

It is worth noting, however, that Georgia was hardly compelled to obtain compounded Pentobarbital in order to continue with executions. Georgia's lethal injection statute does not limit the drugs that the Georgia can use when carrying out executions beyond requiring that they use "a substance or substances sufficient to cause death . . . ." O.C.G.A. § 17-10-38(a), and the Supreme Court of Georgia has empowered Georgia to change their protocol at will and at any time with no supervision from any other entity or meaningful notice to the prisoner or the

public. *Hill v. Owens,* 292 Ga. 380 (2013).[65]   Accordingly, when Pentobarbital became unavailable, Georgia could have chosen a lethal injection drug that is either not a controlled substance or that is available from a source other than a compounding pharmacy and for which no patient-specific prescription would be required.  It is certainly telling that Georgia opted instead to induce a doctor and pharmacy to help them compound it outside of state and federal law, and to shield those entities and themselves from any scrutiny by the public or the courts.

Finally, Ms. Gissendaner notes that the above-detailed agreements that Defendants entered into with their hired doctor and pharmacist evidently expired in June of 2013.  As they are continuing to use compounded pentobarbital in their executions, they must be obtaining it through similarly impermissible means. Because of the veil of their secrecy act, however, there is simply no telling how Defendants are obtaining these drugs, and whether they are committing any additional violations in the process.  As each of these actions reflects the deliberate

---

[65] Ironically, the Georgia Supreme Court's decision in *Hill* concluded that notice-and-comment procedures of Georgia's Administrative Procedures Act were unnecessary to ensure constitutional executions in large part because "[t]he particular issue of lethal injection procedures is heavily litigated and *closely scrutinized by state and federal courts throughout the nation*, including this Court. . . . In light of the exigencies inherent in the execution process, judicial review and oversight of the Department of Corrections' procedures is preferable to APA administrative proceedings."  *Hill v. Owens*, 292 Ga. 380, 387 (2013) (emphasis added)(internal citations omitted).  The secrecy act has now extinguished that scrutiny.

indifference condemned in *Farmer, supra*, this Court should provide injunctive relief.

## CAUSES OF ACTION

**I.    Georgia's Combination of Secrecy, Ineptitude, and Illegality in Its Administration of Executions by Lethal Injection Violates Ms. Gissendaner's  Constitutional Rights**

**A.       Georgia's Conduct Shows the Need to Revisit the *Baze* Standard**

The Eighth Amendment's prohibition against cruel and unusual punishment forbids methods of execution that present "a substantial risk of significant harm." U.S. Const. amend VIII; *Baze,* 553 U.S. at 50-52 (plurality opinion); *see also in re Kemmler*, 136 U.S. 436, 447 (1890) ("Punishments are cruel when they involve torture or a lingering death").  The Supreme Court has repeatedly held that Eighth Amendment's constitutional prohibition against cruel and unusual punishment "is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice." *Weems v. U.S.*, 217 U.S. 349, 373 (1910).  This principle was reiterated in *Gregg v. Georgia*, 428 U.S. 153, 171 (1976), in which Justice Stewart emphasized that the prohibition embodied in the Eighth Amendment has not been confined to  "barbarous" methods of execution, but "has been interpreted in a flexible and dynamic manner."

*Glossip* suggests that the *Baze* plurality's stay standard might well be on the verge of obsolescence.  In this age of secrecy, the Eighth Amendment demands as

much. As noted *supra*, this standard requires Ms. Gissendaner to show "a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." *Baze v. Rees*, 553 U.S. 35, 50 (2008); quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846, and n. 9 (1994). Accordingly, it falls to Ms. Gissendaner to "establish[] that the State's lethal injection protocol creates a *demonstrated* risk of severe pain." *Baze*, 553 U.S. at 61. The Court has also held that "speculation cannot substitute for evidence that the [protocol] is 'sure or very likely to cause serious illness and needless suffering.'" *Landrigan*, 131 S.Ct 445, quoting *Baze*, 553 U. S. at 50.

As noted *supra*, when crafting this standard, the *Baze* plurality could not have anticipated how far a state such as Georgia would go to subvert it by depriving both a death-sentenced prisoner and the Courts of the same information it reviewed. Indeed, far from trying to insure that it would be "subjectively blameless for purposes of the Eighth Amendment," *Baze*, 553 U.S. at 50, Georgia has used its secrecy act to conceal all objectively blameworthy behavior.

### 1. Georgia's Use of the *Baze* Standard Deprives Prisoners of Remedies for Eighth Amendment Violations

There is no greater testament to the need to revisit the *Baze* plurality stay standard than the wild success Georgia has enjoyed in using it to foreclose constitutional review of its procedures and conduct -- as evidenced by the number

of actions that have been denied in this and other courts. *See, e.g.*, *Wellons v. Owens, et al.*, Civil Action No. 14-CV-01827 (N.D. Ga. 2014)(attached as "Ex. 7"); *Wellons v. Commissioner, Georgia Dept. of Corrections*, 754 F.3d 1260, (11th Cir. 2014); *Waldrip v. Owens, et al.*, Civil Action No. 14-CV- 01827 (attached as "Ex. 8"); *see also Hill v. Owens et al.,* No: 2013-CV-233771, at 5 (Ga. Super. Ct. July 18, 2013) ("By making information about the source of the drugs to be used for Plaintiff's execution … O.C.G.A. §42-5-36(d)(2) makes it impossible for Plaintiff to craft a meaningful Eighth Amendment claim, and thus forecloses his right to raise his constitutionally afforded claims and be heard.")  Indeed, as this Court and the Eleventh Circuit have made clear in recent decisions, the *Baze* plurality's stay standard operates to prevent prisoner from even *stating a claim* – and, accordingly, surviving a motion to dismiss – as to Defendants' conduct in acquiring lethal injection drugs and carrying out their executions.

Perhaps the best exemplar of this is this Court's decision in the matter of *Wellons v. Owens, et al.*, in which a death-sentenced prisoner filed a § 1983 petition and a motion for a temporary restraining order ("TRO") contending that Defendants' refusal to disclose information concerning the origins of their lethal injection drugs and the qualifications of their execution team violated his constitutional rights.  Ex. 7.  In support of this claim, Mr. Wellons also presented evidence concerning the range of dangers endemic to the use of compounded

Pentobarbital and the risks of having intravenous access attempted by personnel who lacked the training necessary to protect against the infiltration of the drug into his soft tissues.

This Court denied Mr. Wellons's TRO motion and dismissed the action, finding that Mr. Wellons had failed to show a sufficient likelihood of success on the merits of his claim. Ex. 7. Relying upon a presumption that the state acted in good faith "in selecting the company that produced the pentobarbital and in appointing the team slated to carry out Plaintiff s execution" – a presumption that echoes the misplaced confidence of the *Baze* plurality[66] -- this Court found that "Plaintiff s assertion that there *may* be some problem with the pentobarbital or that the person placing the intravenous lines into Plaintiff may not be qualified to the task is mere speculation and 'cannot substitute for evidence that the use of the drug is sure or very likely to cause serious illness and needless suffering.'" Ex. 7 at 9, quoting *Landrigan*, 131 S. Ct. at 445.

On appeal, the Eleventh Circuit concluded that this Court had not abused its discretion in denying Mr. Wellons's motion for a temporary restraining order and stay of execution. *Wellons*, *supra*. Judge Wilson wrote separately, however, to note the "disturbing circularity problem created by Georgia's secrecy law

---

[66] As is discussed *infra* at 16-17 and 41-59, Defendants' illegal conduct in obtaining their lethal injection drugs demonstrates that this presumption is misplaced and should not factor into this Court's analysis of Ms. Gissendaner's constitutional claims.

regarding methods of execution . . . ." *Wellons*, 754 F. 3d at 1267 (11th Cir. June

17, 2014)(Wilson, J., concurring in judgment). Noting *Baze*'s requirement that Mr.

Wellons show "a substantial risk of serious harm or an objectively intolerable risk

of harm" in order to demonstrate an Eighth Amendment violation, Judge Wilson

wrote as follows:

> *Possibly* due to his lack of information about the compound
> pentobarbital that will be used and the expertise of the people who
> will administer his execution, Wellons has not shown such a risk.
> Indeed, *how could he when the state has passed a law prohibiting him*
> *from learning about the compound it plans to use to execute him?*

*Id.* at 1267-68, citing *Baze*, 553 U.S. at 51 (emphases added)(internal quotation

marks omitted).

There is no "possibly" about it. Georgia is hiding behind a statute designed

to insure that no prisoner, regardless of the constitutionality of its protocol, can

ever obtain the information necessary to meet the *Baze* plurality's stay standard.

Indeed, both the Catch-22 faced by Georgia's death-sentenced prisoners and the

obsolescence of the stay standard is perhaps best illustrated in this way: it is

impossible to imagine any circumstances in which a prisoner could even *approach*

the threshold of the standard except in *the immediate aftermath of a botched*

*execution.* And even then, of course, the secrecy act would impede any meaningful

investigation into what went wrong.

That is simply untenable.    A bedrock principle of our rule of law is that "where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded."  *See Marbury v. Madison*, 5 U.S. 137, 163 (1803); *see also General Oil Co. v. Crain*, 209 U.S. 211, 221-30 (1908) (holding that a state court must provide a remedy for a constitutional violation); s*ee also Morgan v. Illinois*, 504 U.S. 719, 728-29 (1992)(because "the Sixth and Fourteenth Amendments . . . ensure the impartiality of any jury that will undertake capital sentencing," defendant entitled to *voir dire* and challenges for cause to discover and remove potential jurors who would automatically vote for a death sentence in every capital case);  *Brady v. Maryland*, 373 U.S. 83, 86 (1963)(due process requires the government to disclose evidence which "would tend to exculpate [the defendant] or reduce the penalty" ).  Ms. Gissednander can have no meaningful remedy for a lethal injection protocol that violates the Eighth Amendment if its condition precedent is the "torture and lingering death" of another.

## 2.    Defendants Are Not Entitled To – And Do Not Deserve – a Presumption of Good Faith

In denying injunctive relief, the *Wellons* Court also relied heavily upon a dissenting opinion[67] in *Alaska Dept. of Environmental Conservation v. E.P.A.* and

---

[67] 540 U.S. 461, 507 (2004)(Kennedy, J., dissenting). The *Wellons* Court relied upon this opinion without designating it as a dissent, which raises the question of whether it mistook the dissent for controlling authority.  Regardless, as discussed *infra*, any presumption of good faith must be unavailing here.

the decision of the Supreme Court in *Alden v. Maine,* for the proposition that "state government officials are presumed to carry out their duties in a good-faith manner and in compliance with the federal laws."  Ex. 7 at 8.  As this presumption echoes the presumption of good faith that underlies the *Baze* plurality's stay standard, it is worth addressing here.

In the first place, the only authority for this "presumption" is found in the following passage from *Alden*:

> The constitutional privilege of a State to assert its sovereign immunity in its own courts *does not confer upon the State a concomitant right to disregard the Constitution or valid federal law.* The States and their officers are bound by obligations imposed by the Constitution and by federal statutes that comport with the constitutional design.  The good faith of the States thus provides an important assurance that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land." U.S. Const., Art. VI [The Supremacy Clause].

*Alden*, 527 U.S. at 755 (emphasis added).  As this passage makes clear, this "presumption" – to the extent that it exists at all – is not intended to excuse or lessen a State's obligations to follow the constitution and Federal law, nor to sanction attempts to induce and conceal activity that violates Federal law.  Rather, this "presumption" acknowledges that the preservation of Constitutional rights depends in large part upon the States making a good faith effort to safeguard them. When that faith is misplaced – as it has been with Defendants, as they carry out the gravest duty with which they have been charged in violation of state and federal

law – the gravity of that breach should weigh in favor of intervention by this Court, not against it.[68]

In explaining why it found the presumption of good faith appropriate, the *Wellons* court noted that Defendants have a "strong interest in executing [their] condemned prisoners in a manner that does not violate their rights. Botched executions lead to embarrassment, investigations, bad press, and, perhaps worst of all for the individuals involved, the knowledge that they caused an individual needless pain and suffering." Ex. 7 at 8. Ms. Gissendaner respectfully submits that while she agrees with the *Wellons* Court as to what is in Defendants' best interest, nothing about their conduct suggests that they share that assessment. Indeed, Defendants have already experienced embarrassment, investigations, and bad press because of their mismanagement of lethal injection. See *supra* at 16-20. Those experiences have motivated them not to examine how they carry out their duties, but to hide them from Ms. Gissendaner, the public and the courts. In short, the evidence suggests that Defendants are more interested in concealing any mistakes than avoiding them. In taking that approach, they act against their own interest, and that of Mr. Gissendaner, and, for that matter, of everyone.

---

[68] Indeed, the very existence of mechanisms for scrutinizing and challenging the conduct of state actors – including Open Records Acts to judicial proceedings such as § 1983 actions and habeas corpus – attests to our acknowledgment that state actors can and do operate outside of the law.

The district court ultimately concluded that, given its presumption of good faith by Defendants, that Mr. Wellons's argument was "simply an extension of the speculation that the Court found unpersuasive in *Landrigan*." Ex. 7 at 9. As Justices Benham and Hunstein of the Supreme Court of Georgia have noted, however, any "speculation" as to the implications of Defendants' lethal injection procedures for Mr. Wellons's Eighth Amendment rights "arises solely from the State's unwillingness, in light of the secrecy statute, to disclose information that would allow him to make more specific claims." *Owens v. Hill,* 758 S.E.2d 794, 807, (Ga. 2014)(Benham, J., dissenting). Indeed, these justices recognize Defendants' assurances to this Court for what they truly are.

> [I]n this case the State has only made baseline assurances that the compounding pharmacy it used was able to produce a high quality execution drug. *These assurances amount to little more than hollow invocations of "trust us."* While the State produced a redacted laboratory report from an independent laboratory that it claimed had tested Hill's execution drug, Hill, without knowing even the name of the laboratory, was *left again with little more than the State's invocation of "trust us."*

*Id.* These assurances, the "hollow[ness]" of which Defendants' own conduct has revealed, should not defeat Ms. Gissendaner's constitutional claims as they have so many others.

Defendants, in denying Ms. Gissendaner the information necessary even to state a claim as to an Eighth Amendment violation, are depriving her of the remedy while claiming not to implicate her rights. As the Supreme Court seems poised to

68

revisit whether Georgia can move the goalposts in this manner, this Court should stay Ms. Gissendaner's execution.

**B.      Georgia Has Obtained Drugs Illegally in Violation of the Eighth Amendment**

The Supreme Court has indicated that the legality of a state's method of obtaining lethal injections drugs is relevant to the Eighth Amendment inquiry.  In *Brewer v. Landrigan*, 131 S.Ct. 445 (2010), the Court by a 5-4 decision vacated a temporary restraining order granted by the district court in an Arizona case.  The district court had granted the restraining order based on the fact the lethal injection drugs in question, namely sodium thiopenthal, were obtained from foreign sources and therefore the efficacy and safety of the drug were unknown and the court was left to speculate on whether this non-FDA approved drug would cause pain and suffering in violation of the Eighth Amendment.  *Landrigan, supra*.  The 5-4 Court in *Landrigan* rejected this reasoning, noting "speculation cannot substitute for evidence that the use of the drug is 'sure or very likely to cause serious illness and needless suffering,'" citing *Baze v. Rees*, 553 U.S. at 50,     The *Landrigan* Court then noted, "[t]here was no showing that the drug was *unlawfully obtained*, nor was there an offer of proof to that effect."  *Ibid* (emphasis added).  As detailed above, however, there is such a showing here – as to each of the last six executions Georgia has attempted.

Indeed, Ms. Gissendaner contends that the facts detailed above are sufficient to meet even the *Baze* plurality's standard. Georgia intends to execute her with Pentobarbital, a substance that it cannot obtain save by the illegal activities detailed above. Moreover, after reviewing the allegations detailed above concerning Defendants' illegal conduct in obtaining lethal injection drugs in the matter of *Waldrip v. Owens, et al.*, this Court essentially ratified that position, finding as follows:

> Assuming that Plaintiff's arguments regarding the requirements of the Controlled Substances Act, 21 U.S.C. § 801 et. seq., are correct, it would appear that the DOC would not be able to obtain pentobarbital for an execution without technically *running afoul of the statute*.

Ex. 8 at 10-11 (emphasis added).

Unfortunately, the *Waldrip* court then afforded Georgia yet more of the presumption of good faith that it so richly does not deserve, asserting that it "does not *believe* that DOC officials are guilty of violating the criminal laws of the United States or of Georgia" because "[t]here *must* be an exception – or the executive or the courts *would* recognize an exception – to the laws in this context whereby a state can legally obtain the drugs necessary to carry out an execution."

Ex. 8 at 11 (emphases added).

> The DOC is legally compelled to carry out the laws of the state requiring that Plaintiff be executed by lethal injection, and doing so *requires it to obtain pentobarbital*. As such, this Court refuses to countenance an

interpretation of the law that would *require* DOC officials to violate the
law *no matter what they did.*

Ex. 8 at 11 (emphasis added).

This statement is simply incorrect. In the first place, this Court identified no
particular exception – because none exists – that would exempt Defendants from
these statutes. Further, as the Supreme Court has held, "[w]hether, as a policy
matter, an exemption should be created is a question for legislative judgment, not
judicial inference." *United States v. Rutherford*, 442 U.S. 544, 559 (1979).[69] Even
more critically, Georgia law *does not require* that Defendants use Pentobarbital in
executions by lethal injection.[70] Rather, Defendants have *chosen* to use
Pentobarbital. They have *chosen* to use a drug that is available only through
compounding. And they have *chosen not to ask* "the executive or the courts" for
the exception from controlled substances laws that the district court assumes into

_____

[69] Indeed, while the Supreme Court has held "that it is an open question
whether federal courts ever have authority to recognize a necessity defense not
provided by statute," it notes that the existence of such exemption has always been
"controversial" under the common law and "under our constitutional system, in
which federal crimes are defined by statute rather than by common law . . . it is
especially so." *U.S. v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 490, 121
S.Ct. 1711, 1717 (U.S.,2001). In reference to the CSA, moreover, the Court has
held that "[u]nder any conception of legal necessity, one principle is clear: The
defense cannot succeed when the legislature itself has made a 'determination of
values.'" *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 491 (Congress's creation
of schedules with strictures on use of marijuana pretermits necessity defense); *see
also ibid.* at 495 ("[b]ecause federal courts interpret, rather than author, the federal
criminal code, we are not at liberty to rewrite it").

[70] See discussion *supra* at 58-59.

existence. Instead, they have *chosen* to *conceal* their illegal activity from the scrutiny of the public and the courts pursuant to the lethal injection secrecy act.

The implications of affording Defendants the blanket exemption granted by the *Waldrip* court would be sweeping: while Defendants are doing anything related to executions, they can disregard any laws that they find inconvenient, secure in the knowledge that any violation will be merely "technical" – as can the doctor and pharmacy whom they induced into illegal-activity-for-profit with money and assurances of anonymity. This Court cannot allow this to stand.[71]

### C. Defendants' Deliberate Indifference to the Prospect of an Unconstitutional Execution Violates the Eighth Amendment

Regardless of whether the Supreme Court opts to set aside the *Baze* plurality's stay standard, Ms. Gissendaner respectfully submits that Defendants' behavior, as detailed above, manifests a "deliberate indifference" to whether their administration of lethal injection poses a substantial risk of serious harm, and accordingly violates her rights pursuant to the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 828 (1970); *citing Helling v. McKinney*, 509 U.S. 25 (1993); *Wilson v. Seiter*, 501 U.S. 294 (1991); *Estelle v. Gamble*, 429 U.S. 97 (1976). In order to show that she us entitled to an injunction to prevent a violation of her Eighth Amendment rights, Ms.

---

[71] As Mr. Waldrip's appeal to the Eleventh Circuit was mooted by his grant of clemency, that Court has not spoken on this presumed exemption. *Waldrip v. Commissioner, Georgia Dept. of Corrections*, 758 F.3d 1262 (11th Cir. 2014).

Gissendaner must demonstrate that Defendants are "knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so . . . into the future." *Farmer v. Brennan*, 511 U.S. 825, 846, (1994). In examining whether Defendants' have indeed manifested unconstitutional "deliberate indifference," this Court must examine their behavior "in light of the prison authorities' *current attitudes and conduct*," *Helling v. McKinney*, 509 U.S. 25, 36 (1993)(emphasis added), which means "their attitudes and conduct at the time suit is brought and persisting thereafter," *Farmer, supra*, at 845.

Defendants' attitudes and conduct – both past and current -- are telling indeed. Based upon their unseemly efforts in the past to get lethal injection drugs at any cost – even through illegal means – and their willingness to use patently expired drugs of unknown safety and origin on human beings, it is evident that Defendants have developed a culture of shoddiness and unprofessional conduct that should disqualify them from carrying out executions without any oversight from the Courts. Nor do Defendants show any signs of turning over a new leaf. There can be little doubt that Georgia has acquired its lethal injection drugs for its last six scheduled executions in violation of state and federal law, and has or will shortly acquire the drugs they will use to execute Ms. Gissendaner in the same way. Further, by choosing to address their

history of ineptitude and corner-cutting by dropping a curtain that conceals their activities from Ms. Gissendaner, the public, and the courts, Defendants declare that they prefer celerity and expedience to transparency and accountability. Indeed, Defendants' ever-more-aggressive assertion of the scope of the secrecy act merely affirms that, going forward, we will know only less and less of how Georgia chooses to carry out executions.

As the Supreme Court has held, while "deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer,* 511 U.S. at 835. Accordingly, the Court has adopted a subjective test that requires the knowledge of and disregard for an excessive risk of harm, *ibid.* at 837, while acknowledging that "deliberate" might "arguably require[] nothing more than an act (or omission) of indifference to a serious risk that is voluntary, not accidental." *ibid* at 840. As the Court has held, Defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [it] must also draw the inference." *Id.*

Defendants are well aware of the facts in this complaint, as it will no doubt hurry to note in their response. Mr. Gissendaner anticipates that it will reject the *inference* and contest that its actions pose any significant harm to prisoners such as

she.  Ms. Gissendaner respectfully submits that Georgia's position is untenable, as it has deliberately chosen a course that is fraught with risks for prisoners, and its only action in response to criticism or concern over its course has been to conceal it. It is engaging in illegal activity to obtain its lethal injection drugs. While the *Farmer* test is subjective, it is not inert; Georgia cannot blind itself – and the public, and the courts – to the risks it runs and claim that it liberates them from Constitutional scrutiny.

The Supreme Court has held that the "imposition of the death penalty presupposes a [constitutional] means of carrying it out." *Nelson*, 541 U.S. at 646. Georgia's recent history with executions by lethal injections, and its decision to cloak the process in secrecy rather than address its defects, demonstrated that they cannot be trusted to carry out Ms. Gissendaner's sentence of death without presenting a substantial risk of serious harm – and, moreover, are unconstitutionally indifferent to that risk.  Accordingly, Ms. Gissendaner asks for injunctive and declaratory relief.

## CONCLUSION

In sum, Georgia's use of compounded drugs presents a range of risks that readily rise to constitutional dimension.  So, to, does the prospect that it would entrust Ms. Gissendaner's execution to personnel unqualified to inject her with those drugs.  But the *Baze* plurality stay standard nonetheless requires Ms.

75

Gissendaner to "establish[] that the State's lethal injection protocol creates a *demonstrated* risk of severe pain." *Baze*, 553 U.S. at 61. "[S]peculation cannot substitute for evidence that the use of the drug is 'sure or very likely to cause serious illness and needless suffering,'" even if Ms. Gissendaner cannot obtain that that evidence because Georgia is withholding it. *Landrigan*, 131 S.Ct 445, quoting *Baze*, 553 U. S. at 50. Accordingly, Georgia has, by making it so that Ms. Gissendaner and other prisoners could never obtain the information that they needed to meet this standard, placed its lethal injection protocols beyond the review of this Court.

All of that will change, of course, if the Supreme Court revisits its stay standard in *Glossip*. That alone is reason enough for this Court to grant Ms. Gissendaner a stay of execution and hold these proceedings in abeyance pending that decision. [72]

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff Kelly Renee Gissendaner respectfully requests that this Court:

---

[72] In addition, as discussed *infra*, the Supreme Court's grant of certiorari leaves the question of what a petitioner must plead when challenging a method of execution – specifically, whether she must identify an alternative method of execution -- very much up in the air.

1. Grant her Motion for a Temporary Restraining Order and stay her execution, now scheduled for February 25, 2015, at 7:00 p.m., until the Supreme Court of the United States has resolved *Glossip v. Gross*;

2. Enter a declaratory judgment that Defendants' refusal to disclose information concerning the provenance of their lethal injection drugs and the qualifications of their execution team violates Ms. Gissendaner's rights pursuant to the Eighth and Fourteenth Amendments;

3. Grant injunctive relief directing Defendants from proceeding toward the execution of Ms. Gissendaner until and unless they disclose the information necessary to protect her from cruel and unusual punishment under the Eighth Amendment.

This, the 20th day of February, 2015.

Respectfully submitted,

*/s/ Gerald King*
Gerald W. King, Jr. (Ga. Bar No. 140981)
FEDERAL DEFENDER PROGRAM, INC.
101 Marietta Street, Suite 1500
Atlanta, Georgia 30303
404-688-7530
(fax) 404-688-0768
Gerald_King@fd.org

Susan C. Casey (Ga. Bar. No. 115665)
965 Virginia Avenue, NE
Atlanta, Georgia  30306
404-242-5195
(fax) 404-879-0005
susancasey@outlook.com

Lindsay N. Bennett (Ga. Bar. No. 141641)
FEDERAL PUBLIC DEFENDER
801 I Street, 3rd Floor
Sacramento, CA 95814
916-498-6666
(fax) 916-498-6656
Lindsay_Bennett@fd.org

COUNSEL FOR MS. GISSENDANER

Ex. 03



**GEORGIA DEPARTMENT OF CORRECTIONS**
Office of Legal Services
P.O. Box 1529
Forsyth, Georgia 31029
Telephone (478) 992-5240
Facsimile (478) 992-5241

**Nathan Deal**
*Governor*

**Brian Owens**
*Commissioner*

**Robert E. Jones**
*General Counsel*

February 13, 2015

<u>**Via U.S. Mail**</u>
Federal Defender Program, Inc.
Attn: Douglas Munro
Suite 1500 Centennial Tower
101 Marietta Street, NW
Atlanta, GA 30303

Re:     Open Records Act Request

Dear Mr. Munro:

The purpose of this correspondence is to respond to your Georgia Open Records Act request received by the Department on February 10, 2015.  Your requests are listed below followed by the Department's response.

1. **Request:** Any policies, procedures, or other documents concerning the acquisition, storage, transportation, and handling of any and all drugs that the GDC intends to use in executions.
   **Response:** The Department is providing the current Lethal Injection Protocol (13 pages). Pursuant to O.C.G.A. § 42-5-36(d)(1),(2), "the identifying information of any person or entity who participates in or administers the execution of a death sentence and the identifying information of any person or entity that manufactures, supplies, compounds, or prescribes the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence shall be confidential…" Therefore, records related to the acquisition of lethal injection drugs are not subject to disclosure under the Open Records Act. O.C.G.A. §50-18-71(a).

2. **Request:** Any documents from January 1, 2014, to the present regarding execution protocols, regulations, guidelines, checklists, or other documents that provide instruction or direction in the carrying out of an execution, including correspondence between the GDC (or its agents/representatives) and any party concerning protocols used in other states or jurisdictions.

**Response:** The Department is providing the current Lethal Injection Protocol (13 pages), the procedures for Delivery, Processing, and Confinement of UDS Inmates (3 pages), and the procedures for Holding and Preparation of UDS Inmates for Execution (8 pages). The Department does not have any correspondence with any other party concerning protocols used in other states or jurisdictions.

3.  **Request:** Any registrations or licenses with the Drug Enforcement Administration ("DEA") held by the Georgia Department of Corrections ("GDC") for the importation, manufacture, or distribution of controlled substances that are, were, or are intended to be used in connection with executions by lethal injection.
    **Response:** The Department is providing a copy of the current DEA license, Form DEA-223. The Department does not have any other documents responsive to this request.

4.  **Request:** All applications by or on behalf of the GDC for DEA registrations and licenses for the importation, manufacture, or distribution of controlled substances that are, were, or are intended to be used in connection with executions by lethal injection from January 1, 2009 to the present.
    **Response:** The Department is providing a copy of its current DEA Form 224A, Application for Registration Under Controlled Substances Act of 1970. The Department does not have any other documents responsive to this request.

5.  **Request:** Any documentation of the qualifications and training of members of the execution team -- including but not limited to the doctor(s), nurse(s), pharmacist(s), and injection team, or those who are expected or might be called upon to fulfill their roles, regardless of title – for the tasks that they are expected to carry out during the time-frame up to, including, and following an execution by lethal injection as addressed by the GDC's current execution protocol.
    **Response:** Pursuant to O.C.G.A. § 42-5-36(d)(1) and (2), "the identifying information of any person or entity who participates in or administers the execution of a death sentence and the identifying information of any person or entity that manufactures, supplies, compounds, or prescribes the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence shall be confidential..." Therefore, records related to the qualifications and training of any member of the execution team are not subject to disclosure under the Open Records Act. O.C.G.A. § 50-18-71(a).

6.  **Request:** Any performance reviews, disciplinary reports, reprimands, "write-ups", or sanctions for any member of the execution team, including but not limited to guards, administrators, nurses, pharmacists, doctors, and the injection team.
    **Response:** Pursuant to O.C.G.A. § 42-5-36(d)(1) and (2), "the identifying information of any person or entity who participates in or administers the execution of a death sentence and the identifying information of any person or entity that manufactures, supplies, compounds, or prescribes the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence shall be confidential..." Therefore, records related to any performance reviews, disciplinary reports, reprimands, "write-ups", or sanctions of any member of the execution team are not subject to disclosure under the Open Records Act. O.C.G.A. § 50-18-71(a).

In accordance with O.C.G.A. § 50-18-71(c)(1), an agency may impose a reasonable charge for the search, retrieval, redaction, and copying of records. The charge for search, retrieval, or redaction shall not exceed the prorated salary of the lowest paid full-time employee who, in the reasonable discretion of the custodian of records, has the necessary skill and training to perform the request; however, no charge shall be made for the first quarter hour. Your request took less than a quarter hour to retrieve, and therefore, there is no charge for retrieving the records.

Sincerely,
GEORGIA DEPARTMENT OF CORRECTIONS

Jamie A. Vallee
Paralegal

GA DIAGNOSTIC & CLASSICATION PRISON
GA DIAGNOSTIC PRISON
P.O. BOX 3877, HWY 36
JACKSON, GA  30233-0000-000

|ˌlɑˌlɑllˌˌˌˌˌlɑlˌlɑllˌˌlɑllˌˌllˌˌlɑllˌˌllˌˌllˌlɑllˌlɑllɑl|

| DEA REGISTRATION NUMBER | THIS REGISTRATION EXPIRES | FEE PAID |
|---|---|---|
| BG7074761 | 09-30-2015 | FEE EXEMPT |
| **SCHEDULES** | **BUSINESS ACTIVITY** | **ISSUE DATE** |
| 2N, 3,3N, | HOSPITAL/CLINIC | 08-22-2012 |

GA DIAGNOSTIC & CLASSICATION PRISON
GA DIAGNOSTIC PRISON
P.O. BOX 3877, HWY 36
JACKSON, GA  30233-0000

**CONTROLLED SUBSTANCE REGISTRATION CERTIFICATE**
**UNITED STATES DEPARTMENT OF JUSTICE**
**DRUG ENFORCEMENT ADMINISTRATION**
**WASHINGTON D.C. 20537**

Sections 304 and 1008 (21 USC 824 and 958) of the Controlled Substances Act of 1970, as amended, provide that the Attorney General may revoke or suspend a registration to manufacture, distribute, dispense, import or export a controlled substance.

**THIS CERTIFICATE IS NOT TRANSFERABLE ON CHANGE OF OWNERSHIP, CONTROL, LOCATION, OR BUSINESS ACTIVITY, AND IT IS NOT VALID AFTER THE EXPIRATION DATE.**

---

**CONTROLLED SUBSTANCE REGISTRATION CERTIFICATE**
**UNITED STATES DEPARTMENT OF JUSTICE**
**DRUG ENFORCEMENT ADMINISTRATION**
**WASHINGTON D.C. 20537**

| DEA REGISTRATION NUMBER | THIS REGISTRATION EXPIRES | FEE PAID |
|---|---|---|
| BG7074761 | 09-30-2015 | FEE EXEMPT |
| **SCHEDULES** | **BUSINESS ACTIVITY** | **ISSUE DATE** |
| 2N, 3,3N, | HOSPITAL/CLINIC | 08-22-2012 |

GA DIAGNOSTIC & CLASSICATION PRISON
GA DIAGNOSTIC PRISON
P.O. BOX 3877, HWY 36
JACKSON, GA  30233-0000

Sections 304 and 1008 (21 USC 824 and 958) of the Controlled Substances Act of 1970, as amended, provide that the Attorney General may revoke or suspend a registration to manufacture, distribute, dispense, import or export a controlled substance.

THIS CERTIFICATE IS NOT TRANSFERABLE ON CHANGE OF OWNERSHIP, CONTROL, LOCATION, OR BUSINESS ACTIVITY, AND IT IS NOT VALID AFTER THE EXPIRATION DATE.

Form DEA-223 (4/07)

0004

DEA Form 224A - Completed

Completed Internet Form - NOT FOR SUBMISSION
DEA/Control Number - BG70747B1
Submission Date: 08-21-2012

**APPLICATION FOR REGISTRATION**
**UNDER CONTROLLED SUBSTANCES ACT OF 1970**

Form DEA 224A - Completed
Internet Receipt, NOT FOR
SUBMISSION

Application Complete, Internet
confirmation no.: 3388674
Fee Paid: $0.00

| | |
|---|---|
| NAME: APPLICANT OR BUSINESS (LAST) | (First, MI) |
| GA DIAGNOSTIC & CLASSICATION PRISO | |
| TAX IDENTIFYING NUMBER **AND/OR** | SOCIAL SECURITY NUMBER |
| 581308704 | |

THE DEBT COLLECTION IMPROVEMENT ACT OF
1996 (P.L. 104-134) REQUIRES THAT YOU FURNISH
YOUR FEDERAL TAXPAYER IDENTIFYING NUMBER
TO DEA. THIS NUMBER IS REQUIRED FOR DEBT
COLLECTION PROCEDURES SHOULD YOUR FEE
BECOME UNCOLLECTABLE. IF YOU DO NOT HAVE A
FEDERAL TAXPAYER IDENTIFYING NUMBER, USE
YOUR SOCIAL SECURITY NUMBER.

PROPOSED BUSINESS ADDRESS: (WHEN ENTERING A P.O. BOX, YOU ARE REQUIRED TO ENTER A STREET ADDRESS)

GA DIAGNOSTIC PRISON

P.O. BOX 3877, HWY 36

| CITY | STATE | ZIP CODE |
|---|---|---|
| JACKSON | GA | 30233 |

| APPLICANTS BUSINESS PHONE NUMBER | APPLICANTS FAX NUMBER |
|---|---|
| 770 - 504 - 2019 | 770 - 504 - 2006 |

**REGISTRATION CLASSIFICATION**

**1. BUSINESS**
**ACTIVITY:** HOSPITAL/CLINIC

**2. INDICATE HERE IF
YOU REQUIRE ORDER
FORM BOOKS.**

**3. Drug Schedules. (Fill in all circles that apply)**

| | | | | |
|---|---|---|---|---|
| Schedule II Narcotic | Schedule II Non Narcotic | Schedule III Narcotic | Schedule III Non Narcotic | Schedule IV | Schedule V |

**4. All Applicants must answer the following:**

Are you currently authorized to prescribe, distribute, dispense, conduct research, or otherwise handle the controlled substances in the schedules for which you are applying under the laws of the state or jurisdiction in which you are operating or propose to operate?

State License No. PHP0003513

State: GA

Expire Date: 06-30-2013

State Controlled Substance Lic. No. ___

Expire Date: ___

1. Has the applicant ever been convicted of a crime in connection with controlled substance(s)
under state or federal law, or is any such action pending?        N

2. Has the applicant ever surrendered (for cause) or had a federal controlled substance
registration revoked, suspended, restricted or denied, or is any such action pending?        N

3. Has the applicant ever surrendered (for cause) or had a state professional license or
controlled substance registration revoked, suspended, denied, restricted, or placed on probation,
or is any such action pending?        N

4. If the applicant is a corporation (other than a corporation whose stock is owned or
traded by the public), association, partnership, or pharmacy, has any officer, partner,
stockholder or proprietor been convicted of a crime in connection with controlled
substance under state or federal law, or ever surrendered, for cause, or had a
federal controlled substance registration revoked, suspended, restricted or denied, or
ever had a state professional license or controlled substance registration revoked,
suspended, denied, restricted, or placed on probation, or is any such action pending?        N

0005

DEA Form 224A - Completed

Page 2 of 3

**8. Payment Method:** N/A

**7. Certification for Fee Exemption**

Certifying Official's Name: Keith Eutsey

Certifying Official's Title: Deputy Warden of Security

Certifying Official's Phone: 770 - 504 - 2019

**Application Certification:**

**WARNING:** 21 USC 843(d), states that any person who knowingly or intentionally furnishes false or fraudulent information in the application is subject to a term of imprisonment of not more than 4 years, and a fine under Title 18 of not more than $250,000, or both.

By typing my full name in the space below, I hereby certify that the foregoing information furnished on these application/DEA forms pages is true and correct and understand that this constitutes an electronic signature for purposes of these applications/DEA forms only.

**\* Name of Certifying Applicant/Official (For individual registrants, the registrant themselves MUST complete this E-Signature)**

Certifier Name:  Keith Eutsey

This electronic application/DEA form must be certified by the applicant/registrant, if an individual; by a partner of the applicant, if a partnership; or by an officer of the applicant, if a corporation, corporate division, association, trust, or other entity. See 21 C.F.R § 1301.13(I) for more information on who can certify this application

0006

https://www.deadiversion.usdoj.gov/webforms/printHTML.do

DEA Form 2224A - Completed

## ADDITIONAL INFORMATION

Form 224    Approved OMB Form No. 1117-0014 Expires: 11/30/2011 (12 minutes)
Form 225    Approved OMB Form No. 1117-0012 Expires: 03/31/2012(15 minutes)
Form 510    Approved OMB Form No. 1117-0031 Expires: 03/31/2013 (15 minutes)
Form 363    Approved OMB Form No. 1117-0015 Expires: 03/31/2012 (15 minutes)

1.  No registration will be issued unless a completed application form has been received (21 CFR 1301.13).

2.  In accordance with the Paperwork Reduction Act of 1995, no person is required to respond to a collection of information unless it displays a valid OMB control number. The OMB number for this collection is (See Above). Public reporting burden for this collection of information is estimated to average (See Above) per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information.

3.  The Debt Collection Improvements Act of 1996 (31 U.S.C. §7701) requires that you furnish your Taxpayer Identification Number (TIN) or Social Security Number (SSN) on this application. This number is required for debt collection procedures if your fee is not collectible.

4.  PRIVACY ACT NOTICE:

Providing information other than your SSN or TIN is voluntary; however, failure to furnish it will preclude processing of the application. The authorities for collection of this information are §§302 and 303 of the Controlled Substances Act (CSA) (21 U.S.C. §§822 and 823). The principle purpose for which the information will be used is to register applicants pursuant to the CSA. The information may be disclosed to other Federal law enforcement and regulatory agencies for law enforcement and regulatory purposes, State and local law enforcement and regulatory agencies for law enforcement and regulatory purposes, and person registered under the CSA for the purpose of verifying registration. For further guidance regarding how your information may be used or disclosed, and a complete list of the routine uses of this collection, please see the DEA System of Records Notice "Controlled Substances Act Registration Records" (DEA-005), 52 FR 47208, December 11, 1987, as modified.

### DEA OFFICE OF DIVERSION CONTROL, PRIVACY POLICY

# GEORGIA DEPARTMENT OF CORRECTIONS

## GEORGIA DIAGNOSTIC AND CLASSIFICATION PRISON

### LETHAL INJECTION PROCEDURES



July 17, 2012

# GEORGIA DIAGNOSTIC AND CLASSIFICATION PRISON LETHAL INJECTION PROCEDURES

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Pre-execution Procedures | 1 |
| | A. Designation and Notification of Staff | 1 |
| | B. Restrictions | 1 |
| II. | Day of Execution | 2 |
| | A. Within Three (3) Hours of the Execution | 2 |
| | B. Within Two (2) Hours of the Execution | 2 |
| | C. Within One (1) Hour of the Execution | 3 |
| | D. Preparation of the Condemned | 4 |
| | E. Execution Process | 5 |
| | F. Post Execution | 6 |
| | G. Interment of Condemned | 6 |
| | H. Critical Incident Debriefing | 6 |

## TABLE OF APPENDICES

| | TITLE | PAGE |
|---|---|---|
| Appendix I | IV Team – Instructions | 7 |
| Appendix II | Controlled Chemical Handling Procedures for Execution by Lethal Injection with Attachments | 8-11 |

## LETHAL INJECTION PROCEDURES

I.  **PRE-EXECUTION PROCEDURES**

    A.  **Designation and Notification of Staff**

        The individuals listed below shall be present at each execution.  At least twelve (12) hours prior to the execution, the Warden or the Warden's designee will notify the following individuals of the time and date of execution and place to report for assignment.  These individuals will then acknowledge receipt of the Warden's notification.  The Warden has the authority to waive the twelve (12) hour requirement on an emergency basis.

        1.  Warden or Deputy Warden who shall ensure that the court ordered execution is carried out.

        2.  Two (2) Assistants or more as directed by the Warden.

        3.  Two (2) Physicians – to determine when death supervenes.

        4.  One (1) Physician - to provide medical assistance during the execution process (may be one of the Physicians identified in I.A.3 above).

        5.  IV Team - to consist of two (2) or more trained personnel, including at least one (1) Nurse, to provide intravenous access.

        6.  Six (6) Correctional Officers to serve as a Special Escort Team who will apply restraints to the condemned during the execution process.

        7.  Injection Team to consist of three (3) trained staff members to inject solutions into the intravenous port(s) during the execution process.

        8.  One (1) Chaplain to administer to the spiritual needs of the condemned and to provide a prayer on the condemned's behalf upon request.

        9.  Security personnel as appropriate.

    B.  **Restrictions:**

        No photographic, audio, video, recording, or computerized equipment will be permitted in the Execution Chamber or Execution Witness Room except as

specifically authorized by the Warden. Only pencils, note pads, or other writing materials issued and controlled by designated GDC staff will be permitted.

## II.    DAY OF EXECUTION

### A.  Within Three (3) Hours of Execution

Within three (3) hours of the scheduled execution, the following tasks shall be performed:

1. A communications check will be performed.

2. Telephone circuits and private lines between the Command Center (CP1), Execution Chamber (CP2), and the Front Gate (CP3) will be checked.

3. The Execution Chamber and Execution Witness Room will be inspected as directed by the Warden.

4. A radio check between the Command Center, Execution Chamber, and Front Gate will be initiated.

### B.  Within Two (2) Hours of Execution

Within two (2) hours of the scheduled execution, the following tasks shall be performed:

1. Chemicals will be delivered to the H-5 Chemical Room by the Deputy Warden of Security or Correctional Major.

2. The IV Team will perform a check of all necessary equipment and instruments.

3. Communications Check - The same procedure will be followed as at three (3) hours prior to the execution as specified in Paragraph II.A.

4. The Execution Chamber and Execution Witness Room will be inspected as directed by Warden.

5. The condemned will be prepared in accordance with prior responsibilities previously designated by Warden.

6. The condemned may visit with clergy.

7.  An opportunity for the condemned to make a last statement will be provided. Any such statement will be recorded by designated staff.

8.  A shower and clean clothing will be provided to the condemned.

9.  A designated staff member shall confirm the presence of witnesses required by O.C.G.A.§17-10-41 to attend the execution.  Any final instructions will be issued by the Warden.

10. A designated staff member shall confirm the presence of the witnesses designated and approved by the Commissioner. Instructions will be issued to the witnesses to assure an understanding of their conduct in the Execution Witness Room and while being escorted to and from the Execution Witness Room.  All witnesses are to have previously acknowledged, in writing, their understanding and agreement to abide by the rules, regulations, and procedures of the GDC.

C.  **Within One (1) Hour of Execution**

Within one (1) hour of the scheduled execution, the following tasks shall be performed:

1.  The IV Team will perform a check of all necessary equipment and instruments.

2.  The designated staff members will prepare lethal injection syringes.

3.  Medical staff will perform a test on the heart monitor.

4.  The condemned will be offered a mild sedative by a Physician.

5.  Special Escort Team members will ensure that all straps are in place and functional on the execution gurney.

6.  Communications Check: The same communications check procedures specified in Paragraph II.A. above will be repeated.  In addition, the telephone lines between the Command Center (CP1), the Execution Chamber (CP2), and the Front Gate (CP3) are to remain open beginning thirty (30) minutes prior to the scheduled execution.

7.  The Execution Chamber and Execution Witness Room will be inspected as directed by the Warden.

0012

8. Attendees and those required by O.C.G.A. §17-10-41 to attend executions will be issued additional instructions, and will be escorted to the Execution Chamber or Execution Witness Room as appropriate. Any witnesses for the condemned inmate, any media representatives, and the State's witnesses will be processed, instructed, and transported separately.

9. Upon arrival at the Execution Witness Room, witnesses and media representatives will be confirmed. The media representative designated to observe the preparation of the condemned will be identified and confirmed. The presence of witnesses requested by the condemned and those approved by the Commissioner, including media representatives, will be confirmed.

**D. Preparation of the Condemned**

1. The condemned inmate will be escorted to the lethal injection gurney by member(s) of the Special Escort Team approximately twenty (20) minutes prior to the time of the execution. The Special Escort Team will securely control the movements of the condemned from the holding cell to the execution chamber.

2. The Special Escort Team will secure the condemned to the gurney by attaching restraints to the arms, legs, and body of the condemned.

3. The IV Team will provide two (2) intravenous accesses into the condemned. If the veins are such that intravenous access cannot be provided, a Physician will provide access by central venous cannulation or other medically approved alternative.

4. Heart monitor leads will be applied to the condemned by a Nurse from the IV Team.

5. Witnesses will be escorted to the Execution Witness Room.

6. The Warden will introduce himself to witnesses and issue final instructions regarding the execution.

7. The Warden will ask the condemned if he has anything to add to the final statement. Any additional statement will be limited to two (2) minutes. The statement will be recorded by designated staff. A prayer will be offered if requested by the condemned. The prayer will be limited to two (2) minutes.

8. The condemned will be read the Execution Order of the Court.

9. Execution officials will take their places.

10. The Attorney General, or the Attorney General's designee, shall advise the Commissioner as to whether or not to proceed. The Commissioner then instructs the Warden as to whether or not to proceed.

E. **Execution Process**

Upon the Order of the Warden, the execution process will proceed as follows:

1. A staff member designated by the Warden will monitor the time when the injection process begins.

2. The first member of the Injection Team will inject one (1) syringe containing 2.5 grams of Pentobarbital (labeled #1). The second member of the Injection Team will inject an additional syringe containing 2.5 grams of Pentobarbital (labeled #2). The third member of the Injection Team will inject one (1) syringe containing 60 cubic centimeters of Saline (labeled #3), ensuring a steady, even flow of the chemical.

3. Throughout the lethal injection process, an IV Nurse will monitor the progress of the injection in the Execution Chamber to ensure proper delivery of chemicals and to monitor for any signs of consciousness. If the IV Nurse in the execution chamber observes a problem with intravenous flow, the Nurse will inform the attending Physician, who will inform the Warden as to whether or not using an alternative intravenous access is appropriate. The Warden will give the appropriate instructions to the Injection Team.

4. If, after a sufficient time for death to have occurred, the condemned individual exhibits visible signs of life, the Warden shall instruct the Injection Team to administer an additional 5 grams of Pentobarbital followed by 60 cubic centimeters of Saline as outlined in Subsection 2 of Section E. above.

5. Upon completion of the injection of the final syringe, the designated Physician will advise the Warden when the heart monitor indicates that the condemned inmate is deceased. The Warden and the two Physicians will then enter the Execution Chamber to determine if death has occurred.

6. If the condemned shows residual signs of life within a reasonable period after all injections have been completed, steps 1 through 5 above will be repeated upon the order of the Warden.

7. The Warden will then announce the fact of death to the witnesses. The

Execution Chamber curtains will then be closed.

F.  Post Execution

1.  The witnesses and media representatives will be escorted from the Execution Witness Room.  Media representatives will be immediately escorted from the prison to the press area.

2.  The IV lines will be detached by the IV Team, the straps will be removed by the Special Escort Team, and the body will be removed from the gurney.  The body will be placed in a body bag and placed on a stretcher provided by the State Crime Lab.  The body will then be taken by van to the State Crime Lab for a postmortem examination.

3.  Press release: The Public Information Officer for the Department of Corrections will advise news media that the Order of the Court has been carried out.

G.  Interment of Condemned.

1.  The Warden or designee and attending physicians will prepare a certificate of execution and certify the fact of execution.  The certificate will be forwarded to the Clerk of Superior Court of the county in which the sentence was pronounced.  A copy shall be forwarded to the Commissioner.

2.  The last statement of the condemned will be forwarded to the Central Office, as appropriate.

3.  Interment: The body may be released to the relatives at their expense or should the nearest relative of the condemned so desire, the body will be carried to the former home of the person so executed, if in the State of Georgia.  The expense of such transportation to the former home shall be paid by the Ordinary, County Commissioners, or person(s) having the charge of county funds in which the person was convicted. (O.C.G.A. § 17-10-43).

4.  If the relatives do not claim the body of the executed person, interment will be in accordance with Board of Corrections Rule 125-2-4.20.

H.  Critical Incident Debriefing

1.  Staff participants will be seen by the Critical Incident Debriefing Team within seventy-two (72) hours of each execution or as soon as possible.

# APPENDIX I

## IV TEAM - INSTRUCTIONS

### SET UP PROCEDURE:

1. The Warden or designee will have two (2) intravenous infusion devices placed in the veins of the condemned and a Saline solution available for an infusion medium. Those persons engaged in this activity will be referred to as the IV Team.

2. An IV administration set will be inserted into the outlet of the bag of Normal Saline IV solution. Two (2) IV bags will be set up in this manner.

3. The IV tubing shall be cleared of air and made ready for use.

4. The standard procedure for providing IV access will be used.

5. The IV tubing for both set-ups will be connected to the receiving port of the IV access; one for the primary vein, the other for the secondary vein.

6. At this point, the administration sets shall be running at a slow rate of flow (KVO), and ready for the insertion of syringes containing the lethal agents. The Warden or his designee shall maintain observation of both set-ups to ensure that the rate of flow is uninterrupted. **NO FURTHER ACTION** shall be taken until the prearranged signal to start the injection of lethal agents is given by the Warden or designee.

**APPENDIX II**

**CONTROLLED CHEMICAL HANDLING PROCEDURES FOR EXECUTION BY LETHAL INJECTION**

The following procedures will be utilized to obtain controlled chemicals, transport the chemicals to the Execution Chamber at the Georgia Diagnostic and Classification Prison (GDCP), dispose of and/or return unused chemicals to the GDCP Pharmacy.

A. The certificate issued by the Drug Enforcement Agency (DEA), United States Department of Justice will be posted in the medical room of the GDCP Execution Chamber. A copy of the certificate will be kept on file at the GDCP Pharmacy.

B. All controlled materials, blank "Controlled Chemical Disposition Record" forms, and a lockable transport case will be kept in the GDCP Pharmacy.

C. The designated key ring, located in the Tunnel Entrance Restricted Key Box, will be utilized to gain access to the chemical storage containers, transport case and the temporary chemical storage containers located in the Execution Chamber. Access to this key ring and the receipt and/or transportation of chemicals is restricted to: Deputy Warden for Security, Correctional Major, and designated Pharmacist. In an emergency, the Warden of GDCP may designate another official this duty.

D. On the day of a scheduled execution, one of the authorized staff members will draw the proper keys, proceed to the pharmacy and procure the appropriate amount of chemicals.

E. The appropriate amount of chemicals to be issued is as follows: Pentobarbital – a total of 15 grams of the chemical.

F. During the procedures outlined in step #4, the "Controlled Chemical Disposition Record" will be initiated at this time. The Pharmacy will keep a temporary copy upon issuance. The original will be kept with the chemicals in the transport case. The appropriate sections will be completed as needed.

G. Chemicals will be delivered to the Execution Chamber and locked in the chemical storage container.

H. Within one hour of the scheduled execution, the chemicals will be drawn into syringes to be used by the Injection Team by a trained staff member supervised by a nurse.

I. Chemicals will be drawn up as follows:

    1. Pentobarbital – 2.5 grams – Syringe #1

0017

2.   Pentobarbital – 2.5 grams – Syringe # 2.
3.   Saline Solution – 60 cubic centimeters each - Syringe # 3.

J.  A secondary set of Syringe Numbers 1, 2 and 3 will be prepared in the manner outlined above in section I if an additional dosage of Pentobarbital is needed. The secondary set of Pentobarbital will not be drawn into Syringe Numbers 1 and 2 prior to the execution, but will be immediately available, together with the appropriate syringes, if an additional dosage of Pentobarbital is needed.

K.  The remaining chemicals, along with appropriate syringes will be locked in the transport case and placed in the mechanical room in the event they are needed.

L.  At the conclusion of the execution, the amount of each chemical injected into the condemned inmate is to be recorded on the Controlled Chemical Disposition Record form, along with the date, time, inmate name and number.

M.  Any chemical loaded into a syringe that is not used will be destroyed by disposing of the chemicals in an appropriate manner. This must be witnessed and the section completed and signed on the Controlled Chemical Disposition form.

N.  Any unused chemicals will be returned to the pharmacy via the transport case and the remainder of the Controlled Chemical Disposition Record form will be completed.

O.  The original Controlled Chemical Disposition Record form will be retained by the Pharmacy. A copy will be sent to the Warden's office for inclusion into the Execution file.

P.  An inventory will be kept by the Pharmacy of each chemical used and returned. The Controlled Chemical Disposition form and the inventory logs will be kept in a red binder attached to the chemical storage container.

Q.  The attachments 1 through 2 will be completed and submitted as required.

Attachments:        (1) Controlled Chemical Disposition Form
                    (2) Inventory Log for Pentobarbital

**CONTROLLED CHEMICAL DISPOSITION RECORD**
**(LETHAL INJECTION)**                                    APPENDIX II – ATTACHMENT I

**GEORGIA DEPARTMENT OF CORRECTIONS – GDCP**

### CHEMICALS DISPENSED BY GDCP PHARMACY

| NAME OF CHEMICAL – AMOUNT | DATE ISSUED | DATE MANUFACTURED | EXPIRATION DATE | # OF SYRINGES or VIALS |
|---|---|---|---|---|
| PENTOBARBITAL          15 GRAMS | | | | |
| | | | | |
| | | | | |
| | | | | |

| ISSUED BY: (SIGN AND PRINT NAME) | RECEIVED BY: (SIGN AND PRINT NAME) | DEPT/LOCATION |
|---|---|---|
| | | |

### CHEMICALS ADMINISTERED BY INJECTION TEAM

| DATE | TIME | INMATE NAME/NUMBER | CHEMICALS | QTY |
|---|---|---|---|---|
| | | | PENTOBARBITAL | |
| | | | | |
| | | | | |
| | | | | |

### CHEMICALS DESTROYED

| CHEMICALS DESTROYED | QTY | # OF SYRINGES or VIALS | DATE DESTROYED | DEPT/LOCATION |
|---|---|---|---|---|
| PENTOBARBITAL | | | | |
| | | | | |
| | | | | |
| | | | | |

| DESTROYED BY: (SIGN AND PRINT NAME) | WITNESSED BY: (SIGN AND PRINT NAME) | DEPT/LOCATION |
|---|---|---|
| | | |

### CHEMICALS RETURNED TO GDCP PHARMACY

| DATE RETURNED | CHEMICAL RETURNED | QTY RETURNED | # OF SYRINGES or VIALS |
|---|---|---|---|
| | PENTOBARBITAL | | |
| | | | |
| | | | |
| | | | |

| RETURNED BY: (SIGN AND PRINT NAME) | RECEIVED BY: (SIGN AND PRINT NAME) | DEPT/LOCATION |
|---|---|---|
| | | |

0019

CONTROLLED CHEMICAL INVENTORY LOG

GEORGIA DEPARTMENT OF CORRECTIONS – GDCP

APPENDIX – ATTACHMENT 2
CHEMICAL – PENTOBARBITAL

| DATE RECEIVED | TYPE (SYRINGE or VIAL) | AMOUNT or VOLUME | DATE OF MANUFACTURE | EXPIRATION DATE | AMOUNT DISPENSED | DATE DISPENSED | AMOUNT RETURNED | DATE RETURNED | TOTAL INVENTORY | INITIALS & DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

11 | P a g e



# DELIVERY, PROCESSING AND CONFINEMENT OF UDS INMATES

## APRIL 2011





## GEORGIA DEPARTMENT OF CORRECTIONS
### *COMMISSIONER'S OFFICE*
*300 PATROL ROAD*
*3ᴿᴰ FLOOR, GIBSON HALL*
*FORSYTH, GA 30129*

Nathan Deal
*Governor*

Brian Owens
*Commissioner*

April 12, 2011

To:     Warden Carl Humphrey
Georgia Diagnostic and Classification Prison

From:    Commissioner Brian Owens

Subject:    Delivery, Processing and Confinement of UDS Inmates

The following procedures will be utilized for the deliver, processing and confinement of UDS inmates once sentenced by the court.

## I.    RECEPTION OF UNDER DEATH SENTENCE (UDS) CASES

### A.    THE SENTENCE

(1)    Upon a verdict or judgement of death made by a jury or a judge, it is the responsibility of the Clerk of Court, in which said sentence is pronounced, to forward a certified copy of said sentence to the Warden of the Georgia Diagnostic and Classification Prison not less than ten (10) days prior to the first day of the seven (7) day execution period as fixed by the court (OCGA 17-10-33).

(2)    Where the date for execution has passed for any reason, i.e., appeal, habeas corpus, State Board of Pardons and Paroles, etc., the judge of the Superior Court of the county where the case was tried shall have the power and authority to fix a seven (7) day period for the execution of the original sentence. Such order shall fix the seven (7) day period not less that ten (10) nor more than twenty (20) days from the date of such order. Such order shall be sent immediately to the Warden of the Georgia Diagnostic and Classification Prison (OCGA 17-10-40).

(3)    Upon notification, the Warden of the Georgia Diagnostic and Classification Prison will immediately notify the Commissioner and forward a copy of the sentence (Execution Order) or other orders.

(4)    Upon notification as described in 1.3, the Commissioner will forward a copy of the execution order to the Governor (Attention: Legal Counsel, Governor's Office) and the Chairman of the State Board of Pardons and Paroles.

0022

**B.** **Delivery of the Condemned Person**

(1) In all cases in which the defendant is sentenced to be executed, it shall be the duty of the trial judge in passing sentence, to direct that the defendant be delivered to the Commissioner of the Georgia Department of Corrections for execution at such state prison as may be designated by said Commissioner, (OCGA 17-10-38).

(2) It shall be the duty of the sheriff of the county in which such convicted person is so sentenced to convey such convicted person to said state prison not more than twenty (20) nor less than two (2) days prior to the time fixed in the sentence for execution of the condemned person unless otherwise directed by the State Board of Pardons and Paroles, or unless a stay of execution has been caused by appeal, granting of a new trial, or other order of a court of competent jurisdiction, and the expense for transporting of said person to the state prison for the purpose of execution shall be paid by the Ordinary of the County wherein the conviction was had, or the Board of County Commissioners, the County Commissioner, or other person or persons having charge of the county funds, out of any funds on hand in the treasury of such County, (OCGA 17-10-33).

(3) The Commissioner will issue assignment orders to the Sheriff of the County of conviction and forward copies of the Order and sentencing documents to the state prison. Delivery of the condemned person by the Sheriff will be arranged and coordinated by the Commissioner between the Sheriff of the County concerned and the Warden of the prison.

(4) Persons under death sentence incarcerated at institutions other than the institution designated by the Commissioner as the execution site will be transferred to the execution site approximately two (2) days prior to the scheduled execution date. Details of such transfer will be coordinated by the Commissioner.

**C.** **ADMISSION PROCESSING**

Upon arrival of the condemned person at the Georgia Diagnostic and Classification Prison or Arrendale State Prison, he/she will be processed through regular inmate admission procedures, to include security search, medical examination, fingerprint, photograph, personal history information, etc., to include a complete diagnostic evaluation, a copy of which will be provided to the Commissioner of the Department of Corrections, and the State Board of Pardons and Paroles.

**D.** **CONFINEMENT**

The condemned person will be confined in a cell designated by the Warden. Appropriate safeguards and security measures will be maintained as directed by the Warden. Pending the invoking of the Death Watch, the condemned person will be maintained in accordance with Departmental Rules and Regulations, special regulations for persons under death sentence, and specific court order. Persons delivered to the execution site less than thirty-six (36) hours prior to the time of execution, (refer to Paragraph 2.2), will be processed immediately and assigned to the Death Watch Cell.



# UNDER DEATH SENTENCE RECEPTION AND HOLDING PROCEDURES

## APRIL 2011





**GEORGIA DEPARTMENT OF CORRECTIONS**
*COMMISSIONER'S OFFICE*
*300 PATROL ROAD*
*3ᴿᴰ FLOOR, GIBSON HALL*
*FORSYTH, GA 30129*

Nathan Deal
*Governor*

Brian Owens
*Commissioner*

April 12, 2011

To:      Warden Carl Humphrey
         Georgia Diagnostic and Classification Prison

From:    Commissioner Brian Owens

Subject: Holding and Preparation of UDS Inmates for Execution

The following procedures will be utilized for the holding and preparation of UDS inmates for execution.

### HOLDING AND PREPARATION FOR EXECUTION

**A.    PREPARATION FOR EXECUTION AND TIME OF EXECUTION**

The order of the court will specify a time span for the execution. A specific date and time within the designated time span will be established and announced by the Commissioner to the appropriate personnel on a need to know basis. The date and time for execution should be finalized seven (7) days in advance.

**B.    NOTIFICATION**

Upon receipt, the Warden or his designee shall read to the condemned inmate the Order of Execution issued by the court of conviction. The condemned will sign the Order acknowledging notification of the Order and the signature of the condemned will be witnessed by the staff member and same will provide the condemned with a copy of the Order. If the condemned refuses to acknowledge receipt of the Order of Execution, the Warden or designee shall read the Order of the Court and acknowledge receipt for the condemned, in writing, which shall be witnessed by a staff member other than the Warden and attached to the Order.

**C.    DEATH WATCH**

After the Order of Execution is read to the condemned inmate, the condemned shall be given a medical examination and searched for contraband. Following the medical examination and search, the condemned will be moved to a cell designated by the Warden. Once the condemned is moved to the cell designated by the Warden, the condemned inmate's personal property will not be returned to the condemned, with the exception of legal materials, religious materials or personal items expressly permitted, in writing, by the Warden. The Warden may provide the condemned with any additional State issued property as the Warden deems appropriate. A list of all property specifically approved by the Warden shall be kept with the activity log, and initialed by the Warden.

A minimum of two (2) officers shall be assigned to observe the condemned at all times during Death Watch.  If the condemned is a female, security will be maintained by female security personnel.  Duties shall be established by the Deputy Warden of Security and the Warden.  No other correctional staff, or civilian personnel, except medical personnel, shall be allowed in the Death Watch area without approval of the Warden or designee.  No inmates are allowed in the Death Watch area.

(1)   Observation

   (a)   Security of the Execution Chamber and the Execution Witness Room is the responsibility of the Warden.  Security briefings shall be held as appropriate.

   (b)   The officer in charge on each shift shall supervise the use of all items retained by the condemned and shall maintain a log of all activities of the condemned to include, but not limited to, the times of feeding, showering and all other occurrences.

   (c)   All meals for the condemned during the Death Watch shall be prepared/procured and delivered by the Food Service Director, or designee.  The activity log sheet shall reflect all names of persons delivering meals, menu items served the condemned and whether they were consumed or returned, to include date and time.

   (d)   A communication check, by telephone/radio, shall be made every thirty (30) minutes, on a continuous basis, during this period by the Death Watch Officer to the institution's control center.  This communication check shall be logged.

(2)   Medical

   (a)   Sick call will be in accordance with institution Rules and Regulations prior to the Death Watch period.  During the Death Watch, sick call will be in the Death Watch area.

   (b)   Request for medical attention by the condemned, in addition to sick call, will be provided in the Death Watch area unless determined inappropriate by the Medical Authority.  A medical determination to examine or treat the condemned in other than the Death Watch area should be coordinated with the Warden as soon as possible.

D.   **PERSONAL PROPERTY OF THE CONDEMNED**

(1)   The condemned's personal property will be packed by institutional staff and secured in the Property Room.

(2)   The inventory process and sealing of personal property shall be performed by an institutional officer and another staff person  as designated by the Warden.

(3)   The condemned shall sign a completed inventory sheet, which shall be witnessed by the officer and the other staff member.

(4)   The condemned shall indicate, in writing, on the completed inventory sheet the recipient of all personal property.

E.   **STATE ISSUED ITEMS**

(1)   The condemned shall be furnished with the following state-issued items while under Death Watch:

- 1 Mattress
- 1 Pillow
- 1 Pillowcase
- 2 Blankets (as necessary)
- 2 Sheets
- 2 Towels
- 1 Bar of Soap
- 1 Shirt
- 1 Jacket (provided as needed)
- 1 Pair of Pants
- 1 Pair of Boxer Shorts
- 1 Pair of Socks
- 1 Pair of Shower Shoes
- 1 Religious Material
- 1 Toothbrush and Tube of Toothpaste (provided as needed)
- 1 Use of Electric Razor (Cordless)

The Warden may provide the condemned with any additional State issued property, as the Warden deems appropriate. A list of all property specifically approved by the Warden shall be kept with the activity log and initialed by the Warden.

(2)   The condemned may be provided the following upon request:

- 1 Television Set to be Located Outside the Cell
- 1 Radio to be Located Outside the Cell
- Playing Cards
- Stationery
- Newspapers and Magazines (as approved by the Warden)
- Personal Items Approved by the Warden or Designee (limited to essential needs)

(3)   Any variation from the above list shall be approved by the Warden or designee, in writing, and attached to the activity log.

(4)   The condemned will not be provided with the following:

- Razors or Blades (other than cordless electric)
- Belts
- T-Shirts

0027

**F.     FUNERAL ARRANGEMENTS**

At the beginning of the Death Watch, if not previously done, the condemned may specify, in writing, his or her request for funeral arrangements. This information shall be conveyed if necessary to the inmate's family, or others as appropriate, by the Warden or his designee at least twelve (12) hours prior to the scheduled execution.

**G.     WITNESSES WHO MAY BE PRESENT**

(1)     Witnesses to the execution beyond those specifically prescribed by law or elsewhere in this procedure must be approved by the Commissioner prior to the day of the scheduled execution.

   (a)     Restrictions:

      (1)     No photographic, audio, recording, or computerized equipment will be permitted in the execution chamber or witness room except as specifically authorized by the Warden. All pencils, note pads, etc. will be issued and controlled by designated GDC staff.

      (2)     Space limitations may limit the number of witnesses to be present in the execution witness room. Witnesses will be selected as outlined below:

(2)     Five (5) witnesses selected by the condemned. These witnesses may not consist of inmate or victim family members unless approved by the Commissioner of the Georgia Department of Corrections.

(3)     Five (5) witnesses representing the news media organizations. Media representatives shall be determined as follows:

   (a)     The Georgia Bureau Chief of the Associated Press Wire Services may designate one news reporter to be its media representative.

   (b)     The Georgia Press Association, through its Executive Director, may designate two pool newspaper reporters to be its media representatives, including one pool reporter from a newspaper published within the county in which the condemned was convicted.

   (c)     The Georgia Association of Broadcasters, through its President, may designate two pool news reporters to be its representatives for the electronic media, including one television or radio reporter from the county in which the condemned was convicted.

   (d)     The names of the news reporters representing the above mentioned classes or news media and designated alternates, shall be communicated telephonically to the Commissioner of the Department of Corrections at least twenty-four (24) hours prior to an execution.

    (e)     All approved media witnesses will be certified in writing by the Commissioner to the Warden of the Georgia Diagnostic and Classification Prison.

    (f)     In the event that more than one execution is carried out in a single day, the same media representatives shall be the witnesses for those executions. The newspaper and broadcast representatives from the county of conviction will change if the offenders to be executed are from different counties.

    (g)     Upon entering the Georgia Diagnostic and Classification Prison, each media representative must present sufficient evidence to establish his/her identity to the Warden or designee that he/she is entitled access to the press conference interview. This shall include a current photo I.D. Pencils, pens, notebooks, etc., will not be allowed; these items will be provided by Department of Corrections staff. Facility policy prohibits witnesses wearing or bringing jewelry or other personal items into the facility.

(4)    Not less than five (5) witnesses approved in writing by the Commissioner of the Department of Corrections.

    (a)     The Commissioner of the Department of Corrections may approve five (5) or more witnesses to be present in the witness room. These witnesses may include officials with the Executive, Judicial or Legislative Branch of Government, or private citizens. The Commissioner's Office shall maintain a tentative list of witnesses and keep the list updated.

    (b)     The Commissioner may approve one or more witnesses representing the victim(s). Requests of this nature will be received by the Commissioner no later than twelve (12) business hours prior to the day of the scheduled execution.

    (c)     All approved witnesses will be certified in writing by the Commissioner to the Warden of the Georgia Diagnostic and Classification Prison prior to the time of the scheduled execution, if possible. Prior to the time of the execution, the Warden shall confirm participation.

**H.**    **Witnesses: Request of the Condemned**

If the condemned person so desires, the following may be present at such execution: his/her counsel, relatives, clergymen and friends, (OCGA 17-10-41), pursuant to approval as outlined in 12.1.1. The condemned may update the names of those he/she desires to be present at the execution with the Commissioner's approval. These names shall be recorded in writing, witnessed and maintained by the Warden or designee.

(1)    Not later than twelve (12) hours prior to time of execution those witnesses requested by the condemned shall be contacted by the Warden or designee in the most expeditious and appropriate method of communication to confirm the request and advise them of the time and date of the execution, assembly, orientation and escort procedures to the execution witness room.

**I.     Witnesses - Other**

    (1)    Those witnesses to the execution required by law shall be under the supervision of the Warden of the institution or designee and shall appear at the institution at a time and place as directed by the Warden.

    (2)    Those witnesses requested by the condemned shall appear at the institution no later than two (2) hours prior to the execution for orientation and escort to the execution witness room (refer to Paragraph 12.2).

    (3)    Those witnesses to the execution who are approved by the Commissioner of the Georgia Department of Corrections shall appear at the institution no later than two (2) hours prior to the execution for orientation and escort to the execution witness room.

**J.     MEDIA INFORMATION AND PUBLIC INFORMATION OFFICE**

    (1)    News media representatives shall not be allowed to visit any inmate at the institution during the DeathWatch.

    (2)    Briefings for news media representatives shall be conducted as appropriate during the Death Watch and immediately after the execution by the Public Information Officer or designee at a time and place designated by the Warden of the institution.

    (3)    Broadcast reporters will be allowed to broadcast live from a pre-designated area on the grounds of the institution during the hours designated by the Warden on the day of the execution. A delay in the execution may require that these hours be adjusted accordingly.

**K.     VISITATION**

The condemned shall be allowed contact visits the day prior to and the day of the execution with family, friends, private clergy and his legal representatives as approved by the Warden. Except as otherwise noted below, normal visitation policies will apply.

    (1)    If possible, all visitors should be processed into the institution at one time and placed in the room provided. A maximum of five (5) visitors at a time shall be allowed in the institution at one time.

    (2)    The condemned may eat an institutional meal while in the visiting room with his visitors. Visitors may purchase an institutional meal which may be consumed in the visitation area in the presence of the condemned.

    (3)    Attorney(s) shall be allowed to visit the condemned upon approval of the Warden or designee.

**L.     VICTIM'S FAMILY/RELATIVES**

A staff member will be designated to care for any of the victim's family who remain within the institution during the execution. A room shall be designated for this purpose.

**M.** **TELEPHONE**

Telephone access shall be provided to the condemned, with the following limitations:

(1)   Telephone calls shall be in accordance to institutional rules and regulations prior to Death Watch.

(2)   At least one (1) fifteen (15) minute call per day during Death Watch, unless otherwise approved by the Warden; a phone will be provided to the condemned, unless otherwise restricted by the Warden.

(3)   All telephone calls shall be made collect, unless the Warden makes exceptions.

(4)   All telephone calls are to be made between the hours of 8:00 a.m. and 6:00 p.m. unless otherwise approved by the Warden.

(5)   Incoming calls for the condemned will be referred to the Warden or designee for screening and approval.  Such calls will be denied unless the purpose involves family and/or legal matters requiring the condemned's involvement.

Ex. 04

## DECLARATION OF
## LARRY D. SASICH, PHARMD, MPH, FASHP

My name is Larry D. Sasich. I am a consultant pharmacist with experience in pharmacy practice, academia, public interest research, drug regulation, and drug safety. My interest and continued involvement with pharmacy compounding dates from the passage of the Food and Drug Administration Modernization Act (FDAMA) of 1997.

My background, experience and qualifications, in part, include:

- Serving as Chairperson of the Department of Pharmacy Practice at the LECOM School of Pharmacy in Erie, Pennsylvania.

- Serving as a consultant to Public Citizen Health Research Group, Washington, D.C.

- Serving as a Consumer Representative on the Science Board of Food and Drug Administration's, an advisory committee to the FDA Commissioner.

- Serving as a consultant to the Saudi Food and Drug Authority, Riyadh, Saudi Arabia.

I have a Masters in Public Health, with an emphasis in biostatistics and epidemiology, from The George Washington University, and a Doctorate of Pharmacy degree from University of the Pacific. I completed my residency in nuclear pharmacy at the University of New Mexico. I have also been elected a Fellow in the American Society of Health-System Pharmacists (FASHP). I have authored publications and/or presented analysis on drug safety issues. A complete list of my publications and presentations are listed in my Curriculum Vitae, which is appended to this Declaration as Exhibit A.

The Federal Defender Program, Inc., Atlanta, Georgia has previously retained me to provide my opinions on the quality, safety, and risks of pharmacy compounded drugs with particular attention to the preparation of injectable drugs made from non-sterile Active Pharmaceutical Ingredients (APIs) that may be used in executions in Georgia.

I previously provided a declaration to the Federal Defender Program during their representation of Kelly Gissendaner. I have attached that declaration to this document. In that declaration, I detailed the foreseeable risks that the compounded drugs used in lethal injections in Georgia would be sub-standard in a manner that would cause severe pain upon or shortly after injection. As I said in that declaration, "[t]hese include the risk that the compounded drug will be sub-potent, expired, contaminated, contain unintended additives, or will contain a substantial level of particulates." I also noted that "[a]ny testing performed on the drugs in the possession of Department of Corrections – both because of its limited nature and because of the laboratories doing the testing – is unlikely to address the potentially severe problems that are identified in this declaration."

1

I have been informed that Ms. Gissendaner's scheduled execution on March 2 was halted because the compounded drugs obtained by Georgia were "cloudy." Whenever a solution that is supposed to be clear turns cloudy, it indicates one of a number of serious problems that make the drug unusable and dangerous. Those include all of the risks that I detailed in my previous declaration.

## Substantial Risks of Harm From Pharmacy Compounded Drugs

As I noted in my earlier declaration for Ms. Gissendaner, "[t]he acidity/alkalinity (pH) of any injectable drug must be carefully adjusted to ensure that the recipient of the drug does not suffer an immediate painful sensation at the time of injection of the drug. Both a compromised API and improper compounding procedures can cause the pH of an injectable drug to be off-balance."

The cloudiness of Georgia's compounded drugs could indicate an out-of-balance pH that caused the API of the drug to precipitate, or fall out of solution in the form of particles. This poses a number of substantial risks. As I noted before, "[p]articulate matter contaminating sterile injectable drugs can become lodged in small blood vessels." They could also lodge in a prisoner's lungs. This would be extremely painful. It could also reduce the potency of the drugs so that they would not kill the prisoner, or would kill them much more slowly.

Injectable drugs regulated by the FDA must be sterile and meet other stringent requirements for quality, purity, and stability. Compounded injectable drugs made from a non-sterile API outside of an FDA-regulated facility carry a substantial risk of being contaminated with fungi, bacteria, and other contaminates. The cloudiness of Georgia's compounded drugs could reflect that they were contaminated in this way and that, for example, a plume of bacteria was growing in the syringe. Endotoxins are among the potential contaminates of injectable drugs and would elicit an inflammatory reaction and can result in shock.

Other potential contaminates would be "cross-contaminates," in which the drugs are contaminated with a different drug to which the prisoner might be highly allergic. This occurs when the air supply of the room in which the lethal injection drug is being compounded is not scrupulously segregated from the air supply in the room in which an allergy-causing agent is being produced. In the event of a severe allergic reaction, the throat can swell making breathing extremely difficult or impossible.

If Ms. Gissendaner had been injected with the "cloudy" compounded drugs that Georgia obtained for her execution, and the cloud was made up of particulate matter (from precipitated API or contaminates), she would have suffered terrible pain. If the pH of the drug was off-balance in a way that made it even more caustic than it is when properly manufactured, the liquid part of the drug it would have caused her intense, burning pain upon injection.

2

I have previously described the January 10, 2014, execution of Oklahoma prisoner Michael Lee Wilson, who was executed under a three drug protocol that used pentobarbital sodium injection produced by an unknown compounding pharmacy. Time Magazine reported that within 20 seconds of receiving the injection Mr. Wilson cried that he felt his "whole body burning." I have opined that Mr. Wilson's reaction is consistent with a contaminated pentobarbital sodium injection. "Because of common problems with safety procedures of compounding pharmacies and testing laboratories, and the lack of adequate oversight by federal and state authorities, the injection used in Mr. Wilson's execution likely contained cross-contaminates that he was allergic to, bacteria and endotoxins. The injection could have had an altered pH due to contaminates or inadequate procedures used in the preparation of the drug. Additionally, because of this lack of oversight described above, no one knows for sure what was injected into Mr. Wilson." I believe that this could have happened to Ms. Gissendaner on March 2, had her execution proceeded.

The South Dakota execution of Eric Robert on October 15, 2012 used pharmacy-compounded pentobarbital. According to reports, Mr. Robert appeared to clear his throat, gasped heavily and snored. Over a ten-minute period his skin turned a blue-purplish hue. During the course of his execution, he opened his eyes and they remained open until his death. It took 20 minutes for the state to declare Mr. Robert dead. Mr. Robert's heart continued to beat ten minutes after he stopped breathing. I have opined that the events observed during Mr. Robert's execution are consistent with the administration of a compounded drug that was contaminated or sub-potent. I believe that this, too, could have happened to Ms. Gissendaner on March 2.

As I have said above, these risks could have occurred because Georgia's lethal injection drugs were improperly manufactured. It is also possible that the drugs were improperly stored and handled. As I wrote in my previous declaration, "it does not appear that Georgia is properly storing its compounded drugs, which would cause them to expire prior to their use."

Chapter <797> of the United States Pharmacopoeia ("USP") defines, in part, high-risk level compounded sterile products as those using non-sterile ingredients. This would include pharmacy-compounded pentobarbital sodium produced from an API. The USP Chapter <797> storage requirements for high-risk compounded sterile products are:

- 24 hours at controlled room temperature that is defined in USP Chapter <34> as $20^\circ$ C to $25^\circ$ C ($68^\circ$ F to $77^\circ$ F)

- Not more than 3 days at a cold temperature. Cold temperature is defined in USP Chapter <34> as a temperature not exceeding $46^\circ$ F ($8^\circ$ C)

- 45 days in a solid frozen state at temperatures between $-25^\circ$ C and $-10^\circ$ C ($-13^\circ$ F and $14^\circ$ F)

3

USP <797> states that compounded sterile products shall not be stored or transported after the above listed limits. These requirements apply to the facility in which the pentobarbital sodium was produced; storage during transport; and storage at the facility at which the pentobarbital sodium will be administered. Failing to adhere to the USP storage requirements increases the risk of microbial growth, chemical degradation, contamination from physical damage to packaging, and permeability of plastic packaging.

There is nothing in Georgia's lethal injection procedures to indicate that they are storing these compounded chemicals properly. The procedures also direct members of the execution team to do things that make no sense. For example, based upon Georgia's controlled substance inventory log, it receives its compounded drugs in syringes. But the procedures direct the staff to draw the drugs into syringes once they have been brought to the execution chamber. It makes no sense to draw sterile products from one syringe to another. That increases the risk of contamination. The cloudiness of Georgia's lethal injection drugs could be due to expiration or contamination from this improper storage and handling.

As I said at the conclusion of my last declaration, "[t]he true contents of pharmacy compounded pentobarbital injection, or any pharmacy-compounded drug, prepared from a non-sterile API are unknown. The use of pharmacy-compounded injections made from non-sterile API presents an immediate risk of suffering and pain to the recipient of such a drug." I believe that Ms. Gissendaner faced that risk on March 2. The fact that Georgia's lethal injection drugs were cloudy indicates that serious mistakes occurred somewhere along the line in how the drugs were made, stored, and/or handled. Those mistakes were either in the material obtained, training, or personnel, or all three. Proper training is necessary to detect those mistakes and to prevent them from happening again.

I swear under pain and penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated this, the 5th day of March 2015.

Larry D. Sasich,
1201 North Shore Blvd. E #802
Ontario, CANADA
Phone: 705-491-0609
Email: larry.sasich@gmail.com

4

Ex. 04a

## DECLARATION OF
## LARRY D. SASICH, PHARMD, MPH, FASHP

My name is Larry D. Sasich. I am a consultant pharmacist with experience in pharmacy practice, academia, public interest research, drug regulation, and drug safety. My interest and continued involvement with pharmacy compounding dates from the passage of the Food and Drug Administration Modernization Act (FDAMA) of 1997.

My background, experience and qualifications, in part, include:

- Serving as Chairperson of the Department of Pharmacy Practice at the LECOM School of Pharmacy in Erie, Pennsylvania.

- Serving as a consultant to Public Citizen Health Research Group, Washington, D.C.

- Serving as a Consumer Representative on the Science Board of Food and Drug Administration's, an advisory committee to the FDA Commissioner.

- Serving as a consultant to the Saudi Food and Drug Authority, Riyadh, Saudi Arabia.

I have a Masters in Public Health, with an emphasis in biostatistics and epidemiology, from The George Washington University, and a Doctorate of Pharmacy degree from University of the Pacific. I completed my residency in nuclear pharmacy at the University of New Mexico. I have also been elected a Fellow in the American Society of Health-System Pharmacists (FASHP). I have authored publications and/or presented analysis on drug safety issues. A complete list of my publications and presentations are listed in my Curriculum Vitae, which is appended to this Declaration as Exhibit A.

The Federal Defender Program, Inc., Atlanta, Georgia has retained me to provide my opinions on the quality, safety, and risks of pharmacy compounded drugs with particular attention to the preparation of injectable drugs made from non-sterile Active Pharmaceutical Ingredients (APIs) that may be used in executions in Georgia.

I previously provided a declaration to the Federal Defender Program during their representation of Marcus Wellons. I also provided a declaration to the lawyers representing Georgia death row inmate Warren Hill, in which I provided an overview of the problems in the compounding industry. Both declarations were written in the face of the Georgia law that keeps almost all aspects of the execution process and lethal injection drugs a secret. As such, they necessarily lacked specificity. I still do not know the name or location of the compounding pharmacy that will prepare drugs for use in Georgia

1

executions. Nor have I seen testing results for the compounded drugs that will be used. Without this complete information, a full and complete report is not possible.

For the reasons detailed below, there is a foreseeable risk that the compounded drugs used in lethal injections in Georgia will be sub-standard in a manner that will cause severe pain upon or shortly after injection. These include the risk that the compounded drug will be sub-potent, expired, contaminated, contain unintended additives, or will contain a substantial level of particulates. Any testing performed on the drugs in the possession of Department of Corrections – both because of its limited nature and because of the laboratories doing the testing – is unlikely to address the potentially severe problems that are identified in this declaration.

**Pharmacy Compounding Overview**

Pharmacy compounding is a traditional practice of the profession of pharmacy. There are two types of compounding – traditional and non-traditional. Traditional compounding does not involve the creation of drugs from scratch. Rather, it uses active and inactive ingredients to meet the specific, individual needs of a patient whose needs cannot be met with an FDA-approved product for medical reasons. Traditional compounding requires a legal prescription for an individual patient. For example, a two year-old transplant patient may require a medication that is only available in an FDA-approved tablet form. In such a case, a tablet's ingredients may be reformulated into an oral liquid for administration. Traditionally compounded products are not FDA approved, but the FDA generally exercises its enforcement discretion to allow provision of these products to meet the specific needs of patients.

Non-traditional pharmacy compounding involves the use of raw ingredients called Active Pharmaceutical Ingredients (APIs) to manufacture a copy or substitute for an FDA-approved drug. These products are not made for a specific patient with a specific medical need, but for general distribution. Non-traditional compounding resembles drug manufacturing more than it does the practice of pharmacy. Unlike pharmaceutical manufacturers, however, compounding pharmacies are not subject to the drug approval process and rigorous checks and regulatory procedures required under federal Good Manufacturing Practice (GMP). Pharmacies practicing non-traditional compounding are not required, under federal law, to demonstrate that their products are pure, potent, safe, or effective, nor are they required to maintain compliance with federal manufacturing guidelines or oversight. Products made by non-traditional compounding are primarily regulated by state pharmacy laws.

Non-traditional compounded drugs, such as the pentobarbital used in executions, are not FDA-approved for any purpose. This means that the FDA has not verified their safety or effectiveness or the quality of their manufacture. They do not meet federal requirements for purity, potency, efficacy and safety. Existing outside of the FDA

2

regulatory framework that ensures these qualities in manufactured pharmaceutical drugs, compounding pharmacies make large quantities of unregulated, unpredictable and potentially unsafe drugs. The FDA's Web site lists numerous examples of serious public health risks associated with the use of pharmacy compounded products at: http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/PharmacyCompounding/default.htm.

For the treatment of animals, the American Veterinary Medical Association actively discourages the use of compounded drugs except in cases of veterinary medical necessity. This professional policy was underscored after the death of 21 polo ponies from poisoning by compounded drugs. The American Veterinary Medical Association advises that because one cannot assure the quality of bulk APIs, they must not be compounded for use in animals. See Katie Thomas, Polo Ponies were given Incorrect Medication, NEW YORK TIMES, April 23, 2009, available here: http://www.nytimes.com/2009/04/24/sports/othersports/24polo.html?_r=0; Katie Thomas, Deaths of Polo Horses Highlight Practices of Disputed Pharmacies, NEW YORK TIMES, April 30, 2009, available here: http://www.nytimes.com/2009/05/01/sports/othersports/01polo.html.

## The Compounding Process

Drug manufacturing is highly technical, requiring strict adherence to current GMP and a rigorous and continuous process of FDA inspection, regulation, supervision and oversight.

The manufacture of sterile drugs intended for intravenous administration, such as pentobarbital, is acknowledged by pharmaceutical manufacturers and the FDA alike to be one of the most difficult of all pharmaceutical processes to execute. The preparation of sterile drugs is unavoidably complex, often involving many steps and manipulations. Each step poses an opportunity for error, including unintended introduction of potentially dangerous cross contaminants, and the possibility of a problematic osmolality or imbalanced pH.

Unlike manufacturers, compounding pharmacies do not have to adhere to the rigorous FDA approval procedures for manufacturing sterile drugs. Instead, the less rigorous United States Pharmacopoeia (USP) <797> chapter standards may be applied to compounders. As a result, the potential for product contamination in compounded drugs is far higher than that in manufactured drugs. In some states, state law and Boards of Pharmacy do not even require compliance with this lesser USP standard.

## Questionable Ingredients Used In Compounded Drugs

3

The quality of the APIs, or raw bulk products, used in compounding is far more suspect than those used in manufactured drugs. A hearing before the U.S. House Energy and Commerce Committee cited compounding pharmacies as a primary route of entry for counterfeit bulk drugs: "Lured by high prices and potential profits in the United States, counterfeit bulks [API's] can get into our prescription drugs in several ways: (1) as imported ingredients to U.S. manufacturers; (2) as imported ingredients to pharmaceutical compounders; and (3) as source ingredients for Internet pharmacies marketing to the U.S. The counterfeiters use sophisticated methods such as preparing false labeling, containers, seals and certificates of analysis, or using a manufacturing process that differs from the filed manufacturing process." See Prepared Statement of Honorable Fred Upton before the House Commerce Committee Subcommittee on Oversight and Investigations Counterfeit Bulk Drugs, June 8, 2000, available here: http://www.fda.gov/ohrms/dockets/dockets/05p0116/05p-0116-cp00001-17-Exhibit-16-vol1.pdf. Former FDA Associate Commissioner Dennis Baker testified that "[counterfeit bulk drugs] pose a real or potential health hazard because their manufacturer is often unknown . . .. The impurity profile is unknown, and the age, the storage, the manufacturing environment, or the synthesis of the product cannot be determined," creating a situation where "no amount of finished product testing can build quality into the product." Id., Statement of Dennis Baker, available at: http://www.hhs.gov/asl/testify/t000608a.html.

It is very difficult, if not impossible, to trace the raw API chemicals used in compounding back to the original manufacturer for information on quality, packaging, storage, shipment conditions, and chains of custody – all necessary to ascertain the identity, purity, potency, and efficacy of a medication.

Much of the bulk API used in non-traditional compounding is not produced in FDA-registered and inspected facilities. This is not an idle concern. Plants in China have been found to manufacture pesticides using the same equipment used to make APIs bound for human ingestion as part of a compounded product. See Statement of Dennis Baker, supra. By contrast, APIs used in manufactured (FDA-regulated) pharmaceuticals must come from a manufacturer that holds a Drug Master File (a confidential, detailed document submitted by API manufacturers to the FDA containing the chemistry, manufacturing and controls of a drug component) for the chemical, and must be manufactured in an FDAregistered plant.

Ethical chemical manufacturers who adhere to professional Responsible Care principles are more likely to sell directly to FDA-approved manufacturers of finished products and are unlikely to sell chemicals that may be used in grey market drug production. Accordingly, unethical chemical manufacturers and those that are not regulated by the FDA are more likely to release large quantities of bulk chemicals into the grey market, increasing the likelihood that substandard chemicals will serve as the starting materials for both traditional and non-traditional compounding.

4

In this unregulated market, a chemical labeled to represent a certain active ingredient may actually contain another, quite different ingredient. Practitioners, regulators, and experts have identified this problem as to chemicals distributed in large quantities to pharmacies throughout the nation for use in compounding.

There can be no guarantees that APIs purchased from the grey market are safe for use, are not contaminated, or even contain the ingredient listed on the product label. Furthermore, because chemicals may not have been manufactured in an FDA-registered facility under current GMP standards, there can be no assurance as to the quality variation from lot-to-lot or container-to-container.

If poor quality ingredients are used, even the best compounding practices will not build quality and suitability into the final product. The compounded drug may be contaminated, super-potent or sub-potent, non-sterile, or at risk of an unusually short shelf life. A pharmacist may have confidence in her ability to accurately measure or weigh individual ingredients and extend this confidence as a quality measure for the finished compound. But if the pharmacist is starting with an adulterated or counterfeit chemical that would go unrecognized in a pharmacy setting (as opposed to a manufacturing facility with the capacity to test the quality of ingredients and overseen by federal regulators), accurate measurement of chemicals cannot remedy an already adulterated or otherwise unsafe product with respect to identity, purity, potency, or harmful contamination. Despite a pharmacist's best efforts, there are parameters beyond her professional control that build risk and uncertainty into all compounded products.

## Testing The API and The Final Product

Compounded pentobarbital injection is made from the API, sodium pentobarbital, which is then mixed with other ingredients. Testing of both the API and each step in the production of the final compounded product is important, but an educated understanding of the test results – and their potential inadequacies – is crucial. The quality and adequacy of the analytical lab or labs conducting the testing is also vital.

Testing only provides a very provisional indication of an API's suitability for compounding given the unknowns about the chemical's integrity, storage, and custody in the timeframe from testing to pharmacy compounding and use.

Compounding pharmacists generally do not have the ability to test chemicals for identity, potency, purity and contamination. Many contract laboratories that conduct testing are in business to perform such tests for compounding pharmacies and their suppliers.

5

Georgia's execution protocol does not include provisions for testing the API or the finished, compounded dosage form of the pentobarbital to be used in executions. The ability of the Georgia Department of Corrections' source of pentobarbital to engage a reliable and competent laboratory to conduct testing to confirm the identity of the chemical, or to identify the presence of harmful contaminants that pose an immediate safety threat if administered intravenously, is vital to avoiding the serious hazards inherent in the use of compounded drugs for executions.

## Substantial Risk of Harm From Pharmacy Compounded Drugs

Injectable drugs regulated by the FDA must be sterile and meet other stringent requirements for quality, purity, and stability. Compounded injectable drugs made from a non-sterile API outside of an FDA-regulated facility carry a substantial risk of causing immediate harm and pain to the recipients of such drugs. This risk is real, not hypothetical or speculative, and is based on objective evidence from the real world that has been observed over the last century in this country.

Countless members of the public have suffered and experienced pain before science based federal regulations were implemented to protect the public from what had become the obvious hazards of injectable drugs contaminated with fungi, bacteria, and other contaminates.

A recent example of the consequences of injectable drugs not meeting strict FDA standards is the 2012 fungal meningitis epidemic caused by the New England Compounding Center that resulted in more than 700 cases of meningitis and over 60 deaths, all of which were preventable. The risks associated with the preparation of supposedly sterile injections made from non-sterile APIs produced outside federally regulated production facilities were clearly known.

In addition to lack of sterility there are additional risks of immediate harm and pain from loosely regulated pharmacy compounded injectable drugs. These known risks include cross contamination of a lethal injection drug with a drug to which the condemned prisoner may be highly allergic. This occurs when the air supply (atmosphere) of the room in which the lethal injection drug is being prepared compounded is not scrupulously segregated from the air supply in the room in which an allergy-causing agent is being produced. In a severe allergic reaction the throat can swell making breathing extremely difficult or impossible.

The acidity/alkalinity (pH) of any injectable drug must be carefully adjusted to ensure that the recipient of the drug does not suffer an immediate painful sensation at the time of injection of the drug. Both a compromised API and improper compounding procedures can cause the pH of an injectable drug to be off-balance

6

Endotoxins are potential contaminates of injectable drugs. These substances elicit an inflammatory reaction and can result in shock.

Particulate matter contaminating sterile injectable drugs can become lodged in small blood vessels. Depending on the size of these particles the response could be immediate or delayed.

## Problems With Pharmacy Compounded Pentobarbital Used in Executions

On January 10, 2014 Oklahoma prisoner Michael Lee Wilson was executed under a three drug protocol that used pentobarbital sodium injection produced by an unknown compounding pharmacy. Time Magazine reported that within 20 seconds of receiving the injection Mr. Wilson cried that he felt his "whole body burning."

It is my opinion that Mr. Wilson's reaction is consistent with a contaminated pentobarbital sodium injection. Because of common problems with safety procedures of compounding pharmacies and testing laboratories, and the lack of adequate oversight by federal and state authorities, the injection used in Mr. Wilson's execution likely contained cross-contaminates that he was allergic to, bacteria and endotoxins. The injection could have had an altered pH due to contaminates or inadequate procedures used in the preparation of the drug. Additionally, because of this lack of oversight described above, no one knows for sure what was injected into Mr. Wilson.

The South Dakota execution of Eric Robert on October 15, 2012 used pharmacy-compounded pentobarbital. According to reports, Mr. Robert appeared to clear his throat, gasped heavily and snored. Over a ten-minute period his skin turned a blue-purplish hue. During the course of his execution, he opened his eyes and they remained open until his death. It took 20 minutes for the state to declare Mr. Robert dead. Mr. Robert's heart continued to beat ten minutes after he stopped breathing.

It is my opinion that the events observed during Mr. Robert's execution are consistent with the administration of a compounded drug that was contaminated or sub-potent.

## FDA Compared to State Board of Pharmacy Inspections

In the absence of routine FDA regulation and oversight, compounding pharmacies are able to produce injectable drugs under conditions that create a substantial risk that the drugs will be sub-standard in a manner that will cause severe pain upon or shortly after injection. A recent FDA Warning Letter issued to a compounding pharmacy in California is instructive. On May 2, 2014, the FDA issued a Warning Letter to Grandpa's Compounding Pharmacy, Inc., in Placerville, CA. The letter summarized findings made

7

by the FDA following a site inspection that applied Good Manufacturing Practice (GMP) guidelines.

FDA inspectors were on site at Grandpa's Compounding Pharmacy for a period of 4 days in September 2013. The initial findings of the inspection were documented on an FDA Form 483 that was left at the pharmacy by regulation. This form is required to be placed in the public domain and is now available of the FDA's Web site. Subsequently, the FDA issued a detailed Warning Letter to Grandpa's Compounding Pharmacy documenting a number of serious problems in the preparation compounded sterile products.

The FDA found serious deficiencies in producing sterile drug products and flaws in the design of aseptic processing areas, which could lead to contamination of products, potentially putting patients at risk. For example, it was observed that the air supply ductwork for the cleanroom was held together, in part, with duct tape. The FDA also observed that the cleanroom contained an in-wall air conditioner bringing outside air into the room where aseptic manipulations are occurring. These items are difficult to clean and could allow air to enter the cleanroom that has unacceptable microbial and particulate levels. Furthermore, according to the FDA, operators were observed with exposed wrist and forearm skin engaging in aseptic manipulations. In addition, it was observed that this pharmacy used tap water to clean and depyrogenate containers and closures; these are not suitable to depyrogenate the containers and closures intended for injectable drug products. The FDA stated that products produced in Grandpa's Compounding Pharmacy may be produced in an environment that poses a significant contamination risk.

The violations include, for example:

1. Failure to establish an adequate air supply filtered through high-efficiency particulate air filters under positive pressure in the aseptic processing areas (21 CFR 211.42(c)(10)(iii)).

2. Failure to establish and follow appropriate written procedures that are designed to prevent microbiological contamination of drug products purporting to be sterile, and that include validation of all aseptic and sterilization processes (21 CFR 211.113(b)).

3. Failure to ensure that manufacturing personnel wear clothing appropriate to protect drug product from contamination (21 CFR 211.28(a)).

4. Failure to establish an adequate system for monitoring environmental conditions in aseptic processing areas (21 CFR 211.42(c)(10)(iv)).

8

Case 1:15-cv-00655-TWT Document 1-5 Filed 03/02/15 Page 30 of 44

5. This pharmacy did not have for each batch of drug product purporting to be sterile and/or pyrogen-free, appropriate laboratory determination of satisfactory conformance to final specifications for the drug product (21 CFR 211.167(a)).

The FDA inspection found significant deficiencies in air quality at Grandpa's Compounding Pharmacy. These deficiencies could allow for the contamination of compounded sterile products that could pose a substantial risk of immediate harm and pain to condemned prisoners.

Due to inadequate oversight of compounding pharmacy by state and federal regulatory authorities, Grandpa's Compounding Pharmacy may be the rule rather than the exception.

## Failure to Properly Test Pharmacy Compounded Drugs

Adding to the problems of the known risks of pharmacy compounded injectable drugs made from non-sterile bulk API is the testing of these drugs by contract testing laboratories. Poorly regulated, if regulated at all, contract testing laboratories are supposed to test compounded drugs for safety and effectiveness. Too often, however, these labs are themselves substandard, and many are established to serve the financial interests of the pharmacies for which they are doing the testing. Five laboratories that test compounded drugs have had enforcement actions taken against them by the FDA.

Adequate regulatory oversight is absent from the pharmacy industry. Contract testing laboratories used by compounding pharmacies cannot rule out that compounded products are contaminated with bacteria and/or fungi, cross contaminates that could cause severe allergic reactions, particulate matter that may lodge in small blood vessels, endotoxins that may elicit pharmacological effects, incorrectly adjusted acidity (pH), and other unknown contaminates. A product that passes testing is assumed to have met minimum standards for quality, but the results obtained from contract testing laboratories used by compounding pharmacies are not reliable and should not be used to make reliable decisions about the safety, efficacy, and quality of pharmacy-compounded drugs.

## Storage Requirements for High Risk Compounded Sterile Products

I have reviewed what I understand to be Georgia's current lethal injection procedures. Based upon the text of the protocol, it does not appear that Georgia is properly storing its compounded drugs, which would cause them to expire prior to their use.

USP Chapter <797> defines, in part, high-risk level compounded sterile products as those using non-sterile ingredients. This would include pharmacy-compounded pentobarbital sodium produced from an API.

9

The USP Chapter <797> storage requirements for high-risk compounded sterile products are:

* 24 hours at controlled room temperature that is defined in USP Chapter <34> as 20° C to 25° C (68° F to 77° F)

* Not more than 3 days at a cold temperature. Cold temperature is defined in USP Chapter <34> as a temperature not exceeding 46° F (8° C)

* 45 days in a solid frozen state at temperatures between -25° C and -10° C (-13° F and 14° F)

USP <797> states that compounded sterile products shall not be stored or transported after the above listed limits. These requirements apply to the facility in which the pentobarbital sodium was produced; storage during transport; and storage at the facility at which the pentobarbital sodium will be administered.

Failing to adhere to the USP storage requirements increases the risk of microbial growth, chemical degradation, contamination from physical damage to packaging, and permeability of plastic packaging.

There is nothing in Georgia's lethal injection procedures to indicate that they are storing these compounded chemicals properly. The procedures also direct members of the execution team to do things that make no sense. For example, based upon Georgia's controlled substance inventory log, it receives its compounded drugs in syringes. But the procedures direct the staff to draw the drugs into syringes once they have been brought to the execution chamber. It makes no sense to draw sterile products from one syringe to another. That increases the risk of contamination.

## Conclusion

The true contents of pharmacy compounded pentobarbital injection, or any pharmacy-compounded drug, prepared from a non-sterile API are unknown. The use of pharmacy-compounded injections made from non-sterile API presents an immediate risk of suffering and pain to the recipient of such a drug.

10

I swear under pain and penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated this, the ⁄9 day of February 2015.

Larry D. Sasich,
1201 North Shore Blvd. E #802
Ontario, CANADA
Phone: 705-491-0609
Email: larry.sasich@gmail.com

Ex. 04b

# CURRICULUM VITAE

**Larry D. Sasich, Pharm.D., M.P.H., FASHP**
**1201 North Shore Blvd #802**
**Burlington, L7S 1Z5, Ontario**
**Canada**
Cell Phone: 705-491-0609
E-Mail: larry.sasich@gmail.com

**EDUCATION**

| | |
|---|---|
| 1995 to 1997 | Master of Public Health - Epidemiology<br>The George Washington University School of<br>Public Health and Health Services<br>Washington, D.C. |
| 1974 to 1975 | Doctor of Pharmacy<br>University of the Pacific<br>College of Pharmacy<br>Stockton, California |
| 1966 to 1970 | Bachelor of Science Pharmacy<br>Idaho State University<br>College of Pharmacy<br>Pocatello, Idaho |

**RESIDENCY**

| | |
|---|---|
| 1986 to 1987 | Nuclear Pharmacy<br>University of New Mexico<br>College of Pharmacy<br>Albuquerque, New Mexico |

**PROFESSIONAL LICENSES**

| | |
|---|---|
| 1970 to Present | California RPH 27094 |

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| April 2013 to date | Consultant, Drug Policy, Drug Safety and Efficacy<br>Burlington, ON Canada |
| July 2007 to April 2013 | Consultant,<br>Saudi Food and Drug Authority<br>3292 Northern Ring Rd. Al Nafal District<br>Riyadh, Saudi Arabia |
| November 2009 to 2012 | Consultant,<br>Public Citizen's Health Research Group<br>1600 20th Street, NW<br>Washington, D.C. 20009 |
| 2007 to 2009 | Chairman,<br>Department of Pharmacy Practice<br>LECOM School of Pharmacy<br>1858 Grandview Blvd.<br>Erie, PA 16505 |
| 2006 to 2007 | Acting Chairman,<br>Department of Pharmacy Practice<br>LECOM School of Pharmacy<br>1858 Grandview Blvd.<br>Erie, PA 16505 |
| 2005 to 2006 | Assistant Professor,<br>Department of Pharmacy Practice<br>LECOM School of Pharmacy<br>1858 Grandview Blvd.<br>Erie, PA 16505 |
| 2006 to 2008 | Consultant<br>Centre for Science and the Public Interest –<br>Canada<br>Suite 4550, CTTC Bldg.<br>1125 Colonel By Drive<br>Ottawa, Ontario K1S 5R1<br>Canada |

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| 2005 to 2007 | Consultant<br>Public Citizen's Health Research Group<br>1600 20th Street, NW<br>Washington, D.C. 20009 |
| 2005 to 2006 | Consultant<br>Canadian Agency for Drugs and Technologies<br>in Health<br>600-865 Carling Avenue<br>Ottawa, Ontario K1S 5S8<br>Canada |
| 1995 to 2005 | Research Analyst<br>Public Citizen's Health Research Group<br>1600 20th Street NW<br>Washington, D.C. 20009 |
| 1991 to 1995 | Drug Information Pharmacist<br>King Faisal Specialist Hospital and<br>Research Centre<br>Riyadh 11211, Saudi Arabia |
| 1993 to 1996 | Adjunct Clinical Faculty<br>Welch School of Pharmacy<br>University of Wales<br>Cardiff, Wales |
| 1992 to 1995 | Clinical Instructor<br>College of Pharmacy<br>King Saud University<br>Riyadh, Saudi Arabia<br>Graduate and Undergraduate Teaching |
| 1988 to 1990 | Clinical Pharmacist<br>St. Helens Hospital and Health Center<br>St. Helens, OR<br><br>Emanuel Hospital and Health Center<br>Portland, OR |
| 1985 to 1988 | Associate Professor of Clinical Pharmacy<br>Idaho State University<br>College of Pharmacy<br>Pocatello, Idaho<br><br>Promoted and Tenured July 1, 1984 |

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| 1983 to 1984 | Assistant Professor of Clinical Pharmacy<br>College of Pharmacy<br>Idaho State University<br>Pocatello, Idaho |
| | Acting Associate Dean  for Student Affairs |
| 1982 to 1983 | Assistant Professor of Clinical Pharmacy<br>College of Pharmacy<br>Idaho State University<br>Pocatello, Idaho |
| | Director of Professional Practice |
| 1979 to 1982 | Assistant Professor of Clinical Pharmacy<br>College of Pharmacy<br>Idaho State University<br>Pocatello, Idaho |
| | Director, Idaho Drug Information Service and<br>Regional Poison Control Center |
| 1976 to 1979 | Assistant Director of Pharmacy Services<br>USA MEDDAC<br>Berlin, West Germany |
| 1975 to 1976 | Staff Pharmacist<br>USA MEDDAC<br>Wuerzburg, West Germany |
| 1970 to 1974 | Pharmacist<br>Baneth's Pharmacy<br>Menlo Park, CA |

**HONORARY SOCIETIES**

| | |
|---|---|
| 1982 | Rho Chi |
| 1982 | Sigma Xi |

**AWARDS**

| | |
|---|---|
| 2000 | Distinguished Person of the Year – Pharmacists Planning Services |
| 1995 | Fellow American Society of Health-System Pharmacists |
| 1986 | Ciba-Geigy Leadership Award |
| 1983 | Outstanding Service – Idaho Board of Pharmacy |
| 1982 | Phi Delta Chi Faculty Achievement Award |

**APPOINTMENTS**

| | |
|---|---|
| 2009 | FDA Science Board Sub Committee on the Center for Food Safety and Applied Nutrition (CFSAN) |
| 2008 | FDA Science Board Sub Committee on the review of the National Center for Toxicological Research |
| 2007 | Grant Reviewer U.K. Economic and Social Research Council Large Grant proposal: Governance of Pharmaceuticals and Health |
| 2007 | Consumer representative, Science Board to the Food and Drug Administration – advisory committee to the FDA Commissioner |
| 2007 | Pennsylvania Pharmacists Association Pharmacy Compounding Task Force |
| 2006 | Food and Drug Administration Pediatric Advisory Committee November 16, 2006 – substitute consumer representative |
| 2006 | Reviewer *PLoS Medicine* |
| 2000 | Reviewer for the *Western Journal of Medicine* |
| 2000 | Reviewer for the *Journal of the American Medical Association* |
| 1996 | Department of Health and Human Services Steering Committee for the Collaborative Development of a Long-Range Action Plan for the Provision of Useful Prescription Drug Information |
| 1996 | Department of Health and Human Services, Food and Drug Administration, Consumer Consortium |

**APPOINTMENTS**

| | |
|---|---|
| 1995 | Reviewer for the *Saudi Pharmaceutical Journal* |
| 1993 | Reviewer for the *Annals of Saudi Medicine* |
| 1986 | Reviewer for *Annals of Pharmacotherapy* |
| 1987 | Idaho Delegate to Western Regional Conference on Clinical Pharmacy Practice |
| 1985 | Idaho Health Systems Ethics Conference Task Force |
| 1984 | American Pharmaceutical Association Committee to prepare accreditation standards for a community pharmacy residency |
| 1982 | Assistant Editor DRUGDEX® |
| 1981 | USP Dispensing Information Contributors Panel |

**PUBLICATIONS**

Sasich LD, Abi-Jaoude E. Making use of the Food and Drug Administration Briefing Documents to reconsider the safety profile of sertindole. British Journal of Psychiatry 2014 (under review).

Sasich LD, Abi-Jaoude E. Drug approval packages and briefing documents are already freely available. *BMJ* 2013;347:f4861.

Sasich LD. Rapid Response: Tamiflu: 14 flu seasons and still questions. BMJ 2013. At http://www.bmj.com/content/346/bmj.f547?tab=responses. Accessed January 28, 2013.

Sasich LD, Sukkari SR. The US FDA's Withdrawal of the Breast Cancer Indication for Avastin (Bevacizumab*). Saudi Pharmaceutical Journal* 2012; 20: 381-385.

Sukkari SR, Humaidan AS, Sasich LD. The content of Arabic language consumer medication information leaflets for three drugs: a pilot study. *Saudi Pharmaceutical Journal* 2012

Sukkari SR, Sasich LD, Humaidan AS, Burikan ON. An Analysis of Metformin Treatment for Adolescent Obesity at 48 Rather Than 24 Weeks after Treatment Cessation. *Archives of Pediatrics & Adolescent Medicine* 2010; 164(7):678.

Cook GE, Sukkari SR, Sasich LD. An Additional Source of Bias in Antidepressant and Other Trials. *Pharmacotherapy* 2010;30:117e-118e.

Cook GE, Sukkari SR, Sasich LD. Lost in Transmission — FDA Drug Information That Never Reaches Clinicians. *New England Journal of Medicine* 2010;362(6):561-563.

## PUBLICATIONS

Cook GE, Sasich LD, Sukkari SR. DIONYSOS study comparing dronedarone with amiodarone. *BMJ* 2010;340:c285.

Sasich LD, Sukkari SR, Barasain MA. An Academic Perspective on the APPEs' Educational Significance. *American Journal of Pharmaceutical Education* 2009; 73: article 139.

Tuttle DA, Sasich LD, Sukkari SR. Improving Access to FDA Reviews and Documents. *Journal of the American Medical Association* 2009; 302: 2204.

Sasich LD, Sukkari SR, Cook GE, Tuttle DA. The Importance of FDA Approval Packages and Briefing Documents in Pharmacy Education. *American Journal of Pharmaceutical Education* 2009; 73:126-127.

Sasich LD, Barasain MA, Al Kudsi MA. Three country comparison of selected safety information in the prescribing information for rosiglitazone (Avandia). *Saudi Pharmaceutical Journal* 2009; 17: 195-198.

Sukkari SR, Sasich LD. Look in the Looking Glass Not Through It. *American Journal of Pharmaceutical Education* 2009; 73:56-58.

Brown S, Olson P, Sasich LD. My First Drug Information Question – Should My Wife and Baby be Subjects in an Uncontrolled Clinical Trial? *Journal of the American Pharmacists Association* 2008; 48:444-445.

Sukkari SR, Sasich LD, Tuttle DA, Abu-Baker A, Howell H.  Development and Evaluation of a Required Patient Safety Course. *American Journal of Pharmaceutical Education* 2008; 73(3)

Kronmal R, Sasich LD. The FDA Should Not Have Approved Kuvan. *PKU News* 2008; 20: 2-11 and 12 [invited editorial].

Sasich LD. Book Review: Evaluating Clinical Research – All that Glitters is not Gold. *American Journal of Pharmaceutical Education.* 2008; 72(2).

Sasich LD, Barasain MA, Al Kudsi MA. The CV Risks of Etoricoxib (Arcoxia). *Annals of Saudi Medicine* 2008; 28:141-142.

Vitry A, Lexchin J Sasich LD, , Dupin-Spriet T, Reed T, Bertele V, Garattini S, Toop L, Hurley E. Provision of information regulatory authorities' websites. *Internal Medicine Journal* 2008 (doi:10.1111/j.445-5994.01588.x).

Sasich LD, Sukkari SR. Unknown risks of pharmacy compounded drugs. *Journal of the American Osteopathic Association* 2008; 108:86 [letter].

**PUBLICATIONS**

Miller J, Olmer J, Sasich LD. Importance and methods for accessing FDA approval packages and briefing documents. *Annals of Pharmacotherapy* 2007; 41:2071-2072.

Sasich LD. Remembering Jere Goyan. *American Journal of Health-System Pharmacists* 2007; 64:1142 [letter].

Sasich LD. Patients may not be receiving Medication Guides. *Scribe – International Society of Pharmacoepidemiology* 2006; 9:8.

Sasich LD. Don't forget to give out MedGuides. *Drug Topics* April 3, 2006.

Sukkari SR, Sasich LD. Patient Information Leaflets. *Canadian Medical Association Journal* 2004; 171:10 [letter].

Sasich LD. Viewpoint - Useful drug information: 20 years and still waiting. *Drug Topics* 2003; 147:17.

Sukkari SR, Sasich LD. Cisapride and patient information leaflets. *Canadian Medical Association Journal* 2001; 164:1276-1278.

Wolfe S, Lurie P, Sasich LD, Barbehenn E. Information on thiazolidinediones. *Lancet* 2000; 356:254-258 [letter].

Lurie P, Sasich LD. Safety of FDA-approved drugs. *Journal of the American Medical Association* 1999; 282:2297 [letter].

Sasich LD. Useful prescription drug information. *American Journal of Health-System Pharmacists* 1999; 56:477-478[letter].

Sasich LD, Sukkari SR.  International Drug Information Notes: Update on cisapride (Prepulsid). *Saudi Pharmaceutical Journal* 1998; 6:270-272.

Wolfe SM, Sasich LD, Barbehenn E. Safety of sildenafil citrate. *The Lancet* 1998;352: 1393 [letter].

Sasich LD, Sukkari SR.  International Drug Information Notes: Old German drugs. *Saudi Pharmaceutical Journal* 1998; 6:160-163.

Bradley L, Sasich, LD, Wolfe SM. The Information Content of Patient Medication Information Leaflets Distributed by Pharmacists: Examination of Five Fluoroquinolone Antibiotics.  *Journal of the American Pharmaceutical Association* 1998; 38:278-279[abstract].

Sasich LD. Book Review: Moore TJ. Prescription for Disaster New York: Simon & Schuster; 1998. *American Journal of Health-System Pharmacists* 1998; 55:511.

Sasich LD, Sukkari SR. International Drug Information Notes: Recent drug withdrawals and proposed withdrawals in the US and UK. *Saudi Pharmaceutical Journal* 6:92-98; 1998.

## PUBLICATIONS

Sasich LD, Wolfe SM, Pearson C, Swankin DA, Levin DA, Levin AA, Beard J.  The National Council on Patient Information and Education.  *Journal of the American Medical Association* 278:1491-1492; 1997[letter].

Sasich LD, Sukkari SR. Bromocriptine: reply to Sandoz. *Saudi Pharmaceutical Journal* 5:197-199; 1997[letter].

Sasich LD, Sukkari SR.  International Drug Information Notes: Fluoroquinolone associated tendinopathy, tendinitis and tendon rupture. *Saudi Pharmaceutical Journal* 5:130-134; 1997.

Sasich LD, Wolfe SM.  Deficiencies in patient information leaflets concerning gastrointestinal complications of nonsteroidal anti-inflammatory drugs. *Journal of General Internal Medicine* 12:79; 1997[abstract].

Sasich LD, Sukkari SR.  International Drug Information Notes: Probucol: lack of efficacy and market withdrawal. *Saudi Pharmaceutical Journal* 5:72-73;1997.

Sasich LD.  Book Review: Power and Dependence. *Saudi Pharmaceutical Journal* 4:212-213; 1996.

Sasich LD, Sukkari SR.  International Drug Information Notes: The lack of safety and efficacy of tramadol (Ultram, Zydol). *Saudi Pharmaceutical Journal* 4:207-209; 1996.

Sasich LD, Sukkari SR.  International Drug Information Notes: Bromocriptine (Parlodel) and postpartum breast engorgement. *Saudi Pharmaceutical Journal* 4:204-207; 1996.

Sukkari SR, Sasich LD, Nicholls PJ. Therapeutic class redundancy as a measure of formulary system effectiveness. *Saudi Pharmaceutical Journal* 4:190-195; 1996.

Sasich LD, Sukkari SR.  International Drug Information Notes: The risk of calcium channel blockers. *Saudi Pharmaceutical Journal* 4:119-122; 1996.

Sukkari SR, Sasich LD, Nicholls PJ.  Promoting therapeutic information to the medical staff: the evidence based formulary. *Saudi Pharmaceutical Journal* 4:48-55;1996.

Sasich LD, Sukkari SR, Nuessle SJ. Post-graduate pharmacy education relevant to developing countries. *WHO Eastern Mediterranean Region Drugs Digest* 10:48-50; 1995.

Sukkari SR, Sasich LD, Nicholls PJ. The formulary as a source of comparative efficacy drug information in developing countries. Proceedings of the European Symposium on Pharmacoeconomics, Gent, Belgium, 18-20 May 1994.

Sasich LD, Sukkari SR. The drug evaluation process at King Faisal Specialist Hospital. *Saudi Pharmaceutical Journal* 2:189-197; 1994.

Nuessle SJ, Sasich LD. Criteria for use of interferon alpha-2a or interferon alpha-2b for selected indications in adults. *American Journal of Hospital Pharmacy* 51:1030-1033; 1994.

## PUBLICATIONS

Sasich LD: Book Review - The Use of Essential Drugs: Model List of Essential Drug (Seventh List) Fifth Report of the WHO Expert Committee. *Annals of Pharmacotherapy* 27:1145; 1993.

Sasich LD: Blood Transfusion-Associated Bacterial Sepsis In: Conner CS, Rumack BH, eds. DRUGDEX® Information System. Denver, CO: Micromedex, Inc., 1992.

Julnes T, Sasich LD. Oregon's health rationing act and the policy process. *New England Journal of Human Services* 9:20-26; 1991.

Sasich LD. Pneumococcal revaccination after splenectomy. *Drug Intelligence and Clinical Pharmacy* 22:722-723; 1988.

Sasich LD. Bleomycin - therapy of malignant pleural effusions In: Conner CS. Rumack BH, eds. DRUGDEX Information System. Denver, CO: Micromedex, Inc. 1987.

Dodson RA, Sasich LD. Calcium channel blockers: their actions and indications. *Pharmacy Times* 50:4; 1984.

Huff MR, Williams L, Crothers RW, Driver PS, Endo RK, Manske TA, Sasich LD. Preventing burnout: an alternative approach. *Hospital Pharmacy* 19; 1983.

Sasich L D. Proposal for a community pharmacy practice residency program. *American Pharmacy* 1983; 23:25-28.

Driver PS, Endo RE, Levin A, Hall DH, Sasich LD. Anaphylactic-like reactions to zomepirac. *Drug Intelligence and Clinical Pharmacy* 15:384; 1981.

Sasich L, Morriss HA. A computerized on-line key word indexing system for drug information retrieval. *Hospital Pharmacy* 16:136; 1981.

Sasich L. Drug literature filing systems for the practicing pharmacist. *The Idaho Pharmacist* 17:16; 1980.

Hansten PD, Sasich LD, Biggs RL, Cohen SM. Computerization and drug interaction data for a community pharmacy. *Journal of Clinical Computing*. 3:270; 1975.


## BOOKS AND CHAPTERS

Furberg BD, Furberg CD, Sasich LD. Knowing Your Medications. 2010.

Sukkari SR, Sasich LD. Drug induced blood disorders. In: Applied Therapeutics: the Clinical Use of Drugs. Young, LY, Koda-Kimble, M eds. Baltimore: Lippincott, Williams & Wilkins, 2008.

Wolfe SM, Sasich LD, Hope R-E. *Worst Pills, Best Pills*. New York: Pocket Books, 2005.

Sasich LD, Sukkari SR. Drug induced blood disorders. In: Applied Therapeutics: the Clinical Use of Drugs. Young, LY, Koda-Kimble, M eds. Baltimore: Lippincott, Williams & Wilkins, 2004.

**BOOKS AND CHAPTERS**

Wolfe SM, Sasich LD, Ardati AK. *Worst Pills, Best Pills Companion*. Washington DC: Public Citizen, 2002.

Sasich LD, Sukkari SR. Drug induced blood disorders. In: Applied Therapeutics: the Clinical Use of Drugs 6th ed. Young, LY, Koda-Kimble, M eds. Baltimore: Lippincott, Williams & Wilkins, 2001.

Wolfe SM, Sasich LD, Hope R-E. *Worst Pills, Best Pills*. New York: Pocket Books, 1999.

References available on request